**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| IN RE: T-MOBILE CUSTOMER DATA SECURITY BREACH LITIGATION | ) ) ) ) ) ) | MDL No. 3019<br><br>Master Case No. 4:21-md-03019-BCW |

**PLAINTIFFS' MOTION AND SUGGESTIONS IN SUPPORT OF MOTION**
**FOR ATTORNEYS' FEES, COSTS, EXPENSES AND SERVICE AWARDS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 2

ARGUMENT .......................................................................................................... 4

I.  THE COURT SHOULD APPROVE THE REQUESTED ATTORNEYS' FEE. ............ 4

    A.  The Percentage-of-the-Fund Approach.................................................... 4

    B.  The Percentage of the Class Benefit Requested by Class Counsel......................... 6

    C.  The Fee Is Reasonable and Supported by the *Johnson* Factors. ............................ 7

    D.  The Requested Fee Is Reasonable Under a Lodestar Crosscheck. ....................... 20

II.  THE COURT SHOULD APPROVE CLASS COUNSEL'S REQUEST FOR REIMBURSEMENT OF REASONABLY INCURRED EXPENSES. ........................... 22

III.  THE COURT SHOULD APPROVE THE REQUESTED SERVICE AWARDS........... 22

CONCLUSION..................................................................................................... 23

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allapattah Servs., Inc. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ................................................................................... 20

*Americas Mining Corp. v. Theriault*,
51 A.3d 1213 (Del. 2012) ......................................................................................................... 21

*Barfield v. Sho-Me Power Elec. Co-op.*,
No. 2:11-CV-4321-NKL, 2015 WL 3460346 (W.D. Mo. June 1, 2015) ................................... 5

*Boeing Co. v. Van Gemert*,
444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) .............................................................. 4

*Caligiuri v. Symantec Corp.*,
855 F.3d 860 (8th Cir. 2017) ................................................................................ 12, 18, 22, 23

*Carnegie v. Household, Int'l*,
376 F.3d 656 (7th Cir. 2004) ................................................................................................... 11

*Custom Hair Designs by Sandy, LLC v. Central Payment Co.*,
Case No. 8:17CV310, 2022 WL 3445763 (D. Neb. Aug. 17, 2022) ........................................ 18

*Equifax Inc. Customer Data Sec. Breach Litig.*
2020 WL 256132 (N.D. Ga. Mar. 17, 2020) ................................................................... *passim*

*Farrell v. Bank of Am. Corp.*, N.A.,
827 F. App'x 628 (9th Cir. 2020) ............................................................................................. 21

*Gardiner v. Walmart, Inc.*,
Case No. 20-cv-04618-JSW, 2021 WL 4992539 (N.D. Cal. July 28, 2021) ..................... 11, 13

*George v. Academy Mortgage Corporation (UT)*,
369 F. Supp. 3d 1356 (N.D. Ga. 2019) ................................................................................... 13

*Gordon v. Chipotle Mexican Grill, Inc.*,
No. 17-cv-01415-CMA-SKC, 2019 WL 6972701 (D. Colo. Dec. 16, 2019) ........................... 12

*Hammond v. The Bank of New York Mellon Corp.*,
No. 08 Civ. 6060 (RMB) (RLE), 2010 WL 2643307 (S.D.N.Y. June 25, 2010) ............... 11, 13

*Hardman v. Bd. of Educ. of Dollarway, Arkansas Sch. Dist.*,
714 F.2d 823 (8th Cir. 1983) ..................................................................................................... 6

*Health Republic Ins. Co. v. United States*,
156 Fed. Cl. 67 (2021) ........................................................................................................ 5, 21

ii

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) ................................................................................................ 7

*Huang v. Spector,*
    142 S. Ct. 431, 211 L. Ed. 2d 254 (2021) ............................................................. 19

*Huyer v. Buckley,*
    849 F.3d 395 (8th Cir. 2017) .................................................................................. 18

*Huyer v. Njema,*
    847 F.3d 923 (8th Cir. 2017) .................................................................................. 23

*In re Airline Ticket Commission Antitrust Litig.,*
    953 F. Supp. 280 (D. Minn. 1997) ......................................................................... 18

*In re Anthem, Inc. Data Breach Litig.,*
    Case No. 15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) .............. 6, 8, 18

*In re Capital One Consumer Data Sec. Breach Litig.,*
    488 F. Supp. 3d 374 (E.D. Va. 2020) .................................................................... 13

*In re Charter Commc'ns, Inc., Sec. Litig.,*
    No. 4:02-cv-1186-CAS, 2005 WL 4045741 (E.D. Mo. Jun. 30, 2005) .................... 21

*In re Checking Acct. Overdraft Litig.,*
    830 F. Supp. 2d 1330 (S.D. Fla. 2011) ................................................................. 20

*In re Equifax Inc. Customer Data Sec. Breach Litig.,*
    999 F.3d 1247 (11th Cir. 2021) .............................................................................. 19

*In re Equifax, Inc., Customer Data Sec. Breach Litig.,*
    362 F. Supp. 3d 1295 (N.D. Ga. 2019) ................................................................. 13

*In re Google Inc. Cookie Placement Consumer Priv. Litig.,*
    806 F.3d 125 (3d Cir. 2015) ............................................................................ 11, 13

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.,*
    440 F. Supp. 3d 447 (D. Md. 2020) ....................................................................... 13

*In re Media Vision Tech. Sec. Litig.,*
    913 F. Supp. 1362 (N.D. Cal. 1996) ...................................................................... 22

*In re Merry-Go-Round Enters. Inc.,*
    244 B.R. 327 (Bankr. D. Md. 2000) ....................................................................... 21

*In re Monosodium Glutamate Antitrust Litig.,*
    No. Civ. 00MDL1328PAM, 2003 WL 297276 (D. Minn. Feb. 6, 2003) ................... 18

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005) ................................................................. 21

*In re Sonic Corp. Customer Data Sec. Breach Litig.*,
   No. 1:17-md-2807, MDL No. 2807, 2019 WL 3773737 (N.D. Ohio Aug. 12, 2019) ............ 12

*In re Target Corp. Customer Data Security Breach Litig.*
   892 F.3d 968 (8th Cir. 2018) ................................................................. *passim*

*In re UnitedHealth Group Inc. PSLRA Litig.*,
   643 F. Supp. 2d 1094 (D. Minn. 2009) ................................................................. 7

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   2017 WL 1047834 (N.D. Cal. Mar 17, 2017) ................................................................. 20

*In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litig.*,
   364 F. Supp. 2d 980 (D. Minn. 2005) ................................................................. *passim*

