# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| IN RE: T-MOBILE CUSTOMER DATA | ) | MDL No. 3019 |
| SECURITY BREACH LITIGATION | ) | |
| | ) | Master Case No. 4:21-md-03019-BCW |
| | ) | |
| | ) | |
| | ) | |

## CLASS COUNSEL'S CONSOLIDATED DECLARATION IN SUPPORT OF
## MOTION FOR ATTORNEYS' FEES, COSTS, EXPENSES, AND SERVICE AWARDS

Norman E. Siegel, Cari Campen Laufenberg, and James J. Pizzirusso declare as follows:

1.     We were appointed by this Court to serve as Plaintiffs' Co-Lead Interim Class Counsel in the above-captioned MDL. We have worked on the litigation from the announcement of the T-Mobile Data Breach (Norman Siegel and James Pizzirusso were co-counsel in several actions and Cari Laufenberg filed independent actions with other counsel) and formally led the Plaintiffs' efforts in the case since our appointment on February 25, 2022. *See* Doc. 102, Order Appointing Interim Leadership Counsel. We have personal knowledge of all the matters addressed in this Declaration.

2.     This Declaration focuses on the facts that bear on the Court's determination of a reasonable fee, and, among other things, summarizes our work litigating and resolving this matter, our continued work on behalf of the Settlement Class since this Court ordered issuance of notice, and our anticipated future work administering the Settlement. This Declaration also summarizes the timekeeping protocols we developed and applied to all counsel (including ourselves), our efforts to efficiently allocate work, and the lodestar incurred in performing that work. Finally, this Declaration addresses Plaintiffs' requests for reimbursement of reasonable costs and expenses and modest service awards to the Class Representatives in the litigation.

### *Overview of the Litigation*

3.      As detailed in our Declaration submitted in support of preliminary approval of the Settlement, Class Counsel independently began working on this litigation following the August 16, 2021, announcement of the T-Mobile data breach ("Data Breach"). Class Counsel were instrumental in the process of organizing counsel and presenting argument to the Judicial Panel on Multidistrict Litigation, which consolidated and transferred the litigation to Judge Brian C. Wimes of the United States District Court for the Western District of Missouri.

4.      Following consolidation, we took the lead in organizing Plaintiffs' counsel for purposes of responding to this Court's December 22, 2021 Order, which required the parties to file a joint proposed agenda by January 18, 2022, as well as a preliminary report, to be submitted confidentially by each side, detailing what each party expected to be the critical factual and legal issues in the case. Doc. 4, Order Setting Initial Pretrial Conference and General Order on Practice and Procedure.

5.      On January 25, 2022, the initial pretrial conference was held, and Mr. Siegel addressed the Court on behalf of Plaintiffs and Plaintiffs' counsel. Doc. 41, Order Regarding Initial Pretrial Conference. The Court ordered that the leadership structure for the Plaintiffs should consist of three lawyers as lead counsel, an executive committee of five to seven lawyers, and a liaison counsel. The Court ordered that any motions for appointment to leadership positions were to be filed on February 1, 2022. Over 35 lawyers filed applications, some as groups of lawyers and others as individuals.

6.      On February 25, 2022, the Court appointed us as Plaintiffs' Co-Lead Interim Class Counsel ("Class Counsel"), appointed Alexis Wood of the Law Offices of Ronald Marron as Liaison Counsel, and appointed to the Executive Committee the following counsel: Maureen M.

Brady of McShane & Brady LLC, Amy E. Keller of DiCello Levitt Gutzler LLC, Robert Lopez of Hagens Berman Sobol Shapiro LLP, Margaret C. MacLean of Lowey Dannenberg, P.C., Kaleigh N.B. Powell of Tousley Brain Stephens PLLC, Kenya J. Reddy of Morgan & Morgan,[1] Sabita J. Soneji of Tycko & Zavareei LLP, and Rachel K. Tack of Zimmerman Reed, LLP. Doc. 102, Order Appointing Interim Leadership Counsel.

7.      Pursuant to the Court's Order Appointing Co-Lead Interim Class Counsel, we have been responsible for coordinating and managing the activities of Plaintiffs during pretrial proceedings, including formulating the proposed litigation schedule and discovery plan; determining how to present to the Court and opposing parties the position of Plaintiffs on all matters arising during pretrial proceedings; determining and coordinating how discovery is to be conducted on behalf of Plaintiffs, including written discovery, subpoenas, and depositions; conducting settlement negotiations on behalf of Plaintiffs and entering into settlement agreements; ensuring scheduling requirements are met; delegating tasks as needed to non-leadership counsel in order to maximize efficiency; consulting with and employing experts; entering into stipulations with opposing counsel as necessary for the conduct of the litigation; encouraging full cooperation and efficiency among Plaintiffs' counsel; preparing and distributing periodic status reports to the parties; and maintaining adequate time and disbursement records. Doc. 102 at ¶ 1.

8.      Immediately upon our appointment, we worked to prepare a detailed proposed discovery plan and proposed schedule pursuant to the Court's Order (Doc. 102), about which Plaintiffs and T-Mobile met and conferred on multiple occasions. On March 18, 2022, the Parties submitted a Joint Agenda and Report of the Parties' Rule 26(f) Conference, which detailed competing proposed schedules and several preliminary disputes regarding discovery. Doc. 107.

---

[1] Ms. Reddy subsequently withdrew from her position.

The Court then held a status conference with the Parties on March 23, 2022 (Doc. 110), and issued a Scheduling Order on April 18, 2022 (Doc. 117).

9.    During the end of March and early April, Plaintiffs met and conferred on numerous occasions with T-Mobile to negotiate the provisions of a Protective Order and ESI Protocol. On April 6, 2022, the Parties jointly submitted a Protective Order and ESI Protocol, which contained both agreed-to and disputed sections, along with position letters detailing the Parties' disagreements to the Court. *See* Docs. 111 and 112. On May 12, 2022, the Court heard oral argument from Plaintiffs and T-Mobile on the disputed sections of the Protective Order and ESI Protocol, after which it ruled on many of the disputes and ordered the Parties to continue to meet and confer with respect to others. After further conferral, the Parties submitted a Joint Motion for Protective Order and ESI Protocol on June 1, 2022 (Doc. 135), which the Court entered on June 8, 2022 (Docs. 142, 143).

