# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

*In re: T-Mobile Customer Data Security Breach Litig.*

*MDL No. 3019*

## DECLARATION OF BRIAN T. FITZPATRICK

I.  Background and qualifications

1.      I am the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from the University of Notre Dame in 1997 and Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP. My C.V. is attached as Exhibit 1.  I speak only for myself and not for Vanderbilt.

2.      My teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the Fordham Law Review, the NYU Journal of Law & Business, and the University of Arizona Law Review.  My work has been cited by numerous courts, scholars, and media outlets such as the New York Times, USA Today, and Wall Street Journal.  I have also been invited to speak at symposia and other events about class action litigation, such as the ABA National Institutes on

Class Actions in 2011, 2015, 2016, 2017, and 2019; and the ABA Annual Meeting in 2012. Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies. In 2015, I was elected to the membership of the American Law Institute. Last year, I became the co-editor of THE CAMBRIDGE HANDBOOK OF CLASS ACTIONS: AN INTERNATIONAL SURVEY (with Randall Thomas).

3.　　　In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study"). This article is still what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published. Unlike other studies of class actions, which have been confined to one subject matter or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period (2006-2007). *See id*. at 812-13. As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is also several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 21 from the Eighth Circuit alone. *See id*. at 817. I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, the Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools

1

in 2009 and 2010. Since then, this study has been relied upon regularly by a number of courts,

scholars, and testifying experts.[1] This study is attached as Exhibit 2.

---

[1] *See, e.g.*, *In re Stericycle Sec. Litig.*, 35 F.4th 555, 561 (7th Cir. 2022) (relying on article to assess fees); *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (same); *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 2022 WL 4329646, at *5 (D. Mass., Sep. 19, 2022) (same); *de la Cruz v. Manhattan Parking Group*, 2022 WL 3155399, at *4 (S.D.N.Y., Aug. 8, 2022) (same); *Kukorinis v. Walmart*, 2021 WL 8892812, at *4 (S.D.Fla., Sep. 21, 2021) (same); *Kuhn v. Mayo Clinic Jacksonville*, No. 3:19-cv-453-MMH-MCR, 2021 WL 1207878, at *12-13 (M.D. Fla. Mar. 30, 2021) (same); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262 (NRB), 2020 WL 6891417, at *3 (S.D.N.Y. Nov. 24, 2020) (same); *Shah v. Zimmer Biomet Holdings, Inc.*, No. 3:16-cv-815-PPS-MGG, 2020 WL 5627171, at *10 (N.D. Ind. Sept. 18, 2020) (same); *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704 (JSR), 2020 WL 3250593, at *5 (S.D.N.Y. June 16, 2020) (same); *In re Wells Fargo & Co. S'holder Derivative Litig.*, No. 16-cv-05541-JST, 2020 WL 1786159, at *11 (N.D. Cal. Apr. 7, 2020) (same); *Arkansas Teacher Ret. Sys. v. State St. Bank & Trust Co.*, No. CV 11-10230-MLW, 2020 WL 949885, 2020 WL 949885, at *52 (D. Mass. Feb. 27, 2020), *appeal dismissed sub nom. Arkansas Tchr. Ret. Sys. v. State St. Corp.*, No. 20-1365, 2020 WL 5793216 (1st Cir. Sept. 3, 2020) (same); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *34 (N.D. Ga. Jan. 13, 2020) (same); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 3:07-cv-05634-CRB, 2019 WL 6327363, at *4-5 (N.D. Cal. Nov. 26, 2019) (same); *Espinal v. Victor's Cafe 52nd St., Inc.*, No. 16-CV-8057 (VEC), 2019 WL 5425475, at *2 (S.D.N.Y. Oct. 23, 2019) (same); *James v. China Grill Mgmt., Inc.*, No. 18 Civ. 455 (LGS), 2019 WL 1915298, at *2 (S.D.N.Y. Apr. 30, 2019) (same); *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019) (same); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657, at *2 (S.D.N.Y. Nov. 29, 2018) (same); *Rodman v. Safeway Inc.*, No. 11-cv-03003-JST, 2018 WL 4030558, at *5 (N.D. Cal. Aug. 23, 2018) (same); *Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 38 (D.D.C. 2018) (same); *Hillson v. Kelly Servs. Inc.*, No. 2:15-cv-10803, 2017 WL 3446596, at *4 (E.D. Mich. Aug. 11, 2017) (same); *Good v. W. Virginia-Am. Water Co.*, No. 14-1374, 2017 WL 2884535, at *23, *27 (S.D.W. Va. July 6, 2017) (same); *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 385 (S.D.N.Y. 2017) (same); *Brown v. Rita's Water Ice Franchise Co. LLC*, No. 15–3509, 2017 WL 1021025, at *9 (E.D. Pa. Mar. 16, 2017) (same); *In re Credit Default Swaps Antitrust Litig.*, No. 13MD2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (same); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp 3d 1217, 1246 (D.N.M. 2016); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, No. 3:07-cv-5944 JST, 2016 WL 721680, at *42 (N.D. Cal. Jan. 28, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11–cv–4462, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11–cv–4462, 2015 WL 1399367, at *3-5 (N.D. Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 797 (N.D. Ill. 2015) (same); *In re Neurontin Marketing and Sales Practices Litig.*, 58 F.Supp.3d 167, 172 (D. Mass. 2014) (same); *Tennille v. W. Union Co.*, No. 09–cv–00938–JLK–KMT, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 991 F. Supp.