*In re Yahoo! Inc. Customer Data Security Breach Litig.*,
   Case No. 16-MD-02752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020) ................ 8

*Johnson v. Ga. Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974) ................................................................. 5, 14

*Johnston v. Comerica Mortg. Corp.*,
   83 F.3d 241 (8th Cir. 1996) ................................................................. 5

*Keil v. Lopez*,
   862 F.3d 685 (8th Cir. 2017) ................................................................. 20

*Petrovic v. Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir.1999) ................................................................. 5, 21

*Pruchnicki v. Envision Healthcare Corp.*,
   845 F. App'x 613 (9th Cir. 2021) ................................................................. 11, 13

*Rawa v. Monsanto Co.*,
   934 F.3d 862 (8th Cir. 2019) ................................................................. 4, 21

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
   No. Civ. A. 03–4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) ................ 21

*Swinton v. SquareTrade, Inc.*,
   454 F. Supp. 3d 848 (S.D. Iowa 2020) ................................................................. 5, 14

*Tussey v. ABB, Inc.*,
   No. 06-CV-04305-NKL, 2019 WL 3859763 (W.D. Mo. Aug. 16, 2019) ................ *passim*

iv

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ................................................................. 5

*Watkins v. Spector*,
  142 S. Ct. 765, 211 L. Ed. 2d 479 (2022) ......................................... 19

*West v. PSS World Med., Inc.*,
  2014 WL 1648741 (E.D. Mo. Apr. 24, 2014) ...................................... 5

*Yarrington v. Solvay Pharms., Inc.*,
  697 F. Supp. 2d 1057 (D. Minn. 2010) ............................... 6, 10, 14, 22

**Rules**

Federal Rules of Civil Procedure 23 and 54 .............................................. 4

**Other Authorities**

1 Attorney Fee Awards § 2:19 (3d ed.) ..................................................... 22

*Attorney Fees in Class Action: 2009–2013*,
  92 N.YU. L. Rev. 937 (2017) ............................................................ 19

*Court Awarded Attorneys Fees, Report of the Third Circuit Task Force*,
  108 F.R.D. 237 (3rd Cir. 1985) ........................................................... 5

*Manual for Complex Litigation* § 14.121 (4th ed. 2004) .............................. 5

# **INTRODUCTION**

Class Counsel have dedicated substantial time and expense on a purely contingent basis to deliver one of the largest data breach settlements of all time—one that creates a $350,000,000 non-reversionary fund and requires T-Mobile to spend an additional $150,000,000 over the next two years to improve data security. Counting those two figures alone, the settlement is worth $500,000,000. The extensive Identity Defense Services and Restoration Services, also made available to every Class Member, push the value of the benefits conferred on the Class even higher.

Class Counsel obtained this historic result in the face of numerous risks, including navigating a novel and rapidly developing legal landscape under multiple states' varying laws and T-Mobile's potential arbitration defenses, among other obstacles, all of which likely would have presented considerable litigation challenges and uncertainty. Had the case not settled when it did, there assuredly would have been protracted, tooth-and-nail litigation with sophisticated defense counsel that could have extended this case another half decade or more, with no guarantee of achieving a better (or even comparable) result. The failure to reach a settlement at this stage of the litigation would have meant fierce and extended motion practice, including many months of fact discovery and expensive expert discovery, the potential for interlocutory appeals, and lengthy stays of the litigation. At every turn, the threat of non-recovery for the Class would have been significant. Obtaining this recovery required committed and engaged counsel who could both recognize these challenges and communicate the common interest with T-Mobile in overcoming them to successfully resolve this case at this early juncture.

To compensate Class Counsel for achieving the extraordinary result that might normally only be obtained following a full and successful litigation on the merits and appeal, Class Counsel respectfully request, pursuant to Federal Rules of Civil Procedure and the negotiated Settlement

1

Agreement, a fee of 22.5%[1] of the $350 million cash Settlement Fund (or 15.75% of T-Mobile's total cash commitment of $500 million) and expenses in the amount of $147,982.55. Given the extraordinary results in this case, the fee request is reasonable and should be approved under well-established Eighth Circuit's precedent. A lodestar crosscheck, although not required (and disfavored by several courts), also supports the requested fee award. Furthermore, Class Counsel's expenses were reasonable and necessarily incurred on behalf of the Class. Thus, Class Counsel respectfully request that their Motion for fees and expenses be approved in full.

Class Counsel also request that the Court approve modest service awards of $2,500 to each Class Representative, as provided by the Settlement, to compensate them for their efforts on behalf of the Class. The Class Representatives were not only victims of the data breach, but also provided key support to the litigation, including helping to develop and review the factual allegations in the complaint, and providing key guidance with respect to the Settlement. The awards are both legally and factually warranted.[2]

## FACTUAL BACKGROUND

On August 16, 2021, T-Mobile announced a data breach initially thought to affect the personal identifying information ("PII") of 50 million of its past, current, and prospective customers ("T-Mobile Data Breach").[3] (Doc. 128, Compl. ¶¶ 6, 98.) A November 2021 T-Mobile

---

[1] The Settlement Agreement allows Class Counsel to request up to 30% of the Settlement Fund. Following consultation with experts and review of the case law set forth in this Memorandum, however, Class Counsel conservatively request a reduced fee of 22.5%. (*See* Ex. 1, Class Counsel Declaration, ¶¶ 17, 29).

[2] In support of this motion, Plaintiffs rely upon a Declaration of Class Counsel (Ex. 1), as well as the Declaration of Brian Fitzpatrick (Ex. 2). Additionally, Class Counsel rely upon prior declarations, including from Class Counsel (Doc. 158-3), and from Gerald Thompson on behalf of Pango, the provider of the Identity Defense Services and Restoration Services (Doc. 158-7).

[3] Consistent with the 2018 amendments to Rule 23 calling for "frontloading" of information related to a class settlement, Plaintiffs' suggestions in support of preliminary approval and its supporting

filing with the Securities and Exchange Commission admitted that an additional 26 million individuals' PII had been compromised. (*Id.* ¶ 104.) T-Mobile's customers' PII appeared on the dark web for sale, and many customers suffered actual and attempted identity theft and fraud. (*Id.* ¶¶ 8–71, 135–48.)