10.   During this same time, we were working on the major task of preparing and filing the Consolidated Consumer Class Action Complaint ("Complaint"). Preparation of the Complaint was a massive undertaking, involving investigating the underlying facts, consulting with experts, and thoroughly researching many legal theories under the laws of 50 states, the District of Columbia, the U.S. Virgin Islands, and Puerto Rico. We also worked to select appropriate, dedicated named plaintiffs from across the United States by analyzing all of the complaints filed in the MDL, answering many inquiries from affected victims of the data breach, and conducting numerous, extensive telephone interviews including examining detailed questionnaires. Through this process, we selected 64 Plaintiffs to be named in the Complaint. Class Counsel also undertook providing pre-suit notice of consumer claims to attorneys general for numerous states.

4

11.    On May 11, 2022, Plaintiffs filed the 338-page Complaint, with Named Plaintiffs from 39 states including: Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, and Wisconsin. The Complaint asserted representative common law claims on behalf of a nationwide class against T-Mobile for negligence, negligence *per se*, breach of confidence, intrusion upon seclusion, breach of implied contract, unjust enrichment, and declaratory judgment. The Complaint also asserted 86 state statutory claims under state data breach notification laws as well as consumer protection and privacy statutes on behalf of state subclasses. Doc. 128.

12.    Promptly after filing the Complaint, on May 16, 2022, Plaintiffs served document requests and interrogatories on T-Mobile. Plaintiffs also served preservation letters on a number of third parties involved in the response to, and investigation of, the data breach, including FireEye Mandiant, McAfee, KPMG, and Orrick. On June 1, 2022, the Parties exchanged initial Rule 26 disclosures. Additionally, after filing the Complaint, Plaintiffs substantively briefed an opposition to a motion to remand, which made standing arguments adverse to the Class. *See* Doc. 133 (Plaintiff Achermann's Motion to Remand); Doc. 141 (Plaintiffs' Suggestions in Opposition to Motion to Remand).

### *Overview of Settlement Discussions*

13.    At various times before and after filing the Complaint, the Parties engaged in discussions regarding a potential mediation of this case. As part of this process, the Parties exchanged extensive confidential discovery documents and information related to the Data Breach

and the named Plaintiffs in the Complaint, which allowed the Parties to assess the risks of the case as well as potential damages and meaningfully engage in arm's-length settlement negotiations.

14. Following several telephonic conferences and an in-person meeting in Kansas City, the Parties decided to mediate the case with the Honorable Diane M. Welsh (Ret.) of JAMS in Philadelphia, Pennsylvania, a mediator with a proven track record of resolving complex data breach class actions. Judge Welsh conducted pre-mediation calls with each Party, and the Parties exchanged detailed mediation statements in advance of mediation. After vigorous and hard-fought negotiations occurring over two full days on June 7 and June 8, 2022, the Parties reached an agreement in principle and executed a binding Term Sheet, which reflects the essential terms of the Settlement.

15. Over the course of the following several weeks after the execution of the Term Sheet, the Parties engaged in ongoing negotiations regarding the various terms set forth in the Settlement Agreement. These were also lengthy and often difficult negotiations. The time expended to work out significant details and vigorous disagreements between the Parties demonstrates that this proposed resolution was the product of heavily contested and arm's-length negotiations.

16. While the negotiations were professional throughout, they were marked by significant factual and legal disputes pertaining to the value of the case. At all times the negotiations were made at arm's length and free of collusion of any kind. Attorneys' fees were not discussed in any manner until the Parties had reached agreement on the material terms of the Settlement, including the payment of the Settlement Fund. At the conclusion of the negotiations, the Parties agreed that Class Counsel could seek up to 30% of the Settlement Fund as attorneys'

fees. No agreements exist other than those outlined herein and reflected in the Settlement Agreement.

17.     Although we believe the case law in the Eighth Circuit supports a fee of 30%, we determined that given the relatively early settlement in this case that we would discount the fee by 25%, resulting in the requested award of 22.5% of the cash fund. If approved, this would reallocate $26.25 million from the maximum fee Class Counsel could have requested pursuant to the Settlement Agreement to additional cash available to the Settlement Class.

***The Settlement Benefits Conferred on the Settlement Class***

18.     Under the proposed Settlement, T-Mobile will pay $350 million into a non-reversionary fund for Class benefits, notice and administration costs, attorneys' fees and expenses, and service awards for the Settlement Class Representatives.

19.     The Settlement, as implemented through the Consumer Settlement Benefits Plan ("Benefits Plan") drafted by Class Counsel and approved by the Court as Exhibit 2 to Plaintiffs' Motion for Preliminary Approval (Doc. 158-2), establishes that the Settlement Fund will provide specific benefits to Settlement Class Members, including:

- **Out-of-Pocket Losses.** The Settlement Fund will be used to pay valid claims for Out-of-Pocket Losses incurred on or after August 1, 2021, that are fairly traceable to the Data Breach. Out-of-Pocket Losses include, but are not limited to: (i) unreimbursed costs, expenses, losses or charges incurred as a result of identity theft or identity fraud, falsified tax returns, or other alleged misuse of a Settlement Class Member's personal information; (ii) costs incurred on or after August 1, 2021, associated with placing or removing a credit freeze on a Settlement Class Member's credit file with any credit reporting agency; (iii) other miscellaneous expenses incurred on or after August 1, 2021, related to any Out-of-Pocket Losses such as notary, fax, postage, copying, mileage, and long-distance telephone charges; and (iv) costs of credit reports, credit monitoring, or other products related to detection or remediation of identity theft incurred on or after August 1, 2021, through the date of the Settlement Class Member's claim submission.