4.      In addition to my empirical works, I have also published many law-and-economics papers on the incentives of attorneys and others in class action litigation. *See*, *e.g.*, Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 (2021) (hereinafter "A Fiduciary Judge"); Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043 (2010) (hereinafter "Class Action Lawyers"); Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009). Much of this work was discussed in a book I published with the University of Chicago Press entitled THE CONSERVATIVE CASE FOR CLASS ACTIONS (2019). The thesis of the book is that the so-called "private attorney general" is superior to the public attorney general in the enforcement of the rules that free markets need in order to operate effectively and that courts should provide proper incentives to encourage such private attorney general behavior. This work, too, has been relied upon by courts and scholars.[2]

5.      I have been asked by class counsel to opine on whether the attorneys' fees they have requested here are reasonable in light of the empirical studies and research on economic incentives in class action litigation. In order to formulate my opinion, I reviewed a number of

---

2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Fed. Nat'l Mortg. Association Sec., Derivative, and "ERISA" Litig.*, 4 F. Supp. 3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Prod. Liab. Litig.*, No. 11–1546, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 98-99 (D.D.C. 2013) (same); *In re Se. Milk Antitrust Litig.*, No. 2:07–CV 208, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, No. 10 C 816, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

[2] *See, e.g.*, *Briseno v. Henderson*, 998 F.3d 1014, 1025, 1029 (9th Cir. 2021); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 960 (11th Cir. 2020) (Jordan, J., dissenting); *Neese et al. v. Becerra*, 2022 WL 9497214, at *2 n.1 (N.D.Tex., Oct. 14, 2022); *Tershakovec v. Ford Motor Co.*, 2021 WL 2700347, at *18 (S.D. Fla. July 1, 2021); *Vita Nuova, Inc. v. Azar*, 2020 WL 8271942, at *3 n.5 (N.D. Tex. Dec. 2, 2020).

documents provided to me by class counsel; I have attached a list of these documents in Exhibit 3. As I explain, based on my study of settlements across the country and in the Eighth Circuit in particular, I believe the request here is within the range of reason in light of the empirical and economic research on class actions.

## II. Case background

6.      Beginning in August 2021, consumers filed dozens of lawsuits against T-Mobile under various state law theories for permitting cybercriminals to gain access to their personally identifiable information. These lawsuits were eventually transferred to this court by the Judicial Panel on Multidistrict Litigation. During the early stages of the litigation, the parties reached a class-wide settlement. The court certified the settlement class (and a California subclass) and preliminarily approved the settlement on July 26, 2022. The parties are now seeking final approval of the settlement and class counsel are seeking a fee award.