Class Counsel and other attorneys filed dozens of lawsuits across the country.[4] Following motions practice before the Judicial Panel on Multidistrict Litigation ("JPML"), the litigation was centralized before this Court on December 3, 2021. (JPML Doc. 98.) After an application process, this Court appointed three Co-Lead Class Counsel and a Plaintiffs' Executive Committee (Doc. 102.) Class Counsel and the Executive Committee thoroughly vetted hundreds of potential class representatives, investigated the factual circumstances of the data breach, researched the substantive laws of every state, coordinated with other counsel representing individuals who had filed actions against T-Mobile, and subsequently filed a consolidated 336-page amended complaint on May 11, 2022. (Doc. 128.) Class Counsel then negotiated various discovery orders and exchanged numerous documents in extensive informal discovery with T-Mobile to ensure meaningful settlement discussions were possible. (Doc. 158-3, ¶ 23.) Following two full days of hard-fought negotiation overseen by a highly respected retired federal magistrate judge, Class Counsel and T-Mobile reached an agreement in principle to the terms that eventually became the final Settlement Agreement. (*Id.* ¶ 24.)

In the months since the Court granted preliminary approval of the settlement and approved notice, Class Counsel have remained hard at work. Class Counsel have spent considerable time

---

documentation describe the background of this litigation and Class Counsel's work to that point in greater detail.

[4] Class Counsel's work in delivering this settlement is well documented in their declarations. (Doc. 158-3, ¶¶ 12–26; *see also* Ex. 1, ¶¶ 3–16.)

overseeing the claims and notice programs, including negotiating the terms and specifics of the notice; answering questions from Settlement Class Members; and working on necessary papers to be filed before the final approval hearing. (Ex. 1, ¶¶ 26-28.)

Importantly, Class Counsel's work will not end once the settlement is finally approved or even after any potential appeals are resolved. (*Id.* ¶¶ 41, 53-54.) Class Counsel's oversight obligations and other responsibilities will continue until the settlement is fully implemented, which will not occur until many years in the future. (*Id.*) Identity Defense Services and Restoration Services will be available to Class Members for two more years following the effective date of the Settlement. (*Id.* ¶ 22.) And the claims administration program will continue throughout this entire period. (*See id.* ¶ 28.) Once the settlement administrator begins verifying the claims that have been and will be made, Class Counsel will need to monitor the process, communicate with impacted Settlement Class Members, and participate in the dispute resolution process established by the Settlement. (*Id.* ¶ 28.) Class Counsel anticipate incurring lodestar of at least $2,200,000 in ongoing time expended to monitor and implement the Settlement after this petition is filed. (*Id.* ¶ 54.)

## ARGUMENT

## I.     THE COURT SHOULD APPROVE THE REQUESTED ATTORNEYS' FEE.

### A.     The Percentage-of-the-Fund Approach.

When Class Counsel have negotiated a class action settlement, they are entitled to petition the Court to award attorneys' fees and costs for their success. "Under the 'common fund' doctrine, Class Counsel is entitled to an award of reasonable attorneys' fees from the settlement proceeds." *Tussey v. ABB, Inc.*, No. 06-CV-04305-NKL, 2019 WL 3859763, at *2 (W.D. Mo. Aug. 16, 2019) (citing Fed. R. Civ. P. 23(h); *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

District courts in this Circuit typically use the "percentage-of-the-fund method" in awarding attorneys' fees in a common-fund case such as this. *See, e.g., Rawa v. Monsanto Co.*,

934 F.3d 862, 870 (8th Cir. 2019). "In the Eighth Circuit, use of a percentage method of awarding attorney fees in a common-fund case is not only approved, but also 'well established.'" *In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litig. ("Xcel Energy")*, 364 F. Supp. 2d 980, 991 (D. Minn. 2005) (quoting *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999)). Indeed, some courts have suggested that using the "'percentage of the fund method may be preferable.'" *Barfield v. Sho-Me Power Elec. Co-op.*, No. 2:11-CV-4321-NKL, 2015 WL 3460346, at *3 (W.D. Mo. June 1, 2015) (quoting *West v. PSS World Med., Inc.,* No. 4:13 CV 574 CDP, 2014 U.S. Dist. LEXIS 57150, at *3, 2014 WL 1648741 (E.D. Mo. Apr. 24, 2014)); *see also Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 245 (8th Cir. 1996) ("[T]he Task Force recommended that the percentage of the benefit method be employed in common fund situations." (citing *Court Awarded Attorneys Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237, 255 (3rd Cir. 1985)).[5]

"[T]he ultimate reasonableness of the award is evaluated by considering relevant factors from the twelve factors listed in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 719–20 (5th Cir. 1974)." *In re Target Corp. Customer Data Security Breach Litig. ("Target")*, 892 F.3d 968, 977 (8th Cir. 2018) (cleaned up). To be sure, "[m]any of the *Johnson* factors are related to one another and lend themselves to being analyzed in tandem." *Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848, 886 (S.D. Iowa 2020). Therefore, courts in the Eighth Circuit often focus on the

---

[5] In this regard, the percentage-of-the-fund method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation," while "[i]n contrast, the lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (quotations omitted); *see also Health Republic Ins. Co. v. United States*, 156 Fed. Cl. 67, 76 (2021) (noting the lodestar method "'is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation,' and it creates incentives for inefficiency" (quoting *Manual for Complex Litigation* § 14.121 (4th ed. 2004))).

most relevant *Johnson* factors in evaluating fee requests. *See Xcel Energy*, 364 F. Supp. 2d at 993; *Tussey*, 2019 WL 3859763, at *2; *Yarrington v. Solvay Pharms., Inc.*, 697 F. Supp. 2d 1057, 1062 (D. Minn. 2010); *see also Hardman v. Bd. of Educ. of Dollarway, Arkansas Sch. Dist.*, 714 F.2d 823, 825 (8th Cir. 1983).[6] These are discussed in more detail below.

### B. The Percentage of the Class Benefit Requested by Class Counsel.

The requested fee of $78.75 million represents 22.5% of the $350 million common fund. (Ex. 1, ¶ 17.) However, that percentage is not a true measure of the fee as a percentage of the benefits conferred on the Class as it fails to account for other significant settlement benefits. When considering the entirety of the settlement's benefits, the fee percentage is much lower.

For example, in addition to the $350 million fund, T-Mobile has committed to investing another $150 million in data security for 2022 and 2023 above baseline levels. (*Id.* ¶ 24.) This benefits all members of the Class by reducing the risk of another data breach and thus should be considered as a meaningful benefit to the Class. *See Equifax Inc. Customer Data Sec. Breach Litig. ("Equifax")*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *38 (N.D. Ga. Mar. 17, 2020) (explaining that courts "routinely consider" the value of "business practice changes" including the "minimum" increased expenditure on "data security and related technology"), *aff'd in part, rev'd in part and remanded*, 999 F.3d 1247 (11th Cir. 2021), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431, 211 L. Ed. 2d 254 (2021), and *cert. denied sub nom. Watkins v. Spector*, 142 S. Ct. 765, 211 L. Ed. 2d 479 (2022); *In re Anthem, Inc. Data Breach Litig.*, Case No. 15-MD-02617-LHK, 2018 WL 3960068, at *28 (N.D. Cal. Aug. 17, 2018) (finding that "minimum cybersecurity expenditures" were "properly considered in determining an appropriate attorneys' fees award").