- **Lost Time.** The Settlement Fund will also be used to pay claims for Lost Time. Lost Time that is not related to a qualifying claim for Out-of-Pocket Losses may be made in 15-minute increments and supported by a certification for up to 5 hours. In the alternative, Lost Time

related to a qualifying claim for Out-of-Pocket Losses may be made in 15-minute increments and supported by a certification for up to 15 hours. Settlement Class Members can claim $25 per hour, or, if the Settlement Class Member took time off work, their current hourly rate if higher and supported by documentation.

- **Alternative Cash Payments.** As an alternative to making a claim for Out-of-Pocket Losses or Lost Time, Settlement Class Members may request an Alternative Cash Payment of $25, or $100 for California Settlement Subclass Members.

20. Settlement Class benefits also include Identity Defense Services provided by Pango to help detect and remediate actual or attempted identity theft and fraud. The services Pango will provide to participating Settlement Class Members include:

- Credit Monitoring from TransUnion

- Monthly Credit Score from TransUnion

- Real time Inquiry / Authentication Alerts

- Dark Web Monitoring

- High Risk Transaction Monitoring

- USPS Address Change Monitoring & Alerts

- Lost Wallet Protection

- Security Freeze Capabilities

- Customer Support & Victim Assistance

- $1 million identity theft insurance

21. As a separate Class benefit, all Settlement Class Members, *even those who do not enroll in Identity Defense Services or do not submit a claim*, will be entitled to utilize Restoration Services offered through Pango. This coverage is a separate benefit and enables all Settlement Class Members access to U.S.-based fraud resolution specialists who can assist with important tasks such as placing fraud alerts with the credit bureaus, disputing inaccurate information on credit

reports, scheduling calls with creditors and other service providers, and working with law enforcement and government agencies to dispute fraudulent information.

22.     If a claim is rejected for any reason, there is also a consumer-friendly appeals process whereby claimants will have the opportunity to cure any deficiencies in their submission or request an automatic appeal if the Settlement Administrator determines a claim is deficient in whole or part. Settlement Class Members will have 90 days to file a claim for benefits, but are not required to file a claim to access Restoration Services which will remain available for 2 years after the Settlement is finalized.

23.     To the extent total valid claims are greater than the available Settlement Fund, all valid claims (including Alternative Cash Payments) will be reduced on a *pro rata* basis. To the extent total valid claims are less than the available Settlement Fund, all valid claims will be increased on a *pro rata* basis (including Alternative Cash Payments) until the Net Settlement Fund is exhausted.

24.     Additionally, as part of this Settlement, T-Mobile has agreed to maintain an incremental spend commitment of at least $150 million for data security and related technology, in the aggregate, for years 2022 and 2023 above its previously budgeted baseline.

25.     The non-cash benefits conferred upon the Class exceeds the $500 million cash components provided in the Settlement. Consideration of the value of the Identity Defense Services and Restoration Services offered to every Class Member push the value of the Settlement significantly higher. The Identity Defense Services and Restoration Services provided in the Settlement are sold at retail for $96 per year. Accordingly, the value of this benefit to the Settlement Class is approximately $146 million for every 1% of Settlement Class Members that elect to receive this benefit. Given a Settlement Class of more than 76.6 million individuals, this

is an enormous benefit to Settlement Class Members that materially increases the value of the Settlement.

### The Notice and Claims Process

26.     As part of the Court's July 26, 2022, Preliminary Approval Order, the Court appointed Kroll Settlement Administration LLC ("Kroll") as Settlement Administrator to provide notice to Class Members, process claims, and otherwise administer the Settlement. Doc. 162, Order Granting Preliminary Approval at ¶ 6. Kroll subsequently began the process of providing notice to the Class through first-class U.S. mail, electronic mail, and/or SMS Text, as well as additional notice by publication.

27.     Over the last several months, Class Counsel has had near daily contact with Kroll and T-Mobile's counsel to ensure that the notice program was on schedule and met the requirements of the Court's Preliminary Approval Order. This included substantial work in ensuring that the SMS Text program was implemented as planned, which required significant unanticipated work due to technical changes in the ability to use mass-text messaging.

28.     Class Counsel has also been closely monitoring the claims in the case, which are at a current pace of approximately 20,000 per day, and we are responding to Class Member inquiries regarding the Settlement on a daily basis. As explained below, Class Counsel expects it will spend substantial time working with Class Members through the claims period and beyond.

### Factors Supporting Plaintiffs' Motion for Attorneys' Fees

29.     Class Counsel's fee application seeks a percentage of the $350 million cash fund negotiated in this case, which is consistent with the law in this and other circuits. As explained below, we believe consideration of the factors set forth by the Eighth Circuit demonstrates the reasonableness of Class Counsel's requested fee of 22.5% of the cash fund. *See In re Target Corp.*

10

*Customer Data Security Breach Litig. ("Target")*, 892 F.3d 968, 977 (8th Cir. 2018) (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 719–20 (5th Cir. 1974)). This requested percentage is even more reasonable given that Plaintiffs could have asked for up to 30% of the fund.

<u>Factor 1: The benefits conferred on the Settlement Class are extraordinary.</u>

30.     The Settlement represents a significant recovery for the Class. The $350 million Settlement Fund is one of the largest data breach settlements in history, second only to the $380 million fund in *Equifax*. However, the per capita recovery is much higher here than in *Equifax*— nearly double—as there are approximately 76.6 million Class Members here, whereas there were more than 147 million class members in *Equifax*. This recovery also compares favorably to other large data breach settlements including *In re Anthem* ($115 million fund for a class of 80 million individuals); and *In re Yahoo!* ($117.5 million settlement for 194 million class members).

31.     The larger recovery here yields tangible benefits. For instance, the fund here provides cash reimbursement up to $25,000 for unreimbursed out-of-pocket payments spent to avoid or recover from fraud or identity theft that is fairly traceable to the T-Mobile Data Breach. The Settlement also allows for Class Members to obtain valuable Identity Defense Services and Restoration Services. As with compensation for out-of-pocket losses and lost time, these services help prevent more serious losses from occurring and will make Class Members whole, if losses occur. The $350 million Settlement Fund also reimburses Class Members for time spent (up to 15 hours, depending on the circumstances) to avoid or recover from fraud, identity theft, or other misuse of Class Member personal information, which is fairly traceable to the T-Mobile Data Breach. The hourly rate for time is the greater of $25 per hour or the Class Member's hourly wage if the Class Member took time off work.