7.      Under the settlement, T-Mobile will pay $350 million to class members. *See* Settlement Agreement ¶ 3.1. After deducting costs for notice and settlement administration, service awards to the class representatives, and any attorneys' fees and expenses awarded by the court, the monies will used to 1) buy identity protection services for any class member who choose to enroll and 2) to pay class members who file claims either $25-$100 each or, if they prefer, an amount equal to their actual out-of-pocket losses (including lost time) incurred as a result of the data breach. *See id*. at ¶ 3.2; Benefits Plan ¶¶ 3-5. None of this money can revert to T-Mobile; if the claims exceed or undershoot the cash fund, class members will receive more or less than these amounts on a pro rata basis. *See* Benefits Plan ¶ 8. In addition, T-Mobile has agreed to spend $150 million above previously budgeted amounts this year and next to improve its data security.

4

*See* Settlement Agreement ¶ 5.1.  In exchange for these benefits, class members agree to release T-Mobile from any and all claims that "in any way concern, arise out of, or relate to the Data Breach, the facts alleged in the Actions, or any theories of recovery that were, or could have been, raised at any point in the Actions."  *Id*. at ¶ 2.30

8.      Class counsel have now moved the court for an award of fees of $78.75 million, which comes to 22.5% of the cash-fund portion of the settlement or 15.75% of the total monies that the defendant will pay under the settlement.   In my opinion, this request is reasonable in light of the empirical studies on class action fee awards and the research on economic incentives in class action litigation.

III. Assessment of the reasonableness of the request for attorneys' fees

9.      This settlement is a so-called "common fund" settlement where attorneys for the plaintiffs have created a settlement fund for the benefit of class members.  When a fee-shifting statute is inapplicable in such cases (as it is here), courts award fees from class members' proceeds pursuant to the common law of unjust enrichment.  This is sometimes called the "common fund" or "common benefit" doctrine.

10.     At one time, courts that awarded fees in common fund class actions did so using the familiar lodestar approach.  *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043, 2051 (2010) (hereinafter "Class Action Lawyers").  Under this approach, courts awarded class counsel a fee equal to the number of hours they worked on the case (to the extent the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary multiplier that courts often based on the risk of non-recovery and other factors.  *See id.; Johnson v. Comerica Mort. Corp.*, 83 F.3d 241, 244 (8th Cir. 1996).  Over time, however, the

5

lodestar approach fell out of favor in common fund class actions because it was difficult to calculate the lodestar (courts had to review voluminous time records and the like) and the method did not align the interests of class counsel with the interests of the class (because class counsel's recovery did not depend on how much the class recovered). *See id.* at 2051-52; *Comerica*, 83 F.3d at 245 n.8 (recounting "the deficiencies of the lodestar process particularly as it applies to a [common] fund case"). According to my empirical study, the lodestar method is now used to award fees in only a small percentage of class action cases. *See* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in only 12% of settlements). The other large-scale academic studies of fees agree. *See, e.g.,* Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. Law Review 937, 945 (2017) (hereinafter "Eisenberg-Miller 2017") (finding the lodestar method used only 6.29% of the time from 2009-2013, down from 13.6% from 1993-2002 and 9.6% from 2003-2008).

11.  The more popular method of calculating attorneys' fees is known as the "percentage-of-the-fund" method. Under this approach, courts select a percentage that they believe is fair to class counsel, multiply the common fund amount (in mathematical terms, the "multiplicand") by that percentage, and then award class counsel the resulting product. *See id.; Comerica*, 83 F.3d at 244-45. The percentage-of-the-fund approach has the advantages of being easy to calculate (because courts need not review voluminous time records and the like) and of aligning the interests of class counsel with the interests of the class (because the more the class recovers, the more class counsel receives). *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052; *In re Xcel Energy, Inc. Sec., Derivative, & ERISA Litig.*, 364 F.Supp.2d 980, 992 (D. Minn. 2005) (explaining the "strong policy reasons behind the . . . preference for the percentage of recovery method").