---

[6] The nature of the attorney-client relationship does not apply and thus can be disregarded or treated as neutral in considering the fee.

When the larger cash expenditure by T-Mobile is considered, the requested fee falls to just 15.75% of the cash considerations in the Settlement. (Ex. 1, ¶ 44.)

Moreover, it is also appropriate to consider the retail value of the Identity Defense Services and Restoration Services the Settlement provides, which push the value of the settlement much higher. *See Equifax*, 2020 WL 256132, at *38 ("[C]ourts have often recognized the benefit of credit monitoring, use its retail cost as evidence of value, and consider that value in awarding fees."). The Identity Defense Services and Restoration Services the Settlement provides are sold at retail for $96 per year. (Ex. 1, ¶ 25; Doc. 158-7, ¶ 5.) Thus, the value of this benefit is approximately $146 million for every 1% of Settlement Class Members who elect to receive those services. (Ex. 1, ¶ 25; Doc. 158-3, ¶ 37.) In other words, if just 1% of Settlement Class Members take advantage of Identity Defense Services and Restoration Services, the requested fee would be around 12% of the Settlement's total value. (Ex. 1, ¶ 25.)

**C.      The Fee Is Reasonable and Supported by the *Johnson* Factors.**

Whether contemplated as 22.5% of the $350 million cash fund, 15.75% of T-Mobile's $500 million cash outlay, or some lower percentage of the larger sum of the benefits conferred on the Class, the requested fee is more than reasonable under the *Johnson* factors.

(1) The benefits conferred on the Settlement Class are extraordinary.

First and foremost, the settlement represents a significant recovery for the Class. "In considering a fee award, the 'most critical factor' is 'the degree of success obtained.'" *In re UnitedHealth Group Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1104 (D. Minn. 2009) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 436 (1983)).

The $350 million settlement fund is one of the largest data breach settlements in history, second only to the $380 million fund in *Equifax*. Importantly, however, the per capita recovery is much higher here than in *Equifax*—nearly double—as there are approximately 76.6 million Class

7

Members here, and there were more than 147 million class members in *Equifax*. *See Equifax*, 2020 WL 256132, at *1, *34 n.50 (weighing the high per capita recovery for the class in favor of approving the fee application and comparing the *Equifax* settlement to the settlement in *In re Anthem* which "resulted in a $115 million fund for a class of 80 million individuals"); *see also In re Yahoo! Inc. Customer Data Security Breach Litig.*, Case No. 16-MD-02752-LHK, 2020 WL 4212811, at *33–34 (N.D. Cal. July 22, 2020) (considering the Yahoo! settlement fund an "unremarkable" recovery in part based upon a comparison of the $117.5 million settlement for 194 million class members there with the much larger "per-capita recovery" of the $115 million settlement for 79 million class members in *Anthem*). The settlement here is *three times larger* than the *Anthem* settlement, which involved a similar number of class members. *See Anthem*, 2018 WL 3960068, at *10 ("Whether one looks at absolute or per-capita numbers, a settlement fund of $115 million for approximately 79.15 million class members is significant.").

The larger per capita recovery here yields tangible benefits. For instance, the fund here provides cash reimbursement up to $25,000 for unreimbursed out-of-pocket payments spent to avoid or recover from fraud or identity theft that is fairly traceable to the T-Mobile Data Breach.[7] That is 25% more than the $20,000 compensation for out-of-pocket of losses in *Equifax*. *See Equifax*, 2020 WL 256132, at *34. The Settlement also allows for Class Members to obtain

---

[7] As set forth in Plaintiffs' Motion for Preliminary Approval, the fund covers a broad array of costs, including but not limited to: money spent to place or remove a security freeze on credit reports; money spent on credit monitoring or identity theft protection; unreimbursed costs, expenses, losses or charges paid because of identity theft or identity fraud, falsified tax returns, or other alleged misuse of personal information; professional fees incurred to address identity theft, fraud, or falsified tax returns that are fairly traceable to the data breach; and other miscellaneous expenses fairly traceable to the data breach. (Doc. 158, at 6–7; Doc 158-3, ¶ 30.)

expensive Identity Defense Services and Restoration Services.[8] As with compensation for out-of-pocket losses and lost time, these services help prevent more serious losses from occurring and will make Class Members whole if losses occur. The $350 million settlement fund also reimburses Class Members for time (up to 15 hours, depending on the circumstances) spent to avoid or recover from fraud or identity theft, or other misuse of Class Member personal information, that is fairly traceable to the T-Mobile Data Breach. It does so at the greater of $25 per hour or the Class Member's hourly wage if the Class Member took time off work.

These benefits are valuable. The Settlement is designed to make Class Members whole for time spent and expenses incurred to avoid fraud or to recover from identity theft and other harm. As described below, it is difficult to litigate that aspect of a claim on a disputed class-wide basis. Moreover, the Settlement here also provides for an alternative cash payment of $25 for Class Members—and $100 for Settlement Class Members who resided in California at the time of the data breach. Not only may Settlement Class Members elect to obtain the alternative cash payment and forgo submitting documentation to obtain out-of-pocket losses and/or lost time, those who do make claims for out-of-pocket losses and/or lost time will be entitled to the *greater* of the approved claim for out-of-pocket losses and/or lost time or the amount available under the alternative cash payment provision. And no money will revert to T-Mobile. If the value of the approved claims is

---

[8] The suite of Identity Defense Services includes two years of credit monitoring through TransUnion, monthly credit score, real time inquiry/authentication alerts, high risk transaction monitoring, dark web monitoring, USPS address change monitoring and alerts, lost wallet protection, security freeze capability, $1,000,000 in comprehensive identity theft insurance, customer support and victim assistance. Restoration Services includes two years of access to U.S.-based fraud resolution specialists who can assist with important tasks such as placing fraud alerts with the credit bureaus, disputing inaccurate information on credit reports, scheduling calls with creditors and other service providers, and working with law enforcement and government agencies to dispute fraudulent information. (Doc. 158, at 7–8; Doc 158-3, ¶¶ 31–32.)