32.     The Settlement is designed to make Class Members whole for time spent and expenses incurred to avoid fraud or to recover from identity theft or other harm. As described below, it is difficult to litigate that aspect of a claim on a disputed class-wide basis. Moreover, the Settlement here also provides for an alternative cash payment of $25 for Class Members—and $100 for Settlement Class Members who resided in California at the time of the T-Mobile Data Breach. Not only may Settlement Class Members elect to obtain the alternative cash payment and forgo submitting documentation to obtain out-of-pocket losses and/or lost time, those who do make claims for out-of-pocket losses and/or lost time will be entitled to the *greater* of the approved claim for out-of-pocket losses and/or lost time or the amount available under the alternative cash payment provision. Independent of the $350 million Settlement Fund, T-Mobile has agreed to an incremental spending commitment of at least $150 million for data security and related technology, in the aggregate, for years 2022 and 2023 above its previously budgeted baseline.

Factor 2: Class Counsel faced numerous and substantial risks.

33.     Class Counsel obtained an outstanding settlement in the face of several substantial risks. Unlike other data breach cases, most Class Members are current and former T-Mobile customers, and T-Mobile asserted that its Terms and Conditions of Services require customers to individually arbitrate their claims against T-Mobile. Throughout the litigation, T-Mobile contended that these arbitration provisions were ironclad—and the provisions may indeed have been enforceable for a significant number of Class Members. In our assessment, the combination of T-Mobile's arbitration and other defenses, along with potentially individualized damages, make this precisely the kind of litigation that is difficult if not impossible to redress without a class settlement.

34.     In addition to what would surely have been a fiercely litigated motion to compel arbitration, Class Counsel faced other daunting risks. For one, T-Mobile disputed whether the

majority of Class Members had suffered any legally cognizable injuries, including with respect to risk of future identity theft, lost time spent preventing or recovering from identity theft, and out-of-pocket costs (to the extent they could not be shown to be reasonable or necessary). T-Mobile would also have vigorously disputed whether Class Members' damages were proximately caused by its conduct since: (1) the T-Mobile Data Breach was the result of a criminal, third-party cyberattack; and (2) the numerous other breaches of PII (including, in some cases, the personal information of hundreds of millions of individuals) in other data breaches spread across other sectors would make it difficult to trace any instance of identity theft to the T-Mobile Data Breach as opposed to another data breach.

35. T-Mobile also indicated it would dispute whether it owed a duty to safeguard the confidential PII of its current, former, and prospective customers, and would have fiercely litigated the Class's negligence, contract/quasi-contract, invasion of privacy, and statutory claims. The merits issues of various claims in data breach litigation are developing, sometimes in divergent ways in different states. This would not only have made the litigation more complex, but it also could also have exposed some of the Class's claims to challenging dismissal and summary judgment motions.

36. In short, this litigation would have entailed serious risks for the Class and Class Counsel at every turn. Although we strongly believe the Class could have overcome these risks—doing so would not have been easy, and success was far from guaranteed.

Factor 3: Data breach litigation, particularly on a national scale, is novel and complex.

37. Our experience in litigating most of the largest data breach cases confirms that this type of litigation, particularly when it involves a breach of consumer data on a nationwide scale by a company the size of T-Mobile, is difficult and presents cutting edge issues. As discussed elsewhere, this case involved many novel and difficult legal questions, such as the threshold issue

of whether T-Mobile had a duty to protect Plaintiffs' personal data, whether Plaintiffs' alleged injuries are legally cognizable and were proximately caused by the T-Mobile Data Breach, and the application of various state consumer protection statutes. The law in data breach litigation remains uncertain and the applicable legal principles have continued to evolve.

38.     Recent decisions demonstrate the legal challenges in data breach litigation. In some cases, the plaintiffs have prevailed on motions challenging the pleadings, including *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447 (D. Md. 2020); *In re Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374 (E.D. Va. 2020); *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295 (N.D. Ga. 2019). However, other recent decisions have gone against the plaintiffs. *See Pruchnickias v. Envision Healthcare Corp.*, 845 F. App'x 613 (9th Cir. 2021); *Gardiner v. Walmart, Inc.*, 2021 WL 4992539 (N.D. Cal. 2021); *Hammond v. The Bank of New York Mellon Corp.*, 2010 WL 2643307 (S.D.N.Y. 2010). During this time, state law statutory claims have continued to evolve, creating thorny questions of whether and how the new statutes can be applied to data breach litigation.

<u>Factor 4: Class Counsel's efficient resolution of this litigation.</u>

39.     The efficiency with which Class Counsel obtained this extraordinary relief on behalf of the Class is independently valuable for the Class and the Court, as efficient resolution in data breach litigation is particularly important. First, the release of confidential data puts the Class immediately at risk, meaning the injunctive and monitoring components of the Settlement can have the most impact when delivered as near as possible to the breach. Second, Class Members can be harmed in the future,[2] which likewise can be addressed through early implementation of extended

---

[2] The U.S. Government Accountability Office has determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen data have been

Identity Defense Services provided under the Settlement. Further, even Class Members that do not make a claim will have access to the Restoration Services, which will provide immediate access to help any Class Member who suffers fraud or identity theft.

40. Through October 31, 2022, Class Counsel has expended more than 8,225 hours on this litigation. That work involved engaging with clients, investigating the circumstances of the T-Mobile Data Breach, researching multiple states' statutory and common laws, working with several experts in the field to develop liability and damages theories, drafting and filing a complaint that set forth—in granular detail—the factual circumstances of the T-Mobile Data Breach and legal recoveries the Class pursued, working with other counsel who filed similar complaints, resolving MDL and forum issues before the Judicial Panel on Multidistrict Litigation, working with representative Plaintiffs throughout the litigation, informal discovery, mediating the case with T-Mobile, and providing notice to Class Members. And, but for this case, Class Counsel would have spent significant time on other matters. The intensity with which the case was litigated, mediated, and settled demanded Class Counsel's full attention, and work could not be delegated to less experienced lawyers.