6

12.     In the Eighth Circuit, district courts have the discretion to use either the lodestar method or the percentage-of-the-fund method in common fund cases. *See Comerica*, 83 F.3d at 246 ("It is within the discretion of the district court to choose which method to apply.").  In light of the well-recognized disadvantages of the lodestar method and the well-recognized advantages of the percentage method, it is my opinion that courts should generally use the percentage method whenever enough of the value of the settlement can be reliably calculated.  It is my opinion that courts should use the lodestar method only where enough value of the settlement cannot be reliably calculated (and the percentage method is therefore not feasible) or a fee-shifting statute requiring the lodestar method is applicable.  *See id.* (affirming lodestar method where "the value of the settlements remained too speculative to calculate an appropriate percentage of the benefit").  This is not just my opinion.  It is the consensus opinion of class action scholars.  *See* American Law Institute, Principles of the Law of Aggregate Litigation § 3.13(b) (2010) ("[A] percentage-of-the-fund approach should be the method utilized in most common-fund cases.").  In this case, the settlement consists of cash payments and therefore it can be easily valued.  Thus, in my opinion, the court should use the percentage method and I will proceed under that method here.

13.     Under the percentage method, courts must 1) calculate the value of the benefits conferred by the litigation and then 2) select a percentage of that value to award to counsel.  When selecting the percentage, courts in the Eighth Circuit, *see, e.g., Rawa v. Monsanto Co.*, 934 F.3d 862, 870 (8th Cir. 2019), use the familiar factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974): (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by

the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

14.     When calculating the value of the benefits, most courts include any benefits conferred by the litigation, whether cash relief, non-cash relief, attorneys' fees and expenses, or administrative expenses.  Although some of these things do not go directly to the class, they facilitate compensation to the class (e.g., notice and administration expenses), provide future savings to the class, or deter defendants from future misconduct by making defendants pay more when they cause harm.  Thus, in my opinion, it is appropriate to include them all in the denominator of the percentage method.  *See also* Principles of the Law of Aggregate Litigation, *supra*, § 3.13(b) ("[A] percentage of the fund approach should be the method utilized in most common-fund cases, with the percentage being based on both the monetary and nonmonetary value of the judgment or settlement.").

15.     As I explain below, the fee request here is only 22.5% of the cash-fund portion of the settlement and 15.75% of the total monies T-Mobile will pay under the settlement.  It is my opinion that this request is reasonable under the *Johnson* factors in light of the empirical studies of class action fees and in light of the research on the economic incentives in class action litigation.

<u>Valuation of the settlement</u>

16.     Let me begin with the valuation of the settlement.  The $350 million cash fund portion of the settlement can be quantified at face value because none of it can revert to T-Mobile. It is true that the fund will not only distribute cash payments to class members, but will also buy identity protection services for any who want it.  Although these services have a retail value of $96 per person and it is possible that, if enough people sign up for the services, the benefits conferred on the class could far exceed the face value of the fund, because it is unclear how many people

8

will sign up, in order to be as conservative as possible, I will not consider that potential additional value. I will therefore value the cash fund at its face value: $350 million. In addition, T-Mobile has agreed to pay $150 million to improve its data security. If the court included these expenditures, the settlement value would increase to $500 million. As I explain below, it does not matter in my opinion whether the court values the settlement at $350 million or $500 million; the fee request is reasonable either way.

<u>Selecting the percentage</u>

17.    Class counsel have requested $78.75 million in fees, which comes to 22.5% if the court uses a $350 million valuation or 15.75% if the court uses a $500 million valuation. In my opinion, either percentage would be reasonable in light of the empirical studies and research on economic incentives.

18.    Consider first the factors that go to the fee awards in other cases: (5) the customary fee for similar work in the community and (12) awards in similar cases. According to my empirical study, the most common percentages awarded by all federal courts in 2006 and 2007 using the percentage method were 25%, 30%, and 33%, with nearly two-thirds of awards between 25% and 35%, and with a mean award of 25.4% and a median award of 25%. *See* Fitzpatrick, *Empirical Study, supra,* at 833-34, 838. The numbers in the Eighth Circuit were even higher: there were 15 class action settlements in my study in which district courts in the Eighth Circuit used the percentage-of-the-fund method to award attorneys' fees and the average was 26.1% with the median at 30%. *See id*. My numbers agree with the other large-scale academic studies of class action fee awards. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 260 (2010) (hereinafter "Eisenberg-Miller 2010") (finding mean and median of 24% and 25% nationwide, and 25% and 30% in the Eighth Circuit); *Eisenberg-Miller 2017*, *supra*, at 951 (finding mean and median of

9

27% and 29% nationwide, and 29% and 32% in the Eighth Circuit). The fee request here—whether 22.5% or 15.75%—is obviously well below any of these numbers.