9

less than the total value of the net Settlement Fund, qualified claimants will receive additional compensation on a *pro rata* basis.

Independent of the $350 million settlement fund, T-Mobile has agreed to an incremental spending commitment of at least $150 million for data security and related technology, in the aggregate, for years 2022 and 2023 above its previously budgeted baseline. These are the kinds of "meaningful" business changes that justify a greater fee award. *See Xcel Energy*, 364 F. Supp. 2d at 1003. This is so because they will "provide[] a substantial benefit to all class members." *Equifax*, 2020 WL 256132, at *34.

(2) <u>Class Counsel faced numerous and substantial risks.</u>

Making the degree of success even more remarkable, Class Counsel obtained an outstanding settlement in the face of substantial risks. "'Courts have recognized that the risk of receiving little or no recovery is a major factor in awarding attorney fees.'" *Yarrington*, 697 F. Supp. 2d at 1062 (quoting *Xcel Energy*, 364 F. Supp. 2d at 994). "Unless that risk is compensated with a commensurate award, no firm, no matter how large or well-financed, will have the incentive to consider pursuing a case such as this." *Tussey*, 2019 WL 3859763, at *3. Critically, "[t]he risks plaintiffs' counsel faced must be assessed as they existed in the morning of the action, not in light of the settlement ultimately achieved at the end of the day." *Xcel Energy*, 364 F. Supp. 2d at 994.

One risk in particular stands out and made this case particularly undesirable to many lawyers: unlike in other data breach cases, most Class Members are current and former T-Mobile customers and T-Mobile asserted that its Terms and Conditions of Services require customers to individually arbitrate their claims against T-Mobile. Throughout the litigation, T-Mobile contended that these arbitration provisions were ironclad—and the provisions may indeed have been enforceable for a significant number of Class Members. The combination of T-Mobile's arbitration and other defenses, along with potentially individualized damages, make this litigation

10

precisely the kind that is difficult or impossible to redress without a class settlement. *Cf. Carnegie v. Household, Int'l*, 376 F.3d 656, 661 (7th Cir. 2004) ("It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $15 to $30. . . . The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits . . . ." (emphasis in original)).

Apart from what would surely have been a fiercely litigated motion to compel arbitration, Class Counsel faced other daunting risks. For one, T-Mobile disputed whether the majority of Class Members had suffered any legally cognizable injuries, including with respect to risk of future identity theft, *see Hammond v. The Bank of New York Mellon Corp.*, No. 08 Civ. 6060 (RMB) (RLE), 2010 WL 2643307, at *13 (S.D.N.Y. June 25, 2010) (collecting cases), diminution in value of personal information, *see In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 149, 152 (3d Cir. 2015), lost time spent preventing or recovering from identity theft, *see Pruchnicki v. Envision Healthcare Corp.*, 845 F. App'x 613, 614–15 (9th Cir. 2021) (Mem.), and out-of-pocket costs (to the extent they could not be shown to be reasonable or necessary), *see Gardiner v. Walmart, Inc.*, Case No. 20-cv-04618-JSW, 2021 WL 4992539, at *4–5 (N.D. Cal. July 28, 2021). T-Mobile would also have vigorously disputed whether Class Members' damages were proximately caused by its conduct since: (1) the data breach was the result of a criminal, third-party cyberattack; and (2) the numerous other breaches of PII (including, in some cases, the personal information of hundreds of millions of individuals) in other data breaches spread across other sectors would make it difficult to trace any instance of identity theft to the T-Mobile Data Breach as opposed to another data breach.

Furthermore, T-Mobile indicated it would dispute whether it owed a duty to safeguard the confidential PII of its current, former, and prospective customers, and would have fiercely litigated

the Class's negligence, contract/quasi-contract, invasion of privacy, and statutory claims. The merits issues of various claims in data breach litigation are developing, sometimes in divergent ways in different states. This would not only have made the litigation more complex, but it also could also have exposed some of the Class's claims to challenging summary judgment motions.

In short, this litigation would have entailed serious risks for the Class and Class Counsel at every turn. To be sure, Class Counsel strongly believe they could have overcome these risks—but doing so would not have been easy, and success was far from guaranteed. Even if Plaintiffs were successful, appeals would have been inevitable. In this regard, Class Counsel took this case entirely on a contingency basis, which weighs in favor of approving the requested fee. *See Caligiuri v. Symantec Corp.*, 855 F.3d 860, 866 (8th Cir. 2017) (affirming fee award where lower court reasoned, in part, that "[p]laintiffs' counsel, in taking this case on a contingent fee basis, was exposed to significant risk"); *accord Equifax*, 2020 WL 256132, at *33 ("This action was prosecuted on a contingent basis and thus a larger fee is justified."); *see also Target*, 892 F.3d at 977 n.7 (considering "whether the fee is fixed or contingent"). If Class Counsel had not achieved a recovery, they would have received nothing and instead would have suffered a substantial out-of-pocket loss. The Class itself would have recovered nothing as well.

(3) Data breach litigation, particularly on a national scale, is novel and complex.

Data breach litigation, particularly when it involves a breach of consumer data on a nationwide scale by a company the size of T-Mobile, is difficult and presents cutting edge issues. *See Gordon v. Chipotle Mexican Grill, Inc.*, No. 17-cv-01415-CMA-SKC, 2019 WL 6972701, at *1 (D. Colo. Dec. 16, 2019) ("Data breach cases . . . are particularly risky, expensive, and complex."); *accord In re Sonic Corp. Customer Data Sec. Breach Litig.*, No. 1:17-md-2807, MDL No. 2807, 2019 WL 3773737, at *7 (N.D. Ohio Aug. 12, 2019).

12

The "novelty and difficulty of the issues" here favor approving the requested fee, particularly because the novelty and difficulty "created significant risk for Class Counsel." *George v. Academy Mortgage Corporation (UT)*, 369 F. Supp. 3d 1356, 1378 (N.D. Ga. 2019). Indeed, the risks identified above illustrate the novelty and difficulty of the issues in this case. *See Equifax*, 2020 WL 256132, at *32 ("[T]his case involved many novel and difficult legal questions, such as the threshold issue of whether [the defendant] had a duty to protect plaintiffs' personal data, whether plaintiffs' alleged injuries are legally cognizable and were proximately caused by the [data] breach, . . . [and] the meaning of various state consumer protection statutes . . . .").