41. In addition to the time spent to date, we anticipate spending at least another 3,000 hours over the next several years litigating appeals, administering the Settlement, managing the claims process, and responding to inquiries from Class Members. This estimate is likely conservative. After the final approval hearing, we reasonably expect to expend at least 1,000 hours litigating any appeals and thirty to forty hours per week on average over the next 1-2 years

---

sold or posted on the Web, fraudulent use of that information may continue for years." United States Gov't Accountability Office, *Data Breaches Are Frequent, But Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737, at 29 (June 2007), *available at*: https://www.gao.gov/assets/gao-07-737.pdf.

overseeing the notice and claims processes and communicating with the various stakeholders, which would collectively total over 1,500 hours per year. Finally, Class Counsel reasonably anticipates engaging with approximately 1% of the expected claims as part of the claims review process and believes that it is likely that Class Counsel will spend more than 1,000 hours in post-final approval time on claims review alone. For reference, in *Equifax* class counsel spent more than 8,000 hours at a lodestar of $6,000,000 following the submission of the fee application.

<u>Factor 5: Class Counsel and defense counsel are both exceptionally skilled.</u>

42.     Both the Class and T-Mobile are represented by highly skilled and reputable attorneys. We have previously provided our detailed resumes demonstrating our experience in consumer litigation and data breach litigation in particular. Similarly, T-Mobile is represented by Alston & Bird, which has provided capable and experienced defense in numerous data breach cases. T-Mobile is well-funded and represented by highly-qualified national attorneys.

<u>Factor 6: The reaction of the Class supports Class Counsel's requested fee.</u>

43.     Now nearly a month into the notice process, there have been a handful of objections to the requested fee, which the notice indicated would be up to 30% of the Settlement Fund. This motion, seeking only 22.5% of the Settlement Fund, will be posted on the Settlement website and available to all Class Members before the December 8, 2022, objection deadline. Class Counsel will therefore address any valid objections raised to this motion in advance of final approval.

<u>Factor 7: The requested fee is less than or comparable to other<br>awards in the Eighth Circuit and other awards in data breach cases.</u>

44.     The requested fee is in line with—if not substantially lower than—awards in other class actions that have resulted in similar settlements. In the Eighth Circuit, courts have "frequently awarded attorneys' fees ranging up to 36% in class actions." *Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017). Here, even if the fee is based only on the cash fund, ignoring all other monetary

and non-monetary benefits, the requested percentage (22.5%) is substantially lower than the percentages commonly awarded in the Eighth Circuit as well as that allowed for in the Agreement itself (30%). What's more, if the additional $150 million T-Mobile is required to spend on data security over the next two years is taken into account, the resulting percentage requested by Class Counsel is even lower (15.75%)—and it is even lower than that if the *full* value of the Settlement's benefits are considered.

45.     The requested percentage is also less than or similar to awards in other data breach cases across the country. *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *14-16 (N.D. Cal. Aug. 17, 2018) (approving a 27% fee award on a $115 million common fund in a data breach case). In applying for a fee of 22.5%, we are seeking a similar fee to the one approved in *Equifax* (and affirmed by the Eleventh Circuit on appeal), despite delivering the Class nearly double the recovery on a per capita basis.

46.     The fee we are seeking here is also well below the percentages that were included in the fee agreements signed by many of the named plaintiffs in this case. *See In re Remeron Direct Purchaser Antitrust Litig.*, No. CIV.03-0085 FSH, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005) ("[t]he percentage-of-the-fund method of awarding attorneys' fees in class actions should approximate the fee which would be negotiated if the lawyer were offering his or her services in the private marketplace."). Class Counsel regularly negotiates contingency fee arrangements with both individuals and sophisticated businesses with fees that amount to 33.3% to 40% of the expected recovery. Thus, consideration of real-world contingency arrangements and the actual contingency fee arrangements used by Class Counsel supports the requested award of 22.5% of the Settlement Fund.

### *Consideration of the Lodestar Supports the Requested Fee*

47.     Some courts supplement their analysis of the percentage-of-fund method with the lodestar cross-check to determine whether a proposed fee award is excessive relative to the hours worked by counsel, or whether the fee is within a reasonable multiplier of the lodestar. While the lodestar cross-check is not necessary in the Eighth Circuit, we respectfully submit that a lodestar cross-check in this case supports the requested fee. Despite the risks, complexities, and challenges posed by this litigation, Class Counsel and other lawyers working at the direction of Class Counsel invested over 8,225 hours of attorney and other professional time on behalf of the Class from case inception through October 31, 2022.

48.     At the outset of the case, Class Counsel implemented a rigorous timekeeping process. All law firms that filed complaints that were consolidated in the MDL were directed to submit contemporaneously recorded time and expenses incurred in the case to Class Counsel on a monthly basis. A copy of the billing protocol established by Class Counsel and sent to all firms is attached to this Declaration as Exhibit A. Class Counsel received and reviewed all contemporaneous time submitted from all Plaintiffs' counsel. Inadequate or incomplete time entries, time that was not performed at the direction of Co-Lead Counsel, or reports that did not meet the billing protocol were eliminated or returned for correction. The complete time records are available for the Court's review upon request.

49.     In preparation for Plaintiffs' fee request, Class Counsel spent a full day in Seattle in October 2022 reviewing all time entries submitted in the case, including time and expenses submitted by Co-Lead firms. Each Plaintiffs' firm's time and expense submission was reviewed by at least two attorneys from two different Co-Lead firms. All time and expenses submitted by the Co-Lead firms were reviewed by at least one lawyer from a different Co-Lead firm. In

evaluating the time entries submitted by other law firms, Class Counsel looked to ensure that the time was non-duplicative and performed at the direction of Plaintiffs' Co-Lead Counsel, who also audited and confirmed the validity of all law firms' expense submissions and removed unapproved expenses where appropriate. Time and expenses that were excessive or were not consistent with the billing protocol were disallowed, and not considered in this submission.