19.     In order to visualize how low the fee request here is, I graphed the distribution of the Eighth Circuit's percentage awards from my study in Figure 1, below. The figure shows what fraction of settlements (y-axis) had fee awards within each five-point range of fee percentages (x-axis). The figure includes red arrows where the fee request here would fall under both of the aforementioned settlement valuations. As the figure shows, a fee award of 22.5% or 15.75% would be lower than the vast majority awarded in this Circuit. Indeed, the bar containing 22.5% is lower than some *three-fifths* of awards in this Circuit and the bar containing 15.75% is lower than some *three-fourths* of such awards.

### Figure 1: Percentage-method fee awards in the Eighth Circuit, 2006-2007



20.     With all of that said, it should be noted that the settlement here is unusually large; few settlements each year reach $350 or $500 million.  This is notable because some courts analyze the "other cases" factor in reference to the size of the settlement.  For this reason, my empirical study and the other large-scale academic studies show that settlement size has a statistically significant but inverse relationship with fee percentages—*i.e.*, that some courts awarded lower percentages in cases where settlements were larger.  *See* Fitzpatrick, *Empirical Study, supra,* at 838, 842-44; *Eisenberg-Miller 2010, supra,* at 263-65; *Eisenberg-Miller 2017, supra,* at 947-48.  Thus, for example, the mean and median fee percentages awarded in settlements in my dataset between $250 million and $500 million were only 17.8% and 19.5%, respectively.  *See id.* at 839.  (The Eisenberg-Miller studies do not break settlements down as granularly.)  Although the 15.75% number is below these numbers, the 22.5% number is above them.  Nonetheless, for several reasons, this does not change my opinion that these factors support the fee request.

21.     First, "some courts" in the above paragraph does not mean "all courts." The data from my study is nationwide data—the data points are too few to break them down by Circuit— and different Circuits have different answers to the question of whether fees should be lowered in bigger settlements.  For example, there is nothing in Eighth Circuit law that requires the Court to assess the "other cases" factor in reference only to similarly-sized settlements.  *See, e.g., In re Xcel*, 364 F.Supp.2d at 997 ("To the extent that the [objectors] imply that courts 'traditionally accounted for economies of scale by awarding lower fees as the size of the fund increases' . . . the court reads the precedent otherwise.").

22.     Second, when, as here, courts are not required to assess the "other cases" factor in reference to similarly-sized settlements, it is my opinion that courts should not exercise their discretion to do so anyway.  The reason is the one I intimated above when discussing the

11

percentage versus lodestar methods: it creates poor incentives for class counsel. *See, e.g.*, *In re Cendant Corp. Litigation*, 264 F.3d 201, 284 n. 55 (3d Cir. 2001) ("Th[e] position [that the percentage of a recovery devoted to attorneys' fees should decrease as the size of the overall settlement or recovery increases] . . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply." (alteration in original)); *Allapattah Servs. Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185, 1213 (S.D.Fla. 2006) ("By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little"); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (quoting *Allapattah*); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, No. 10-ml-02151, at 17 n.16 (C.D. Cal., Jun. 17, 2013)) ("The Court . . . agrees with . . . other courts . . . which have found that decreasing a fee percentage based only on the size of the fund would provide a perverse disincentive to counsel to maximize recovery for the class.") Consider the following example: if courts award attorneys 25% of settlements if they are under $100 million but only 18% of settlements if they are over $100 million (e.g., the average percentage I found in my study for settlements between $100 and $500 million), then rational attorneys will prefer to settle cases for $90 million (*i.e.*, an $22.5 million fee award) rather than $120 million (*i.e.*, a $21.6 million fee award)! Such incentives are obviously perverse. Indeed, cutting fee percentages when lawyers recover more money has been deemed so irrational—at least when not done only on the margin (e.g., for the *portion* above $100 million)—that it has been banned in at least one Circuit on the ground that "[p]rivate parties would never contract for such an arrangement . . . ." *See Synthroid I*, 264 F.3d 712, 718 (7th Cir. 2001). This is why studies of sophisticated corporate clients do not