As was true just over two years ago, "[t]he law in data breach litigation remains uncertain and the applicable legal principles have continued to evolve . . . ." *Id.* There have been a handful of recent decisions on motions to dismiss data breach claims upholding these claims. *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447 (D. Md. 2020); *In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374 (E.D. Va. 2020); *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295 (N.D. Ga. 2019). However, other recent decisions have gone the other way. *See Pruchnicki*, 845 F. App'x at 614–15; *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d at 149, 152; *Gardiner*, 2021 WL 4992539, at *4–5; *Hammond*, 2010 WL 2643307, at *13. During this time, state law statutory claims have continued to evolve, creating thorny questions of whether and how the new statutes can be applied to data breach litigation.

(4) <u>Class Counsel's efficient resolution of this litigation.</u>

The timeliness with which Class Counsel obtained this extraordinary relief on behalf of the Class is independently valuable and weighs in favor of a substantial fee.[9] Efficiency—and providing expeditious relief—is best for the Class, the Court, and the Defendant. *See Yarrington*, 697 F. Supp. 2d at 1062 ("[T]he Settlement Class will receive settlement benefits faster than they would receive awards obtained after trial and a likely appeal."); *Xcel Energy*, 364 F. Supp. 2d at 1001 ("[C]ontinued litigation, which could have extended several years, would have delayed recovery by the Class. Instead, the settlement immediately confers benefits."). Indeed, "time limitations imposed by the client or the circumstances" (*see Target*, 892 F.3d at 977 n.7) is a factor weighing in favor of a larger fee award. *See Equifax*, 2020 WL 256132, at *33 ("Priority work done under significant time pressure is entitled to additional compensation and justifies a larger percentage of the recovery."); *accord Johnson*, 488 F.2d at 718.

Efficient resolution in data breach litigation is particularly important. First, the release of confidential data puts the Class immediately at risk, meaning the injunctive and monitoring components of the Settlement can have the most impact when delivered as near as possible to the breach. Second, Class Members can be harmed in the future,[10] which likewise can be addressed through early implementation of extended Identity Defense Services provided under the

---

[9] To be sure, efficient resolution is not an indication that victory was assured. *See Swinton*, 454 F. Supp. 3d at 886 ("[A]lthough the parties agreed to a settlement early on in the litigation, this was not an easy case.").

[10] The U.S. Government Accountability Office has determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years." United States Gov't Accountability Office, *Data Breaches Are Frequent, But Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737, at 29 (June 2007), *available at*: https://www.gao.gov/assets/gao-07-737.pdf.

14

Settlement. Further, even Class Members that do not make a claim will have access to the Restoration Services, which will provide immediate access to help any Class Member who suffers fraud or identity theft. Lastly, achieving an early result means more Class Members will have necessary records readily available to make documented claims.

Notably, Class Counsel has already expended more than 8,225 hours on this litigation. That work involved engaging with clients, investigating the circumstances of the T-Mobile Data Breach, researching multiple states' statutory and common laws, working with several experts in the field to develop liability and damages theories, drafting and filing a complaint that set forth— in granular detail—the factual circumstances of the T-Mobile Data Breach and legal recoveries the Class pursued, working with other counsel who filed similar complaints, resolving MDL and forum issues before the JPML, working with representative Plaintiffs throughout the litigation, informal discovery, mediating the case with T-Mobile, and providing notice to Class Members. The full measure of time devoted to this effort contributed directly to the extraordinary relief the settlement provides.[11] As was true in *Xcel Energy*:

> But for the cooperation and efficiency of counsel, the lodestar of plaintiffs' counsel would have been substantially more and would have required this court to devote significant judicial resources to its management of the case. Instead, counsel moved the case along expeditiously, and the court determines that the time and labor spent to be reasonable and fully supportive of the [requested] attorney fee.

364 F. Supp. 2d at 996; *accord Equifax*, 2020 WL 256132, at *32 ("[T]he amount of work devoted to this case by class counsel likely was a principal reason that they were able to obtain such a favorable settlement at a relatively early stage.").

---

[11] But for this case, Class Counsel would have spent significant time on other matters. *See Target*, 892 F.3d at 977 n.7 (considering "the preclusion of employment by the attorney due to acceptance of the case"). The intensity with which the case was litigated, mediated, and settled demanded Class Counsel's full attention, and work could not be delegated to less experienced lawyers. Accordingly, a larger fee is justified.

15

Likewise, Class Counsel anticipates spending at least another 3,000 hours over the next several years litigating appeals, administering the settlement, managing the claims process, and responding to inquiries from Class Members. The estimate of 3,000 future hours is likely conservative. After the final approval hearing, Class Counsel reasonably expect they will spend 1,000 hours litigating any appeals. Further, if the three Class Counsel firms each spend only five hours per week on average overseeing the notice and claims processes and communicating with the various stakeholders over the next several years, that is an additional 1,500 hours. Finally, if Class Counsel must engage with 1% of the expected claims as part of the claims review process, it is likely that Class Counsel will spend more than 1,000 hours in post-final approval time on claims review alone. In Equifax, class counsel spent more than 8,000 hours at a lodestar of $6,000,000 following the submission of the fee application. (Ex. 1, ¶¶ 41, 53-54); *see Equifax*, 2020 WL 256132, at *32 (finding that "the work that class counsel . . . estimate they will do" with respect to "managing the claims process and administering the settlement" "weighs in favor of approval of the requested fee" in light of "the magnitude of the settlement and the number of claims"). As with the substantial amount of time Class Counsel expended to efficiently resolve this litigation, the significant commitment of time in the future supports Class Counsel's requested fee.

(5) <u>Class Counsel and defense counsel are both exceptionally skilled.</u>

Both the Class and T-Mobile have been represented by highly skilled and reputable attorneys. *See Target*, 892 F.3d at 977 n.7 (considering "the experience, reputation, and ability of the attorneys"). The Class is represented by Norman Siegel of Stueve Siegel Hanson LLP, James

16

Pizzirusso of Hausfeld LLP, and Cari Laufenberg of Keller Rohrback L.L.P.[12] (Ex. 1, ¶¶ 1, 6; Doc. 158-3, ¶¶ 3–11.) As was true in *Tussey*, "[o]ther courts have also recognized the skill and benefits conferred by [C]lass [C]ounsel." *Tussey*, 2019 WL 3859763, at *3; see also Ex. 1, ¶ 51 n.4. Indeed, some of the Class Counsel here represented the plaintiffs in *Equifax*, where the court emphasized:

> Plaintiffs' legal team includes lawyers from some of the most experienced and skilled class action law firms in the country who have collectively handled more than 50 data breach cases, including all of the most significant ones. Their experience and skill was needed given the scope of the case and the quality of the opposition.