50.     After reviewing and vetting all time records and ensuring that the work recorded was not duplicative, unnecessary, or not performed at the direction of Co-Lead Counsel, the total recorded lodestar for all firms is $5,973,534. Of this amount, $5,285,610 (approximately 88%) was reported by Class Counsel and the Executive Committee. With respect to the lodestar submitted by non-lead firms, the time reflects work performed at the direction of Co-Lead Counsel (or, in some instances, work performed before appointment of Co-Lead Counsel but which was determined to have advanced the litigation) including document review and communications with Plaintiffs. A chart reflecting the lodestar for each firm is attached as Exhibit B.[3]

51.     Each Co-Lead Counsel attests that the rates charged by the lawyers and staff in their firm are reasonable, based on each person's position, and experience level. Each Co-Lead Counsel further affirms that (1) the rates submitted with this declaration are based on rate scales each Co-Lead Counsel has submitted and Courts have approved in other contingency cases,[4] and (2) the

---

[3] Co-Lead Counsel will distribute any fee awarded by the Court based on the overall contribution to the result achieved. The lodestar reported by each firm will be a material, but not the exclusive consideration in distributing any fee award.

[4] *See, e.g., Johnson v. Lifebridge Health Care, Inc.*, Case No. 24-C-18-006801, Order Granting Final Approval at 11 (Cir. Court Baltimore City, MD., October 26, 2022) (finding Stueve Siegel Hanson's 2022 rates reasonable); *Hays v. Nissan North America, Inc.* Case No. 4:17-CV-0353-BCW, Doc. 138, Order Granting Final Approval at 3 (W.D. Mo. September 30, 2022) (same); *In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litig.*, No. 15-md-02672-CRB, Doc. 8088 (N.D. Cal. Nov. 9, 2022) (awarding attorneys' fees based on Keller

rates reported here are the rates charged to hourly-paying clients of the Co-Lead firms that undertake hourly work.

52. Based on our collective experience and knowledge of the legal market, including the market for hiring lawyers engaged in complex litigation, the rates reflected in Exhibit B are comparable to or lower than the rates charged by other law firms with similar experience, expertise, and reputation, for similar services in the nation's leading legal markets.

### *Additional Anticipated Time*

53. The lodestar figure above does not include the substantial amount of time that Class Counsel will be required to devote to achieving final approval, responding to any objections, overseeing the claims administration process and the distribution of settlement funds to the Class, and litigating any appeals. For example, class counsel in the Equifax data breach litigation have expended over $6 million in time addressing similar tasks *after* the submission of the fee application in that case.

54. These additional hours, for which Class Counsel will not receive any additional compensation from the Settlement Fund, effectively reduce the multiplier, and should be considered in evaluating the reasonableness of the fee request. Given the size of the settlement, the number of Class Members, and the range of relief offered, we expect that we will incur at least 3,000 hours of additional time finalizing this Settlement, or approximately $2,200,000 in additional lodestar.

---

Rohrback's current rates); *Southern California Gas Leak Cases*, No. BC601844 (Cal. Super. Ct. Apr. 29, 2022) (finding Keller Rohrback rates reasonable); *In re: Blue Cross Blue Shield*, No. 2:13-CV-20000-RDP, Doc. 2932 (N.D. Ala. August 9, 2022) (finding Hausfeld's rates reasonable on a lodestar crosscheck). Class Counsel can provide copies of these orders upon request.

*Plaintiffs' Motion for Reimbursement of Expenses*

55.     Class Counsel also request reimbursement of reasonable and necessary litigation costs and expenses in the amount of $147,982.55. As with the time submission process discussed above, all expenses were reviewed by Class Counsel to ensure conformity with the billing protocol, and all expenses incurred were reasonable, necessary, and expended in furtherance of the litigation.

56.     Class Counsel's costs and expenses are summarized in Exhibit B and are the same costs that Counsel would normally charge a monthly-paying client. Accordingly, Class Counsel's request for reimbursement of $147,982.55 in expenses from the Settlement Fund (as supplemented by any additional expenses incurred before final approval) is reasonable and should be approved.

*Plaintiffs' Service Awards*

57.     Consistent with the law in this Circuit, Plaintiffs also request approval for a $2,500 service award for each of the Settlement Class Representatives. These individuals performed important work on the case, including time-consuming gathering of facts and documents, assisting Class Counsel with the allegations in the consolidated complaint, and reviewing the Settlement Agreement and Benefits Plan. That work materially advanced the litigation and protected the Class's interests. Further, the requested service awards are significantly lower than other awards in the Eighth Circuit.

DATED this 17th day of November 2022 in the United States of America.

_____
Norman E. Siegel

_____
Cari Campen Laufenberg

_____
James J. Pizzirusso

# EXHIBIT A

 

March 3, 2022

All Plaintiff's Counsel

    **Re:**    *In re T-Mobile Customer Data Security Breach Litigation*
             Case No. 4:21-md-03019

Dear Counsel:

As you know, the Court recently appointed the undersigned as interim Co-Lead Counsel in this litigation. Our responsibilities include monitoring time and expenses accrued by all Plaintiffs' counsel in this case.

In keeping with other cases before Judge Wimes, and consistent with our communications with the Court leading up to the Initial Status Conference, all time spent and expenses incurred in connection with this litigation must be recorded on a contemporaneous basis. As provided in the appointment order, **all work undertaken in this litigation must be expressly authorized by Co-Lead Counsel**.

To facilitate the monitoring of time and expenses, each firm must submit detailed monthly time and expenses. All time should be reported at your regular billing rates in effect at your firm during the particular month(s) for which you are reporting. However, review of time and costs for reporting purposes and review of documents and coding must be capped at the lesser of the timekeeper's regular rate or $425.00 per hour.