report any such practice among them when they hire lawyers on contingency, even in the biggest cases like patent litigation. *See, e.g.,* David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 Ala. L. Rev. 335, 360 (2012) (finding that corporations either agree to flat rates of, on average, 38.6% or graduated rates that start, on average, at 28% and accelerate, on average, to 40.2%); Fitzpatrick, *A Fiduciary Judge*, *supra*, at 1159-63. But if class members would never contract for such an arrangement on their own, why should courts force it upon them in class actions? Given that courts are supposed to act as "fiduciaries" for absent class members, the answer is clear to me: they should not. *See, e.g.*, Fitzpatrick, *Fiduciary Judge*, *supra*, at 1154-55.

23.     Third, it bears noting that there is a large range around average fee percentages in class action litigation. For example, the standard deviation in my study was 7.9% in the $250 to $500 million range.[3] This means that fee awards can be found that are much higher (and lower) than average in big settlements like this one. In other words, the fee request here would land well within the range of fee awards in comparably large settlements. *See, e.g.*, *In re: Syngenta AG MIR 162 Corn Litigation*, 357 F.Supp.3d 1094, 1110 (D. Kan. 2018) (33.33% of $1.5 billion); *In re Urethane Antitrust Litig.*, No. 04 Civ. 1616, 2016 WL 4060156, at *6 (D. Kan. July 29, 2016) (33.33% of $835 million); *Dahl v. Bain Capital Partners, LLC*, No. 07-cv-12388, Dkt. 1095 (D. Mass. Feb. 2, 2015) (33% of $590.5 million); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (33% of $510 million); *In re Vitamins Antitrust Litig.*, No. Misc. 99-197 (TFH), 2001 WL 34312839, at *10, 14 (D.D.C. July 16, 2001) (34% of $359 million); *Hale*

---

[3] Professors Eisenberg and Miller have taken the view that, the greater the number of standard deviations fee requests are from the mean, the greater justification is needed to approve them. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical L. Studies 27, 74 (2004). Because even the higher percentage here—22.5% of $350 million—would be within one standard deviation of the mean, they would say it should be presumed reasonable. *See id.*

*v. State Farm*, No. 12-00660-DRH-SCW (S.D. Ill. Dec. 16, 2018) (33.33% of $250 million); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-340-SLR, ECF No. 543 (D. Del. 2009) (33% of $250 million); *In re Buspirone Antitrust Litig.*, No. 01-md-1413 (S.D.N.Y. Apr. 11, 2003) (33% of $220 million); *In re Relafen Antitrust Litig.*, No. 01-12239, at 8 (D. Mass. Apr. 9, 2004) (33% of $175 million); *In re Apollo Group Inc. Securities Litigation*, 2012 WL 1378677, at *9 (D. Ariz. April 20, 2012) (33% of $145 million); *In re Combustion Inc.*, 968 F. Supp. 1116, 1142 (W.D. La. 1997) (36% of $127 million); *City of Greenville v. Syngenta Crop Protection*, 904 F. Supp. 2d 902, 908-09 (S.D. Ill. 2012) (33% of $105 million).

24. Consider next the factors that go to the results obtained by class counsel in light of the risks class counsel faced: (2) the novelty and difficulty of the questions; (6) whether the fee is fixed or contingent; (8) the amount involved and the results obtained; and (10) the undesirability of the case. The best way to assess these factors is to compare the class's best-case damages estimate to the settlement and then to analyze whether any discount was justified by the risks the class faced. Because many class members have not suffered any out-of-pocket losses here, however, it is difficult to estimate a best-case damages estimate. Perhaps the most likely theory of recovery was that each class member could at least obtain nominal damages. Given the size of the class, that would have been roughly $75 million. The other theories—that class members paid more for T-Mobile's services thinking they came with privacy protections than they would have if they had known the services did not; that T-Mobile profited from their consumer's data and this profit could be disgorged; that the class could recover from T-Mobile for the value commanded on the black market of their private information; that T-Mobile breached implied contractual provisions with the class—are so uncertain it is difficult to gauge what more, if anything, the class might have recovered. A theory with a bit more legs is the new California Consumer Privacy