2020 WL 256132, at *33. To the *Equifax* court's latter point, T-Mobile is represented by Alston & Bird. Alston & Bird has provided capable and experienced defense in numerous data breach cases. In other words, Class Counsel faced "well-funded defendants represented by highly-qualified national attorneys," which justifies a higher fee award. *Tussey*, 2019 WL 3859763, at *3. Class Counsel's achievement of outstanding relief for the Class here demonstrates that they possessed "the skill requisite to perform the legal service properly." *Target*, 892 F.3d at 977 n.7.

(6) <u>The reaction of the Class supports Class Counsel's requested fee.</u>

Now nearly a month into the notice process, there have been limited objections to the requested fee, which assumed the request would amount to 30% of the fund. Class members wishing to object to this fee motion (reflecting the lower 22.5% of the cash fund) must notify the court by December 8, 2022, at which time Class Counsel will respond to any valid objections.

---

[12] Like the Co-Lead Counsel above, the other attorneys serving as Interim Leadership Counsel, as appointed by this Court, "exhibit impressive qualifications and the necessary commitment to zealous representation," (Doc. 102), and their hard work has appreciably advanced this litigation. (Ex. 1, ¶¶ 6, 50 & Ex. C.)

17

(7) <u>The requested fee is less than or comparable to other awards in the Eighth Circuit and other awards in data breach cases.</u>

The requested fee is in line with—if not substantially lower than—awards in other class actions that have resulted in similarly impressive settlements. In assessing this factor, Eighth Circuit courts look to similar fee awards in class actions within the Eighth Circuit generally, as well as to fee awards in similar litigations in other circuits. *See Xcel Energy*, 364 F. Supp. 2d at 998.

In the Eighth Circuit, courts have "frequently awarded attorneys' fees ranging up to 36% in class actions." *Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017).[13] Here, even if the fee is based only on the cash fund, ignoring all other monetary and non-monetary benefits, the requested percentage (22.5%) is substantially less than the percentages commonly awarded in the Eighth Circuit as well as that allowed for in the Agreement itself (30%). What's more, if the additional $150 million T-Mobile is required to spend on data security over the next two years is taken into account, the resulting percentage requested by Class Counsel is even lower (15.75%)—and it is even less if the *full* value of the Settlement's benefits are considered. *See supra* part I.B.

The requested percentage is also less than or similar to awards in other data breach cases across the country. *See, e.g., Anthem*, 2018 WL 3960068, *14–16 (approving a 27% fee award on a $115 million common fund in a data breach case). Indeed, Class Counsel are seeking a similar fee to the one approved in *Equifax* (and affirmed by the Eleventh Circuit on appeal), despite

---

[13] *E.g., Caligiuri*, 855 F.3d at 865 (33.33% of $60,000,000 common fund); *Custom Hair Designs by Sandy, LLC v. Central Payment Co.*, Case No. 8:17CV310, 2022 WL 3445763, at *5 (D. Neb. Aug. 17, 2022) (33.33% of $84,000,000 common fund); *In re Airline Ticket Commission Antitrust Litig.*, 953 F. Supp. 280, 285–86 (D. Minn. 1997) (awarding 33.3% of $86,892,000 common fund); *In re Monosodium Glutamate Antitrust Litig.*, No. Civ. 00MDL1328PAM, 2003 WL 297276, at *3 (D. Minn. Feb. 6, 2003) (30% of $81,400,000); *Xcel Energy*, 364 F. Supp. 2d at 999 (awarding 25% of $80,000,000 common fund and noting "courts in this circuit and this district have frequently awarded attorney fees between twenty-five and thirty-six percent of a common fund in other class actions").

18

delivering the Class nearly *double* the recovery on a per capita basis here. *See In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1281 (11th Cir. 2021) ("The District Court awarded $77.5 million in attorney's fees, which it found is 20.36 percent of the $380.5 million settlement fund. . . . 20.36 percent is well within the percentages permitted in other common fund cases, and even in other megafund cases."), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431, 211 L. Ed. 2d 254 (2021), and *cert. denied sub nom. Watkins v. Spector*, 142 S. Ct. 765, 211 L. Ed. 2d 479 (2022).

Of course, these results in data breach cases align with complex consumer litigation more generally. *See* Theodore Eisenberg, Geoffrey Miller, & Roy Germano, *Attorney Fees in Class Action: 2009–2013*, 92 N.YU. L. Rev. 937, 952 (2017) (finding that the mean fee percentage in consumer class actions was 26% between 2009 and 2013); *see also Target*, 892 F.3d at 977 n.7 (considering "the customary fee"). Complex consumer litigation customarily is handled on a contingent fee basis because consumers are unwilling and unable to pay substantial hourly rates, and the potential recovery does not justify the economic investment. *See Target*, 892 F.3d at 977 n.7 (considering "whether the fee is fixed or contingent"). Contingent fees in consumer cases are typically in the range of 33.3% to 40% of the recovery. (Ex. 1, ¶ 46); *see Tussey*, 2019 WL 3859763, at *4 ("'Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases.'" (quoting Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. of Empirical Legal Studies 27, 35 (2004))). The requested fee is substantially below that range and much lower than contingent fees charged by Class Counsel in private litigation. (*See* Ex. 1, ¶¶ 44-46).

That this case involves a fund of more than $100 million does not change the analysis. The Eighth Circuit has not adopted either the "megafund" approach or the related "sliding scale"

approach, and the only published decision within the Eighth Circuit to refer to itself as a "megafund" case awarded a fee of 25% of an $80 million common fund—greater than the percentage requested by Class Counsel here. *See Xcel Energy*, 364 F. Supp. 2d at 999; *see also In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) ("[C]ourts nationwide have repeatedly awarded fees of 30 percent or higher in so-called 'megafund' settlements."). In any event, awarding lower percentages in megafund cases has been roundly criticized, in part because doing so undercuts the virtues of the percentage approach and fails to recognize that such cases are inherently riskier. As one court explained in awarding a fee representing 31.33% of a $1.06 billion fund:

> [D]ecreasing the percentage awarded as the gross class recovery increases . . . is antithetical to the percentage of the recovery method . . . the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained. By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little.

*Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) (citation omitted).