**Reports for the preceding month will be due on the 15th day of the next month (or next business day if the 15th day is a weekend or holiday) and should be sent via email to tmobiletime@stuevesiegel.com.**

Your first report is due April 15, 2022, and should include all time and expenses from inception of the case through March 31, 2022. Please note that we cannot and do not represent that pre-leadership appointment time, or any time for that matter, will be allowed by the Court or even submitted to the Court. All firms must use the standard form in the attached Excel spreadsheet for time and expense reporting. The template includes a time tab and an expense tab. **With your first report, please advise us as to who at your firm is the appropriate contact person for time and expense reporting purposes.**

Please note the following:

First, please submit your time in the proper format and on time. Time sent in the wrong format will be sent back. Time that is not timely submitted will not be considered.

*Second,* Co-Lead Counsel reserves the right to not assign work to firms that are not current in their monthly time and expense reports.

*Third,* work performed in this case without the express, specific authorization of Co-Lead Counsel will not be compensable. This includes reading and reviewing of correspondence and pleadings, or appearances at hearings or depositions and travel time and expenses related to such appearances, unless assigned to do so by Co-Lead Counsel. If in doubt, please confirm before incurring the time or expense.

*Fourth,* all billings may be audited periodically and billings that we do not believe are appropriate may be disallowed before our time is submitted to the Court, or at any time thereafter. It will make our job in this regard much easier if we all exercise restraint in our time keeping by only reporting time that is reasonably expended in prosecution of our clients' and the class's claims. We recognize that, given the number of reports to be submitted, it may not be realistic for Co-Lead Counsel to provide immediate feedback regarding time submission and that such decisions may evolve as the case progresses, or based on feedback from the Court. Accordingly, please note that even if billing reports are "accepted" at the time submitted, this does not mean that the time is "approved," or that the submissions will ultimately be deemed compensable and submitted to the court in support of a fee application. We will examine—and re-examine—all of our time in a comprehensive way before any fee application is submitted to determine, based upon a complete picture of how the case was prosecuted, how each firm's time should be treated.

*Fifth,* we are not using task codes; therefore your time entries will require fulsome, clear descriptions of each and every time entry you make, and separate tasks should have separate time indicated. Individuals identified in time entries must be described by at least their first initial and last name, not by initials. "John Doe" is preferred; "J. Doe" is acceptable; and "JD" is unacceptable.

*Sixth,* we ask that you not staff committee calls with more than one lawyer from your firm. Exceptions to this policy will require advance approval from Co-Lead Counsel. Absent express authorization, time for multiple attendees will not be compensable.

*Seventh,* we intend to be particularly mindful about the use of contract lawyers, in particular for document review purposes. Any use of contract lawyers for document review or any other work must be expressly approved in writing by Co-Lead Counsel in advance. Work performed by contract attorneys, for any purpose, may be subjected to a cap on the hourly rate charged for those lawyers' time.

*Eighth,* Co-Lead Counsel have established an account from which common expenses will be paid. Common expenses include such matters as filing and service costs related to the MDL consolidated action; deposition and court reporter fees; the cost of creating and operating a document depository; administrative expenses, such as the expenses associated with EC meetings and conference calls; expert and consultant fees and expenses; fees for e-discovery, copying, and coding (done outside of a particular firm); witness expenses; fees for independent investigators;

bank charges; and such other common expenses approved by Co-Lead Counsel. No one other than Co-Lead may incur common expenses without approval. Bills for approved common expenses should be sent for payment to James Pizzirusso, whose firm maintains the litigation fund. Any common expense will require advance approval from Co-Lead Counsel before the expense is paid.

*Ninth,* you should report on a monthly basis all non-common expenses (*e.g.*, Westlaw, in-house copies) for which you may seek reimbursement at the conclusion of the case. Non-common expenses should be reported at cost without any markups.

If we are fortunate enough to earn a fee in this case, the allocation of the fee between the participating firms will be made by Co-Lead Counsel when the fee has been earned. In allocating any fee, Co-Lead Counsel will be guided by the concept that each firm will be rewarded for the value it has contributed to the results obtained for our clients. Each firm's lodestar will be a factor in determining value, but it will not be the only factor. Among other things, how efficiently a firm has handled its responsibilities will be given significant weight.

We look forward to working with all of you on this case.

Sincerely,

Norman E. Siegel

Cari Campen Laufenberg

James J. Pizzirusso

# EXHIBIT B

| Firm | Biller | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Hausfeld LLP | Dorsey, Angel | 1.30 | $325.00 | $422.50 |
| | Engdahl, Ian | 85.60 | $520.00 | $44,512.00 |
| | Hansson, Katherine | 5.30 | $520.00 | $2,756.00 |
| | Kenney, Jeannine | 0.40 | $760.00 | $304.00 |
| | Lewis, Richard S. | 1.00 | $1,275.00 | $1,275.00 |
| | Martin, Scott | 2.70 | $1,150.00 | $3,105.00 |
| | McCune, Kenya | 0.50 | $325.00 | $162.50 |
| | Mitchell, James | 38.60 | $325.00 | $12,545.00 |
| | Nathan, Steven | 393.90 | $725.00 | $285,577.50 |
| | Pizzirusso, Jamie J. | 487.20 | $960.00 | $467,712.00 |
| | Ratner, Brian A. | 1.50 | $975.00 | $1,462.50 |
| | Ringeling, Camila | 40.00 | $430.00 | $17,200.00 |
| | Smith, Gary | 1.70 | $960.00 | $1,632.00 |
| | Walker, Renner | 120.10 | $675.00 | $81,067.50 |
| | | 1179.80 | | $919,733.50 |