Act—it provides for statutory damages irrespective of out-of-pocket loses and might have totaled a billion dollars or more for the California class members here—but even this law is untested and subject to several defenses. Nonetheless, we might assume that the class could have obtained a billion dollars or more here. But that is if everything went right. Not only was recovery uncertain on any of these substantive theories of liability—even with nominal damages, it would be contested whether it should be $1 for the class or $1 for each class member—but, even more significantly in my view, T-Mobile has individual arbitration provisions in its contracts. Thus, it is difficult to see how this case could have survived a motion to compel arbitration, at least with respect to the significant portion of the class that had agreements with T-Mobile. Even if the class somehow survived that, it is not clear that a litigation class would be certified here given the variety of state laws at issue. If you add all these risks up, $350-500 million not only looks good; it looks incredible. Indeed, class counsel recovered more per class member here than other data breach class actions pursuing similar theories. As such, these factors support the fee request, too.

25. Consider next the factors that go to the skills of class counsel and their relationship with the plaintiffs: (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (7) time limitations imposed by the client or the circumstances; (9) the experience, reputation, and ability of the attorneys; and (11) the nature and length of the professional relationship with the client. Although I was not privy to the attorney-client relationships here, I can say that class counsel count among their number some of the deans of the national class action bar, especially the data breach class action bar. These are not average lawyers; they are exceptional ones. These factors, too, therefore support the fee request.

26. Consider finally factor (1): the time and labor required. There are two ways that courts consider this factor: qualitatively or quantitatively. The qualitative approach assesses what class counsel did during the litigation; i.e., whether class counsel have dug deeply enough into a case to know what it is worth. *See, e.g.*, *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir. 1988) ("[I]n awarding attorneys' fees in a common fund case, the 'time and labor involved' factor need not be evaluated using the lodestar formulation . . . ."). The quantitative approach is to calculate class counsel's lodestar and to "crosscheck" the fee percentage requested against the lodestar to ensure that the ensuing multiplier is not in some sense "too much." *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d at 285. Courts in this Circuit are not required to take the quantitative approach, *see, e.g., Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999) ("Having found that the district court's approval of the fee under the 'percentage of the fund' approach was proper . . . we need not address these criticisms [of the data used to calculate the lodestar crosscheck]."); *In re Xcel*, 364 F.Supp.2d at 999 ("Although not required, the court will exercise its discretion . . . by cross-checking . . . against lodestar."), and, indeed, the quantitative approach tends to be the minority approach nationwide. *See* Fitzpatrick, *supra*, at 833 (finding that only 49% of courts consider lodestar when awarding fees with the percentage method); *Eisenberg-Miller 2017*, *supra*, at 945 (finding percent method with lodestar crosscheck used 38% of the time versus 54% for percent method without lodestar crosscheck).

27. In this case, the qualitative approach supports the requested fee. Class counsel were able to secure all the information necessary to fairly evaluate the claims and potential damages in order to secure one of the largest data breach settlements on record. Class counsel obtained the key forensic report, understood the scope of the data compromised, and were well informed regarding the existing and potential harms to the class. Thus, class counsel dug deep enough to know what

this case was worth. The qualitative approach would not punish class counsel for doing so efficiently.

28. The quantitative approach, by contrast, would punish class counsel for doing so efficiently. In my opinion, the majority of courts are wise to reject it. I say this because the lodestar crosscheck harms class members by creating bad incentives for class counsel. In particular, the lodestar crosscheck reintroduces the very same undesirable consequences of the lodestar method that the percentage method was designed to correct in the first place. For example, if counsel believe that courts will cap the percentage awarded at some multiple of their lodestar, then they will have precisely the same incentives they would if courts used the lodestar method alone: to be inefficient, perform unnecessary projects, delay results, and overbill and overstaff work in order to run up their lodestar. Moreover, by capping the amount of compensation counsel can receive from a settlement, the lodestar crosscheck misaligns their incentives from those of their clients and blunts their incentives to achieve the largest possible award. *See* Fitzpatrick, *Class Action Lawyers*, *supra*, at 2065-66. For these reasons, to my knowledge, real clients have never reported using lodestar crosschecks when they hire lawyers on contingency, *see* Fitzpatrick, *A Fiduciary Judge, supra*, at 1167, and, for that reason, the Seventh Circuit has all but banned it in awarding class action fees, *see Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("The . . . argument . . . that any percentage fee award exceeding a certain lodestar multiplier is excessive . . . echoes the 'megafund' cap we rejected in *Synthroid*."). Again, if class members would never contract for such an arrangement on their own, why should courts force it upon them in class actions? Given that courts are supposed to act as "fiduciaries" for absent class members, the answer is again clear to me: they should not. *See, e.g.*, Fitzpatrick, *Fiduciary Judge*, *supra*, at 1154-55.