### D.     The Requested Fee Is Reasonable Under a Lodestar Crosscheck.

Although a lodestar crosscheck is "not required" in the Eighth Circuit, *Keil v. Lopez*, 862 F.3d 685, 701 (8th Cir. 2017)—and, as explained below should be *disfavored*—doing so here confirms that the requested fee is reasonable and should be approved. As noted above, Class Counsel have spent over 8,225 hours through October 31, 2022, on this litigation and reasonably anticipate spending at least another 3,000 hours over the next several years. (Ex. 1, ¶¶ 40, 41, 47, 54.) *Cf. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, MDL No. 2672 CRB, 2017 WL 1047834, at *5 (N.D. Cal. Mar 17, 2017) (calculating over 20,000 hours for future reasonably anticipated work in conducting lodestar crosscheck). These hours account for an

overall lodestar of $8,173,534 at current rates. (Ex. 1, ¶¶ 50, 54.) While the resulting multiplier here would be higher than in many cases if the requested fee is approved, it is important to note that Eighth Circuit courts have made clear that the lodestar cross-check "does not trump the court's primary reliance on the percentage of common fund method." *Xcel Energy*, 364 F. Supp. 2d at 999 (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307 (3d Cir. 2005) and *Petrovic*, 200 F.3d at 1157). In this regard, courts have "caution[ed] against setting fees in a 'formulaic way.'" *In re Charter Commc'ns, Inc., Sec. Litig.*, No. 4:02-cv-1186-CAS, 2005 WL 4045741, at *22 (E.D. Mo. Jun. 30, 2005) (quoting *Rite Aid*, 396 F.3d at 301). "'[T]o overly emphasize the amount of hours spent on a contingency fee case would penalize counsel for obtaining an early settlement and would distort the value of the attorneys' services.'" *Rawa*, 934 F.3d 870 (quoting *Charter Commc'ns*, 2005 WL 4045741, at *18).[14]

Moreover, courts have awarded fees with similar (and larger) multipliers in many other cases. *See Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1252 (Del. 2012) (66 multiplier); *In re Merry-Go-Round Enters. Inc.*, 244 B.R. 327, 335 (Bankr. D. Md. 2000) (19.6 multiplier); *Health Republic Ins. Co. v. United States*, 156 Fed. Cl. 67, 82 (2021) (multiplier of 18 to 19); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ. A. 03–4578, 2005 WL 1213926, at *16–18 (E.D. Pa. May 19, 2005) (15.6 multiplier); *In re Doral Fin. Corp. Sec. Litig.*, No. 05-cv-04014-RO, at ¶ 9(f) (S.D.N.Y. Jul. 20 17, 2007) (ECF 65) (10.26 multiplier); *Farrell v. Bank of Am. Corp.*, N.A., 827 F. App'x 628, 630, 636 (9th Cir. 2020) (10.15 multiplier). Considering the extraordinary relief Class Counsel expediently obtained in the face of potentially drawn-out

---

[14] Professor Fitzpatrick notes that "the majority of courts are wise to reject" the lodestar crosscheck because it "harms class members by creating bad incentives for class counsel. In particular, the lodestar crosscheck reintroduces the very same undesirable consequences of the lodestar method that the percentage method was designed to correct in the first place." (Ex. 2, Declaration of Brian T. Fitzpatrick, ¶ 28.)

litigation with severe risks and an uncertain outcome, the lodestar crosscheck confirms Class Counsel's requested fee is warranted.

## II.      THE COURT SHOULD APPROVE CLASS COUNSEL'S REQUEST FOR REIMBURSEMENT OF REASONABLY INCURRED EXPENSES.

"Reasonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionately by those class members who benefit by the settlement.'" *Yarrington*, 697 F. Supp. 2d at 1067 (quoting *In re Media Vision Tech. Sec. Litig.,* 913 F. Supp. 1362, 1366 (N.D. Cal. 1996)). Class Counsel have also reasonably and necessarily incurred $147,982.55 in expenses for such items as expert fees, legal research; travel for meetings and hearings; mediation fees; and other customary expenditures. (Ex. 1, ¶¶ 55, 56 & Ex. B); *see Tussey*, 2019 WL 3859763, at *5 ("Reimbursable expenses include many litigation expenses beyond those narrowly defined 'costs' recoverable from an opposing party under Rule 54(d), and includes: expert fees; travel; long-distance and conference telephone; postage; delivery services; and computerized legal research." (citing Alba Conte, 1 Attorney Fee Awards § 2:19 (3d ed.))). Class Counsel kept costs at a reasonable level. (Ex. 1, ¶¶ 55, 56 & Ex. B); *see Tussey*, 2019 WL 3859763, at *5. The Court should thus approve Class Counsel's expense reimbursement request.

## III.     THE COURT SHOULD APPROVE THE REQUESTED SERVICE AWARDS.

Courts routinely approve service awards to compensate class representatives for the services they provide and the risks they incur on behalf of the class. The factors for deciding whether the service awards are warranted are: "(1) actions the plaintiffs took to protect the class's interests, (2) the degree to which the class has benefited from those actions, and (3) the amount of time and effort the plaintiffs expended in pursuing litigation." *Caligiuri*, 855 F.3d at 867.

22

Here, the Settlement Class Representatives performed important work on the case, including time-consuming gathering of facts and documents, assisting Class Counsel with the allegations in the consolidated amended complaint, and reviewing the Settlement Agreement and Benefits Plan. (Ex. 1, ¶ 57; Doc. 158-3, ¶ 43.) That work materially advanced the litigation and protected the Class's interests. (Ex. 1, ¶ 57.) Indeed, their time and effort made this historic Settlement possible. Finally, the requested service awards are significantly lower than other awards in the Eighth Circuit. *See Caligiuri*, 855 F.3d at 867 ("[C]ourts in this circuit regularly grant service awards of $10,000 or greater."); *Huyer v. Njema*, 847 F.3d 923, 941 (8th Cir. 2017) (affirming approval of settlement that included $10,000 service awards to named plaintiffs).

The Court should therefore approve the requested service awards of $2,500 for each Settlement Class Representative.

## **CONCLUSION**

Accordingly, Class Counsel respectfully requests that the Court approve the requested fee of $78.75 million, reimbursement of current expenses in the amount of $147,982.55 (subject to being updated before the final approval hearing), and service awards of $2,500 to each of the Settlement Class Representatives.

23

Respectfully submitted this 17th day of November, 2022.

/s/ Norman E. Siegel
Norman E. Siegel, MO #44378
STUEVE SIEGEL HANSON LLP
460 Nichols Rd., Ste. 200
Kansas City, MO 64112
siegel@stuevesiegel.com

Cari Campen Laufenberg (*pro hac vice*)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
claufenberg@kellerrohrback.com

James J. Pizzirusso (*pro hac vice*)
HAUSFELD LLP
888 16th St. NW, Ste. 300
Washington, DC 20006
jpizzirusso@hausfeld.com

*Co-Lead Interim Class Counsel*

24