| Firm | Biller | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Keller Rohrback LLP | Cappio, Gretchen | 5.00 | $1,045.00 | $5,225.00 |
| | Chan, Alex | 5.10 | $350.00 | $1,785.00 |
| | Farris, Juli E. | 100.50 | $1,065.00 | $107,032.50 |
| | Fierro, Eric | 7.70 | $795.00 | $6,121.50 |
| | Garrido, Joel M. | 7.50 | $350.00 | $2,625.00 |
| | Gotto, Maxwell | 146.80 | $295.00 | $43,306.00 |
| | Graver, Devon | 0.30 | $285.00 | $85.50 |
| | Green, Kellyn A. | 50.20 | $375.00 | $18,825.00 |
| | Hill, Jennifer | 2.00 | $365.00 | $730.00 |
| | Kolcun, Jason T. | 0.50 | $410.00 | $205.00 |
| | LaPorte, Kait B. | 5.60 | $280.00 | $1,568.00 |
| | Laufenberg, Cari Campen | 302.30 | $1,010.00 | $305,323.00 |
| | Loeser, Derek W. | 10.50 | $1,000.00 | $10,500.00 |
| | McKinlay-Mench, Rosie | 6.50 | $300.00 | $1,950.00 |
| | Mersing, Jacob T. | 5.50 | $405.00 | $2,227.50 |
| | Montgomery, Mary K. | 77.80 | $340.00 | $26,452.00 |
| | Nanfelt, Nathan L. | 5.30 | $585.00 | $3,100.50 |
| | Oldach, John E. | 1.60 | $270.00 | $432.00 |
| | Rodgers, Aubrey A. | 13.50 | $350.00 | $4,725.00 |
| | Sarko, Lynn Lincoln | 2.70 | $1,200.00 | $3,240.00 |
| | Schafer, David H. | 23.50 | $320.00 | $7,520.00 |
| | Springer, Christopher | 288.10 | $650.00 | $187,265.00 |
| | Tiezazu, Y. Tizzy | 0.30 | $295.00 | $88.50 |
| | Wilcher, Debra Lynn | 0.20 | $270.00 | $54.00 |
| | Wilson, Kiana R. | 29.00 | $315.00 | $9,135.00 |
| | Wright, Emma M. | 98.80 | $550.00 | $54,340.00 |
| | | 1196.80 | | $803,861.00 |

| Firm | Biller | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Stueve Siegel Hanson LLP | Brulez, Margaret | 1.30 | $300.00 | $390.00 |
| | Cervantes, Katrina | 114.00 | $300.00 | $34,200.00 |
| | Davis, Bria | 197.30 | $500.00 | $98,650.00 |
| | Dent, Jillian | 242.10 | $650.00 | $157,365.00 |
| | Edwards, Tanner | 2.00 | $575.00 | $1,150.00 |
| | Marquart, Mary Rose | 59.40 | $340.00 | $20,196.00 |
| | Moore, Austin | 400.40 | $825.00 | $330,330.00 |
| | Perez, Cheri | 12.70 | $300.00 | $3,810.00 |
| | Perkins, Lindsay | 2.10 | $825.00 | $1,732.50 |
| | Reyes, Erika | 81.00 | $300.00 | $24,300.00 |
| | Siegel, Norman | 722.50 | $1,125.00 | $812,812.50 |
| | Six, Stephen | 1.60 | $1,025.00 | $1,640.00 |
| | Spates, Brandi | 20.80 | $475.00 | $9,880.00 |
| | Stueve, Benjamin | 4.60 | $575.00 | $2,645.00 |
| | Vahle, Barrett | 407.90 | $950.00 | $387,505.00 |
| | Walters, Stephanie | 30.20 | $750.00 | $22,650.00 |
| | Weiner, Adrian | 4.20 | $325.00 | $1,365.00 |
| | Wilders, Bradley | 0.20 | $950.00 | $190.00 |
| | Williams, Sheri | 38.40 | $300.00 | $11,520.00 |
| | Youngentob, Kasey | 1.00 | $475.00 | $475.00 |
| | | 2343.70 | | $1,922,806.00 |

| Non-Lead Firms | Hours | Lodestar |
|---|---|---|
| Abington Cole + Ellery | 111.00 | $105,450.00 |
| Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. | 36.90 | $22,105.00 |
| Chestnut Cambronne PA | 12.80 | $9,150.00 |
| DiCello Levitt | 201.70 | $168,124.50 |
| Emerson Firm, PLLC | 85.70 | $68,131.50 |
| Finkelstein, Blankinship, Frei-Pearson & Garber, LLP | 84.90 | $35,667.00 |
| Hagens Berman Sobol Shapiro LLP | 170.50 | $123,482.50 |
| Held & Hines LLP | 48.80 | $20,740.00 |
| Herman Jones LLP | 235.90 | $169,127.00 |
| Kershaw Talley Barlow, PC | 35.70 | $22,790.00 |
| Law Offices of Ronald A. Marron | 203.90 | $111,676.50 |
| Lite DePalma Greenberg & Afanador, LLC | 169.10 | $105,195.00 |
| Lowey Dannenberg | 539.90 | $358,816.00 |
| McShane & Brady | 436.20 | $332,095.00 |
| MoginRubin LLP | 318.60 | $151,219.50 |
| Nussbaum Law Group | 33.10 | $27,904.50 |
| Seeger Weiss LLP | 147.90 | $68,085.00 |
| Tousley Brain Stephens PLLC | 248.40 | $172,669.50 |
| Tycko & Zavareei LLP | 185.50 | $137,410.10 |
| Wolf Haldenstein Adler Freeman & Herz LLP | 57.90 | $33,578.00 |
| Zimmerman Reed LLP | 142.90 | $83,717.00 |
| TOTAL | 3507.30 | $2,327,133.60 |

| Category | Expenses |
|---|---|
| Copies/Printing | $2,198.65 |
| ESI Processing & Hosting | $1,363.26 |
| Experts | $26,125.00 |
| Filing Fee | $15,696.39 |
| Hearing Transcript | $388.25 |
| Mediation | $14,815.31 |
| Miscellaneous | $31,022.90 |
| Postage | $1,086.75 |
| Research (Pacer/Westlaw) | $23,649.47 |
| Service/Courier | $1,801.64 |
| Telephone | $183.22 |
| Travel (Transportation/Meals/Hotel) | $29,651.71 |
| TOTAL | $147,982.55 |

5