29.     In the event the court nonetheless wishes to follow a strictly quantitative approach here, I will comment on class counsel's lodestar.  The lodestar multiplier that would result if the court grants class counsel's fee request would be higher than usual.  According to class counsel, their lodestar thus far is $6,000,000 through October 31, 2022, with another $2,200,000 in anticipated time.  If we add those numbers together, it means the requested fee award would result in a multiplier of 9.6.  Of the 204 cases in my study where the district court used the percentage-of-the-fund method with a lodestar crosscheck and the lodestar multiplier was ascertainable, the multipliers ranged from .07 to 10.3, with a mean and median of 1.65 and 1.34, respectively.  *See* Fitzpatrick, *Empirical Study, supra*, at 834.  Larger settlements tend to result in larger multipliers, but, even factoring that in, the multiplier here would still be higher than usual.  *See Eisenberg-Miller 2010*, *supra*, at 274 (finding mean and median multipliers of 3.18 and 2.60, respectively, for recoveries above $175.5 million).  But it is also true that the multiplier here would fall within the range of multipliers found in previous settlements.  As I noted, in just the two years of my empirical study, I found multipliers up to 10.3.  There are many in other years that are even higher. *See, e.g.*, *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1252 (Del. 2012) (awarding fee with a 66 multiplier); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002) (noting multipliers of up to 19.6); *Health Republic Ins. Co. v. United States*, 156 Fed. Cl. 67, 82 (2021) ("[E]ven if the Court applied the lodestar cross-check, a multiplier of 18–19 would, at least, not be outside the realm of reasonableness."); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ.A. 03–4578, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (awarding fee with 15.6 multiplier); *Lloyd v. Navy Fed. Credit Union*, 2019 WL 2269958, at *13 (S.D. Cal. May 28, 2019) (awarding fee even though "[t]he Court is aware that a lodestar cross-check would likely result in a multiplier of around 10.96"); *In re Doral Financial Corp. Securities Litigation*, No. 05-

18

cv-04014-RO (S.D.N.Y. Jul. 17, 2007) (awarding fee with 10.26 multiplier); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); *Bais Yaakov of Spring Valley v. Peterson's Nelnet, LLC*, No. 11-cv-00011 (D.N.J. Jan. 26, 2015) (awarding fee with 8.91 multiplier); *Raetsch v. Lucent Tech., Inc.*, No. 05-cv-05134 (D.N.J., Nov. 8., 2010) (awarding fee with 8.77 multiplier); *Thacker v. Chesapeake Appalachia, L.L.C.*, No. 07-cv-00026 (E.D.Ky. Mar. 3, 2010) (awarding fee with 8.47 multiplier); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 05-11148-PBS, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (awarding fee with 8.3 multiplier).

30.     Given that all of the other *Johnson* factors support the fee request and the time and labor expended here is within the range of previous cases, it is my opinion that it would be a mistake to reject the fee request simply because class counsel did not bill more hours before achieving what is a highwater mark in data breach settlements—especially when, as I noted above, billing more hours here probably would have resulted in a worse outcome for the class, not a better one.

31.     For all these reasons, I believe the fee award requested here falls within the range of reason in light of the empirical studies and research on economic incentives.

32.     My compensation in this matter was a flat fee in no way dependent on the outcome of class counsel's fee petition.

Nashville, TN

November 16, 2022

Brian T. Fitzpatrick