**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| IN RE: T-MOBILE CUSTOMER DATA | ) | |
| SECURITY BREACH LITIGATION, | ) | MDL No. 3019 |
| | ) | |
| | ) | Master Case No. 4:21-MD-03019-BCW |
| ALL ACTIONS | ) | |

<u>**ORDER AND JUDGMENT GRANTING FINAL APPROVAL OF CLASS ACTION
SETTLEMENT AND AWARDING ATTORNEYS' FEES, COSTS, EXPENSES, AND
SERVICE AWARDS**</u>

Before the Court is Plaintiffs' Motion for Final Approval of Class Action Settlement (Doc. #210), Plaintiffs' Motion for Attorneys' Fees, Costs, Expenses, and Service Awards (Doc. #179), and all objections to the same. The Court, being duly advised of the premises, in light of the entirety of the record and having held a hearing on January 20, 2023, grants Plaintiffs' motions, approves the Class Action Settlement Agreement (Doc. #158-1)[1], awards fees and costs as set forth, and overrules all objections.

**I.    BACKGROUND**

T-Mobile, with more than 100 million customers, is one of the largest consumer brands in the United States. In their Consolidated Consumer Class Action Complaint ("Complaint"), Plaintiffs allege T-Mobile collects and maintains the confidential personal information of millions of U.S. consumers, including Social Security numbers, driver's license numbers, phone numbers, unique technical identifiers tethered to customers' mobile phones, and other identifying information unique to each individual customer. Plaintiffs allege that, sometime in 2021, one or more cybercriminals exploited T-Mobile's data security protocols and gained access to internal services containing the personally identifiable information ("PII") of millions of current, former,

---

[1] All capitalized terms throughout this Order not otherwise defined have the same meanings as those set forth in the Settlement Agreement (Doc. #158-1 at 8-16).

1

and prospective T-Mobile customers, referred to hereinafter as "the Data Breach." (Doc. #128 at 41-44). After exfiltrating a large portion of this data, the hacker or hackers offered to sell a subset of the stolen PII via a dark-web forum. (Doc. #128 at 44-47). On August 16, 2021, T-Mobile announced the cyberattack, stating (at the time) that account data for more than 50 million current, former, or prospective customers was compromised in the Data Breach. (Doc. #128 at 4-5, 48). T-Mobile also disclosed than unidentified number of phone numbers, International Mobile Equipment Identity ("IMEI"), and International Mobile Subscriber Identifier ("IMSI") numbers were compromised. (Doc. #128 at 49). In November 2021, T-Mobile revealed in an SEC filing that its "investigation also identified approximately 26.0 million additional individuals" whose "names, dates of birth and, in many cases, addresses" were compromised, increasing the total number of individuals whose PII was compromised in the Data Breach to approximately 76.6 million. (Doc. #128 at 49). The stolen PII was listed for sale and sold on the dark web, with Plaintiffs' allegations citing to actual postings form the dark web, as well as an unsealed FBI indictment concerning the forum in in which the information was offered for sale and sold. (Doc. #128 at 44-49).

After T-Mobile provided notice of the Data Breach, customers filed dozens of lawsuits against T-Mobile. On August 23, 2021, a plaintiff in one of those cases filed a motion before the Judicial Panel on Multidistrict Litigation ("JPML"), supporting centralization of those actions in the Western District of Washington. In re T-Mobile Customer Data Sec. Breach Litig., (MDL No. 3019), JPML Doc. #1. On September 14, 2021, T-Mobile filed its response to that motion, supporting centralization in the Western District of Missouri. JPML Doc. #49. On December 3, 2021, the JPML ordered centralization of those actions in the United States District Court for the Western District of Missouri for coordinated or consolidated proceedings before this Court. JPML Doc. #98.

On February 25, 2022, after an application process authorized under Fed. R. Civ. P. 23(g), the Court appointed Norman E. Siegel of Stueve Siegel Hanson LLP, Cari Campen Laufenberg of Keller Rohrback L.L.P., and James J. Pizzirusso of Hausfeld LLP as Co-Lead Interim Class Counsel, together with Liaison Counsel Alexis Wood of the Law Offices of Ronald Maron, and an Executive Committee of eight members: Maureen M. Brady of McShane & Brady LLC; Amy E. Keller of DiCello Levitt Gutzler LLC; Robert Lopez of Hagens Berman Sobol Shapiro LLP; Margaret C. MacLean of Lowey Dannenberg, P.C.; Kaleigh N.B. Powell of Tousley Brain Stephens PLLC; Kenya J. Reddy of Morgan & Morgan (subsequently resigned appointment); Sabita J. Soneji of Tycko and Zavareei LLP; and Rachel K. Tack of Zimmerman Reed, LLP, authorizing them to litigate all pretrial proceedings and to conduct settlement negotiations on behalf of Plaintiffs and putative class members. (Doc. #102).

On May 11, 2022, Plaintiffs filed their Complaint on behalf of 64 Plaintiffs from across the United States. (Doc. #128). Plaintiffs' Complaint asserted the following claims against T-Mobile on behalf of Plaintiffs and the Nationwide Class, or alternatively on behalf of Plaintiffs and the Statewide Subclasses: (1) negligence; (2) negligence per se; (3) breach of confidence; (4) invasion of privacy – intrusion upon seclusion; (5) breach of express contract; (6) breach of implied contract; (7) unjust enrichment; (8) declaratory judgment; and numerous additional claims on behalf of the respective Statewide Subclasses. (Doc. #128 at 73-309). After filing the Complaint, Class Counsel served discovery on T-Mobile. (Doc. #158-3 at 10).

In June 2022, the Parties engaged in mediation. (Doc. #158-3 at 10-11). As part of this process, the Parties exchanged extensive confidential discovery documents and information related to the Data Breach and the named Parties in the Complaint, which allowed the Parties to assess the risks of the case and meaningfully engage in arm's-length settlement negotiations. (Doc. #158-3 at 10-11). After several conferences, including an in-person meeting in Kansas City, the

Parties decided to mediate the case with the Honorable Diane M. Welsh (Ret.) of JAMS, a mediator with a proven track record of resolving complex data breach class actions, in Philadelphia, Pennsylvania. (Doc. #158-3 at 11). Judge Welsh conducted pre-mediation calls with each Party, and the Parties exchanged detailed mediation statements in advance of the mediation. (Doc. #158-3 at 11). After negotiations occurring over two full days on June 7 and 8, 2022, the Parties reached a settlement in principle and executed a binding term sheet, which reflects the essential terms of the settlement. (Doc. #158-3 at 11).

Class Counsel then obtained bids from and negotiated with third-party administrators to secure the most economical and complete administration of the Settlement (Doc. #211-1 at 7). After soliciting competing bids, Class Counsel negotiated an agreement with Kroll – an experienced and reputable national class action administrator – to serve as the Settlement Administrator. (Doc. #158-1 at 14). Class Counsel also negotiated for Intersections, LLC, doing business as Pango ("Pango") to provide the Settlement's Identity Defense Services and Restoration Services. (Doc. #162 at 6).

Class Counsel then filed the Unopposed Motion for Preliminary Approval and to Direct Notice of Proposed Settlement to the Class (Doc. #157) and Suggestions in Support (Doc. #158) (together, the "Preliminary Approval Motion"), which the Court granted on July 26, 2022. (Doc. #162). In its Preliminary Approval Order, the Court determined that it would likely be able to certify the proposed Settlement Class and California Settlement Subclass for settlement purposes and preliminarily approved the Settlement as fair, reasonable, and adequate, in accordance with Fed. R. Civ. P. 23(e), pending a Final Approval hearing. (Doc. #162). The Court also approved the notice Plan and set the Final Approval Hearing for January 13, 2023 at 10:00 a.m. (Doc. #162). The Court subsequently rescheduled the Final Approval Hearing to January 20, 2023 at 10:00 a.m. (Doc. #164).

Pursuant to the Court's direction, the Claims Administrator appointed by the Court implemented a notice program. In accordance with the Court's Order, direct notice to Class Members was served by mail, email, and/or text. The notice informed Class Members of the terms of the Settlement, including instructions for submitting a claim for cash reimbursement for out-of-pocket losses and time spent addressing issues related to the Data Breach. The notice further informed Class Members of the deadline to submit an objection to the Settlement or to opt out of the Settlement and that Class Counsel would seek attorneys' fees up to 30% of the Settlement Fund, reimbursements for costs and expenses, and service awards of $2,500 for each of the Named Plaintiffs. The Notice Plan has been implemented and reached approximately 92.4% of the Settlement Class. (Doc. #211-3 at 3).

After completion of the ordered class notice, over 2 million Settlement Class Members filed claims, and Class Counsel expects that every Class Member submitting a valid, Out-Of-Pocket Loss claim will be completely (or nearly completely) reimbursed for losses that are fairly traceable to the Data Breach. Conversely, only 13 Settlement Class Members filed timely and compliant objections, which equates to .000017% of the class.[2]

Class Counsel have applied separately for a fee of 22.5% of the 350 million cash fund – or 15.75% of T-Mobile's total cash commitment of $500 million – and reimbursement of litigation expenses of $170,845.18. (Docs. #179; #211-1 at 16). Class Counsel have also requested service awards of $2,500 for each Settlement Class Representative. (Doc. #179 at 28-29). T-Mobile takes no position on these requests.

---

[2] The Settlement Administrator has identified five (5) other submissions that are not timely and compliant objections that nonetheless take issue with the Settlement Agreement in some respect. (Doc. #211-2 at 8). Though not proper objections, the Court addresses the submissions herein.

On January 20, 2023, the Court held a hearing on all pending motions, which was attended by Class Counsel, counsel for T-Mobile, counsel for objector Cassie Hampe, and counsel for objector James Achermann (appearing remotely).

## II. FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Nothing has occurred that would alter the Court's initial determination that the Settlement is fair, reasonable, and adequate. The response of the Settlement Class Members to the Settlement underscores that the Settlement is fair, reasonable, an adequate. Therefore, the Court, for good cause shown, having reviewed the Settlement Agreement, including the exhibits attached thereto, the arguments and the authorities presented by the Parties and their counsel, and the record in the Action, grants Plaintiffs' Motion for Final Approval of Class Action Settlement as follows.

### A. Class Certification for Settlement Purposes Only

The Settlement Agreement provides for a Settlement Class, which includes a California Settlement Subclass, defined as follows:

> The approximately 76.6 million U.S. residents identified by T-Mobile whose information was compromised in the Data Breach, as reflected in the Class List. For the avoidance of doubt, the Settlement Class includes the California Settlement Subclass. Excluded from the Settlement Class are (i) T-Mobile, any entity in which T-Mobile has a controlling interest, and T-Mobile's officers, directors, legal representatives, successors, subsidiaries, and assigns; (ii) any judge, justice, or judicial officer presiding over the Action and the members of their immediate families and judicial staff; (iii) any individual who timely and validly opts out of the Settlement; and (iv) all individuals who on or before the date the Court enters the Preliminary Approval Order have either (1) filed or served a written arbitration demand or petition against T-Mobile relating to the Data Breach, or (2) provided written notice to T-Mobile of their intent to pursue arbitration against T-Mobile relating to the Data Breach with a description of claims to the address provided in T-Mobile's Terms and Conditions or to T-Mobile's Counsel.

(Doc. #158-1 ¶ 2.36). The California Settlement Subclass includes members of the Settlement Class who were residents of the State of California on August 1, 2021. (Doc. #158-1 ¶ 2.6). The Settlement expressly excludes from the Settlement Class any individual who, on or before the date the Court entered the Preliminary Approval Order, had filed or served a written arbitration demand

or petition against T-Mobile relating to the Data Breach, or provided written notice to T-Mobile of their intent to pursue arbitration against T-Mobile relating to the Data Breach with a description of claims to T-Mobile's counsel or to the address provided in T-Mobile's Terms and Conditions, meaning those individuals who have chosen to pursue arbitration will be able to continue those proceedings without interference from this Settlement. (Doc. #158-1 ¶ 2.36).

For the following reasons, the Court affirms that it is proper to certify, and hereby does certify, for settlement purposes only, the Settlement Class pursuant to Federal Rule of Civil Procedure 23(b)(3).

### a. Numerosity

Rule 23(a)(1) requires that a proposed settlement class be "so numerous that joinder of all class members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, there are approximately 76.6 million Settlement Class Members. The numerosity requirement is met. Carpe v. Aquila, Inc., 224 F.R.D. 454, 457 (W.D. Mo. 2004) (quoting 2 W. Rubenstein, Newberg on Class Actions, § 3.05 at 3-25) ("[W]here the class is very large – for example numbering in the hundreds – joinder will be impracticable . . . . [t]he difficulty inherent in joining as few of 40 class members should raise a presumption that joinder is impracticable . . . .")).

### b. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," such that all their claims can productively be litigated at once. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349-50 (2011) (internal quotations and citations omitted). This requires that the determination of the common question "will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. at 350. "Even a single common question will do." Id. at 359. Here, all Settlement Class Members suffered the same alleged injury

7

from the same conduct—exposure of their PII in the Data Breach—and the claims of the Class Members all rise or fall based on T-Mobile's alleged actions and/or omissions, which were made in a uniform manner to all Settlement Class Members. The commonality requirement is met. Pollard v. Remington Arms Co., LLC, 320 F.R.D. 198, 206 (W.D. Mo. 2017), aff'd, 896 F.3d 900 (8th Cir. 2018) ("This lawsuit contains questions of law that link the class members and are substantially related to the resolution of this matter."); In re Anthem, Inc. Data Breach Litig., 327 F.R.D. 299, 307-09 (N.D. Cal. 2018).

### c. Typicality

Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of those of the class. This requirement "is fairly easily met so long as other class members have claims similar to the named plaintiff." DeBoer v. Mellon Mortg. Co., 64 F.3d 1171, 1174 (8th Cir. 1995). In assessing typicality, courts consider whether the named plaintiff's claim "arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996). The Settlement Class Representatives' claims are typical of other Settlement Class Members' claims because they arise from the same alleged event or course of conduct, the Data Breach that exposed their PII. Plaintiffs' claims are typical because they, like all members of the Settlement Class, provided their PII to T-Mobile. Plaintiffs allege T-Mobile owed a duty and was contractually obligated to protect and keep that information secure. Plaintiffs allege that they, like all other members of the Settlement Class, have sustained injury and damages as a result of T-Mobile's uniform breach of its alleged duty and contractual obligations to adequately safeguard that information. Plaintiffs' claims arise out of the same course of alleged conduct, are based on the same legal theories, seek the same types of damages as those of the Settlement Class, and meet all necessary standing requirements. The typicality requirement of Rule 23(a)(3) is met. Pollard, 320 F.R.D. at 206; In re CenturyLink Sales

Pracs. & Sec. Litig., MDL No. 17-2795 (MJD/KMM), 2020 WL 7133805, at *15 (D. Minn. Dec. 4, 2020) ("Plaintiffs' and the Settlement Class's claims result from the same conduct . . . .").

###### d. Adequacy of Representation

The adequacy requirement is satisfied when "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). The Settlement Class Representatives and Class Counsel have adequately represented Settlement Class Members and will continue to do so. (Doc. #162 at 2-4). The Settlement Class Representatives are similarly situated to and do not have any interests antagonistic to absent Settlement Class Members, and they have retained lawyers whom the Court has recognized as being informed and experienced, thus satisfying the adequacy requirement. Id.

###### e. Predominance

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623. Plaintiffs are not required to prove that each element of their claims is "susceptible to classwide proof." Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 469 (2013) (citation omitted). Rather, the predominance inquiry measures the relative weight of the common questions as against individual ones. Amchem, 521 U.S. at 624. The predominance requirement is satisfied when plaintiffs and class members share a common claim that is "capable of classwide resolution," meaning that determination of that claim's "truth or falsity will resolve an issue that is central to [the claim's] validity . . . in one stroke." Dukes, 564 U.S. at 350.

Common issues predominate here because all claims arise out of an alleged common course of conduct by T-Mobile, and therefore, central questions at issue in this litigation can be

9

established through generalized evidence. As such, Plaintiffs' claims raise common issues concerning the same fundamental questions of fact and law regarding the Data Breach and T-Mobile's conduct, which revolve around common evidence that does not vary among Settlement Class Members, and these common issues predominate over any individual concerns and can be fairly resolved for all Settlement Class Members at once. Similarly, resolving these questions as to one claim would resolve the other claims as well. Dukes, 564 U.S. at 350.

### f. Superiority

"[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy . . . ." 7AA Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure § 1779 (3d ed. 2005). Here, the superiority requirement is satisfied, as litigating the claims of the approximately 76.6 million Settlement Class Members would be inefficient, and a class action represents a superior means through which these Settlement Class Members may obtain relief. Pollard, 320 F.R.D. at 208 Anthem, 327 F.R.D. at 315-16.

### B. Class Counsel and Settlement Class Representatives

The Court concludes that Norman E. Siegel of Stueve Siegel Hanson LLP, Cari Campen Laufenberg of Keller Rohrback L.L.P., and James J. Pizzirusso of Hausfeld LLP have fairly and adequately represented the interests of the Settlement Class Members. Plaintiffs' counsel have substantial experience in consumer class action litigation, including in data breach and privacy litigation, have spent a significant amount of time identifying the potential claims in this action and pursuing relevant discovery, and have negotiated a well-informed Settlement that provides meaningful relief to Plaintiffs and Settlement Class Members. The Court previously appointed Mr. Siegel, Ms. Laufenberg, and Mr. Pizzirusso as Class Counsel (Doc. #162 at 4) and now affirms that appointment pursuant to Federal Rule of Civil Procedure 23(g).

10

The Court further concludes that the Plaintiffs identified in Exhibit B to the Settlement Agreement have fairly and adequately represented the interests of the Settlement Class Members and appoints them as Settlement Class Representatives. (Doc. #158-1 at 53-54). The Court further finds that Plaintiffs Jill Kobernick, Daniel Strenfel, and Henry Thang have also fairly and adequately represented the interests of the California Settlement Subclass and appoints them as Settlement Class Representatives for the California Settlement Subclass.

### C. Jurisdiction

The Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) and supplemental jurisdiction under 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy. Further, the Court has personal jurisdiction over the parties before it. Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1407 and the January 31, 2022 Transfer Order of the JPML in MDL 3019, as well as, pursuant to 28 U.S.C. § 1391 because the Defendant regularly transacts business and may be found in this District.

### D. Findings Concerning Article III Standing and Overruling of Objector Achermann's Objection Regarding Standing

James Achermann filed an objection to the settlement that the Court lacks subject matter jurisdiction to approve the settlement and enter a class-wide judgment in this case. While Achermann does not dispute the class lacks standing under Article III – while, in his motion to remand, Achermann disputes the Court jurisdiction over his own claims on the basis of lack of standing – Achermann asserts that Article III standing should be assessed with reference to his asserted interpretation of TransUnion LLC v. Ramirez, 141 S. Ct. 2190 (2021): the Court is required to make "factual findings, based on evidence, as to whether it has Article III subject matter jurisdiction." (Doc. #185 at 2).

The Court's obligation to assure itself of litigants' standing under Article III extends to proposed class action settlements. Frank v. Gaos, 139 S. Ct. 1041, 1046 (2019) (citing Daimler

11

_Chrysler Corp. v. Cuno_, 547 U.S. 332, 340 (2006) (quoting _Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc._, 528 U.S. 167, 180 (2000)).

"In order for a class to be certified, each member must have standing and show an injury in fact that is traceable to the defendant and likely to be redressed in a favorable decision." _Halvorson v. Auto-Owners Ins. Co._, 718 F.3d 773, 778 (8th Cir. 2013) (citing _Avritt v. Reliastar Life Ins. Co._, 615 F.3d 1023, 1034 (8th Cir. 2010). "Although federal courts do not require that each member of a class submit evidence of personal standing, a class cannot be certified if it contains members who lack standing." _Id._ (citing _Denney v. Deutsche Bank AG_, 443 F.3d 253, 264 (2d Cir. 2006)). Therefore, "[a] class must therefore be defined in such a way that anyone within it would have standing." _Id._ at 264. "Or, to put it another way, a named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves." _Halvorson_, 718 F.3d at 779 (citing _Avritt_, 615 F.3d at 1034)

Achermann argues "a showing of Article III standing at class certification require[s] evidence or factual findings as to absent class members" (Doc. #185 at 4); however, "federal courts do not require that each member of a class submit evidence of personal standing." _Halvorson_, 718 F.3d 779 (citing _Denney_, 443 F.3d at 263). As the Fifth Circuit has observed, "it would make no practical sense for a court to require evidence of a party's claims when the parties themselves seek settlement under Rule 23(e)." _In re Deepwater Horizon_, 739 F.3d 790, 807 (5th Cir. 2014) Requiring class members "to prove their claims prior to settlement under Rule 23(e) would eliminate class settlement because there would be no need to settle a claim that was already proven." _Id._

The decision in _TransUnion LLC v. Ramirez_, 141 S. Ct 2190 (2021) did not change this standard. _TransUnion_ did not address standing in the class action settlement and, after _TransUnion_, the Supreme Court refused to revisit the rule set forth in _Frank v. Gaos_ that only the named plaintiff

requires standing for a class settlement to advance. <u>Frank</u>, 139 S. Ct. at 1046; <u>In re Equifax Inc.</u> <u>Customer Data Sec. Breach Litig.</u>, 999 F.3d 1247, 1261 (11th Cir. 2021) ("[O]nly one named plaintiff must have standing as to any particular claim in order for [a class settlement] to advance.) (citing <u>Wilding v. DNC Servs. Corp.</u>, 941 F.3d 1116, 1124-25 (11th Cir. 2019))), <u>cert. denied sub</u> <u>nom</u>. <u>Huang v. Spector</u>, 142 S. Ct. 431 (2021), <u>Watkins v. Spector</u>, 142 S. Ct. 786 (2022). Moreover, none of the cases Achermann cites stand for the proposition that <u>TransUnion</u> requires an evidentiary showing or factual findings as to the standing of either the named plaintiffs or class members at the class certification stage, settlement or otherwise.

In this case, the Class is defined such that everyone within it has standing. The class includes the "approximately 76.6 million U.S. residents identified by T-Mobile whose information was compromised in the Data Breach, as reflected by the Class List. (Doc. #158 at 12). As reflected in T-Mobile's records, each member of the preliminarily-approved class had their PII, including names, Social Security numbers, driver's license numbers, phone numbers, unique technical identifiers tethered to customers' mobile phones, and other identifying information unique to each individual customer stolen by a malicious hacker and made publicly-available for sale on the dark web. (Doc. #158 at 9-10; Doc. #158-5 at 6; Doc. #128). Even though it is not required, these allegations are supported by actual postings from the dark web, as well as an indictment concerning the forum in which the information was offered for sale and sold. (Doc. #128). T-Mobile does not dispute that the information was for sale; Plaintiffs allege T-Mobile attempted to purchase it. (Doc. #128). As a result of this malicious publication and sale of their PII, as set forth in the Consolidated Complaint, the Class Representatives and the Class Settlement Members have standing.

Moreover, the Class Representatives allege that they and the Class "remain at a substantial and imminent risk of future harm" given the public disclosure of their data. (Doc. #128). That the Class Representatives and the Class are "at a substantial and imminent risk of future harm" is

established by the fact that multiple Class Representatives, as set forth in the Consolidated Complaint, have suffered identity theft and fraud as a result of their PII being stolen in the T-Mobile Data Breach. (Doc. #128). Because of the Data Breach, the Class Representatives have taken mitigating actions resulting in additional concrete injuries, which include spending time and effort mitigating the risk of the breach, such as monitoring their accounts and freezing their credit. (Doc. #128).

Further, that the Class seeks redress for common law tort and express and implied contract claims. The Class Representatives allege on behalf of the Class multiple common law claims, including negligence, negligence per se, breach of confidence, intrusion upon seclusion, breach of implied contract, unjust enrichment, and declaratory judgment – as well as the assertion of express breach of contract on behalf of current customers and the assertion of state-specific claims on behalf the state-subclass. The assertion of these claims distinguishes this matter from TransUnion, which solely concerned a statutory violation. TransUnion, 141 S. Ct at 2204 (in statutory context, court should analyze whether plaintiffs have identified a common-law analogue). The Eighth Circuit, for example, has held that a plaintiff who sufficiently alleges he or she was a party to a breached contract "has a judicially cognizable interest for standing purposes, regardless of the merits of the breach alleged." Carlsen v. GameStop, Inc., 833 F.3d 903, 909 (8th Cir. 2016) (finding standing where plaintiff alleged breach of contract when defendant shared PII with Facebook in violation of defendant's privacy policy). Moreover, TransUnion specifically identified that the "disclosure of private information" qualifies as a concrete injury for standing. 141 S. Ct. at 2204.

Here, the allegations that the Class members' private information was disclosed on the dark web as well as other harms suffered constitute a concrete injury. The harms set forth adequately show that the Class Representatives and the Class have Article III standing, as numerous courts

14

have held in the data breach context. <u>Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.</u>, 892 F.3d 613, 622 (4th Cir. 2018) (plaintiffs suffered injury in fact from data breach owing to lost time, notification to credit agencies, and steps to mitigate risk of future identity theft); <u>In re Zappos.com, Inc.</u>, 888 F.3d 1020, 1027 (9th Cir. 2018) (finding standing in data breach case based on "sensitivity of the personal information, combined with its theft"); <u>Remijas v. Neiman Marcus Grp., LLC</u>, 794 F.3d 688, 694-96 (7th Cir. 2015) (plaintiffs had adequately alleged imminent harm when hackers stole data and plaintiffs had already lost time and money protecting themselves against identity theft and fraudulent charges); <u>Anderson v. Hannaford Bros. Co.</u>, 659 F.3d 151, 164 (1st Cir. 2011); <u>In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.</u>, 440 F. Supp. 3d 447, 459 (D. Md. 2020); <u>Sackin v. TransPerfect Glob., Inc.</u>, 278 F. Supp. 3d 739, 749 (S.D.N.Y. 2017).

Moreover, multiple courts have found Article III standing in the data breach context after <u>TransUnion</u>. <u>See</u>, <u>e.g.</u>, <u>In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.</u>, 603 F. Supp. 3d 1183, 1203 (S.D. Fla. May 10, 2022) (finding that, given theft of PII, "in addition to establishing substantial risk of future harm" plaintiffs alleged "concrete harms sufficient to satisfy the Court's holding in <u>TransUnion</u>," including "the cost of the increased time plaintiffs have spent and must continue to spend reviewing their financial information"); <u>In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.</u>, Civil Action No. 19-md-2904, 2021 WL 5937742, at *9 (D.N.J. Dec. 16, 2011) (finding standing for plaintiffs who alleged PII was for sale on dark web and stating "a plaintiff who suffers a wrongful disclosure need not additionally demonstrate misuse resulting in economic harm"); <u>Clemens v. ExecuPharm Inc.</u>, 48 F.4th 146, 155-56 (3d Cir. 2022) (finding standing post-<u>TransUnion</u>).

The same is true for data breach cases at the class action settlement stage, wherein multiple courts after <u>TransUnion</u> have found standing for the proposed settlement class and granted final

15

approval. <u>Baldwin v. Nat'l W. Life Ins. Co.</u>, 2022 WL 16709706, at *1 (W.D. Mo. June 16, 2022) (granting final approval of data breach class action settlement post-<u>TransUnion</u> and finding it had jurisdiction to do so, after having addressed the impact of <u>TransUnion</u> on standing previously in the record, 2021 WL 4206736, at *3 (W.D. Mo. Sept. 15, 2021) (public disclosure requiring monitoring sufficient to confer standing in face of challenge based on <u>TransUnion</u>)); <u>In re: Capital One Consumer Data Sec. Breach Litig.</u>, MDL No. 1:19-md-2915 (AJT / JFA), 2022 WL 18107627, at *6 (E.D. Va. Sept. 13, 2022) (granting final approval and standing for class whose data had been exfiltrated and who alleged claims for breach of implied and express contract).

Here, the Court finds the Class Representatives have standing and the Settlement Class includes only individuals with standing. Therefore, this Court has jurisdiction to grant final approval of the settlement and Achermann's objection is overruled.

### E.     Findings Concerning Notice

The preliminarily approved Notice Plan has been implemented by the Settlement Administrator and the Parties in accordance with the requirements of the Settlement Agreement, and that such Notice Plan, including the utilized forms of Notice, constitutes the best notice practicable under the circumstances and satisfies due process and the requirements of Rule 23 of the Federal Rules of Civil Procedure. The Court finds that the Settlement Administrator and Parties have complied with the directives of the Preliminary Approval Order, and the Court reaffirms its findings concerning notice as set forth in paragraph 8 thereof. (Doc. #162 at 5-6).

### F.     Findings Concerning Claims Process

The Court finally approves the claims process as a fair and reasonable method to allocate the Settlement benefits among Settlement Class Members. The Court directs that the Settlement Administrator continue to effectuate the claims process according to the terms of the Settlement Agreement.

### G. Findings Concerning the Fairness, Adequacy, and Reasonableness of the Settlement

The Court previously determined that the proposed Settlement meets the requirements of Rule 23(e) such that notice should issue. (Doc. #162). The Court now determines that the Settlement is fair, reasonable, and adequate and should be approved in a class judgment.

In evaluating the Settlement, the Court has considered the factors articulated in Rule 23(e)(2), as well as other factors previously analyzed by this and other courts, including whether:

> (a) the class representatives and class counsel have adequately represented the class;
>
> (b) the proposal was negotiated at arm's length;
>
> (c) the relief provided for the class is adequate, taking into account:
>
> > (i) the costs, risks, and delay of trial and appeal;
> >
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> >
> > (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and
> >
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (d) the proposal treats class members equitably relative to each other.

The Court finds that this Settlement satisfies all requirements of Rule 23(e)(2). The Settlement provides extraordinary relief to Settlement Class Members, including significant monetary benefits to compensate for Out-of-Pocket Losses and Lost Time spent dealing with issues related to the Data Breach, valuable Identity Defense Services and Restoration Services, as well as a significant monetary commitment by T-Mobile to improve its network and data security

17

and address vulnerabilities that resulted in the Data Breach. This relief compares very favorably to settlements in other data breach class actions. The Settlement is fair, reasonable, and adequate, and should be granted final approval.

1.    **The Settlement Class Representatives and Plaintiffs' Counsel have Adequately Represented the Class (Rule 23(e)(2)(A)).**

The Court finds that the Settlement Class Representatives and Class Counsel have provided adequate representation to the Settlement Class by diligently pursuing this case in the face of numerous and substantial risks, negotiating a robust Settlement that provides Settlement Class Members with significant relief, and working on behalf of Settlement Class Members in the settlement approval process. Further, Class Counsel's view that the Settlement is fair, reasonable, and adequate, and in the best interests of the Settlement Class, supports approval of the Settlement.

In addition, the Court finds the Settlement Class Representatives have adequately represented the Settlement Class. Each of them has actively participated in the litigation, providing allegations for the Complaint, gathering information for informal and formal discovery, and working with Class Counsel in the settlement approval process —all of which was essential to Class Counsel's investigation and pursuit of the claims at issue in this action.

2.    **The Settlement was Negotiated at Arm's Length (Rule 23(e)(2)(B)).**

The Court finds the Settlement was negotiated at arm's length, without collusion. This conclusion is based on the record, the terms of the Settlement itself, the length and difficulty of the negotiations, and the involvement of a highly respected mediator, the Honorable Judge Diane M. Welsh (Ret.) of JAMS. See e.g., Marcus v. Kansas Dept. of Revenue, 209 F. Supp. 2d 1179, 1182 (D. Kan. 2002) ("When a settlement is reached by experienced counsel after negotiations in an adversarial setting, there is an initial presumption that the settlement is fair and reasonable.").

### 3. The Relief Provided for the Class is Adequate (Rule 23(e)(2)(C)).

The relief offered to Class Members in the proposed Settlement is adequate under the factors outlined in Rule 23(e)(2)(C). Each Settlement Class Member is entitled to claim benefits that are tailored to the relief sought through the litigation: recovery of up to $25,000 in Out-of-Pocket Losses that are fairly traceable to the Data Breach and/or payment for Lost Time spent dealing with issues related to the Data Breach, or an Alternative Compensation payment available without documentary proof of Out-of-Pocket Losses; two years of Identity Defense Services to help detect and remediate potential identity theft and fraud; and two years of Restoration Services including access to U.S.-based specialists in fraud resolution and identity restoration, which are available to all Settlement Class Members without making a claim. T-Mobile's incremental spending commitment of at least $150 million for data security and related technology for 2022 and 2023 to improve its network and data security and address vulnerabilities that resulted in the Data Breach is likewise an important benefit flowing to Settlement Class Member whose sensitive personal information is still maintained by T-Mobile. Moreover, Class Counsel, a group with substantial experience in leading major data breach class actions, strongly believe that the relief is fair, reasonable, and adequate. (Doc. #158). The Court may rely upon experienced counsel's judgment, which is further confirmed by considering the four specific factors enumerated in Rule 23(e)(2)(C).

### a. Factor 1: The Costs, Risks, and Delay of Trial and Appeal

Plaintiffs face significant risks and costs should they continue to litigate the case. First, most Settlement Class Members are current and former T-Mobile customers, and T-Mobile asserted that its Terms and Conditions require such customers to individually arbitrate their claims against T-Mobile. Had T-Mobile prevailed in a motion to compel arbitration, Settlement Class Members would have been unable to litigate their claims on a class-wide basis in federal court.

Second, there was a significant risk that Plaintiffs' claims would not have survived, or survived in full, on a class-wide basis after rulings at the motion to dismiss, class certification, and summary judgment stages of litigation. Third, even if Plaintiffs had prevailed throughout such stages of litigation and proceeded to trial, Plaintiffs would still have faced significant risks, costs, and delays including likely interlocutory and post-judgment appeals.

In contrast to the risks, costs, and delays posed by litigation as well as trial and possible appeals, the proposed Settlement provides certain, substantial, and immediate relief to the Settlement Class. It ensures that Settlement Class Members with valid claims will receive monetary compensation now and provides them with access to Identity Defense Services and Restoration Services, benefits that may not have been available at trial. It also requires T-Mobile to make an incremental spending commitment that will help protect Settlement Class Members' data from potential subsequent exposure. The substantial costs, risk, and delay of further litigation, trial, and appeal support a finding that the proposed Settlement is adequate.

### b. Factor 2: The Method of Distributing Relief Is Effective

The proposed distribution process will be efficient and effective. The available relief was detailed in the Notice, which lays out the benefits to which Settlement Class Members are entitled, including benefits provided regardless of whether a Settlement Class Member files a claim. The three categories of relief will be distributed as follows:

First, Settlement Class Members were able to make claims online via the Settlement website or by mail for reimbursement for Out-of-Pocket Losses that are fairly traceable to the Data Breach and/or Lost Time spent dealing with issues related to the Data Breach. Settlement Class Members need only submit a claim form on the website or by mail accompanied by reasonable documentation showing the claimed expenses to establish Out-of-Pocket Losses and/or a self-certification of their Lost Time. (Doc. 158-2). If a claim is rejected for any reason, there is also a

consumer-friendly appeals process whereby claimants will have the opportunity to cure any deficiencies in their submission or request an automatic appeal if the Settlement Administrator determines a claim is deficient in whole or part. (Doc. #158-2).

Second, Settlement Class Members will be entitled to at least two years of Identity Defense Services provided by Pango. Settlement Class Members need only visit the Settlement website and sign-up via an online form in order to claim this benefit.

Third, for at least two years all Settlement Class Members will be entitled to utilize Restoration Services offered through Pango, regardless of whether they submit a claim for losses or enroll in Identity Defense Services. This coverage is a separate benefit and permits all Settlement Class Members to have access to U.S.-based fraud resolution specialists who can assist with important tasks such as placing fraud alerts with the credit bureaus, disputing inaccurate information on credit reports, scheduling calls with creditors and other service providers, and working with law enforcement and government agencies to dispute any fraudulent transactions or credit applications.

Because Settlement Class Members may make claims through a simple online form or by mail — and have the benefit of additional services for which they need take no action, including the Restoration Services detailed above as well as the incremental spending commitment to which T-Mobile has agreed—the method of distributing the relief is both efficient and effective, and the proposed Settlement is adequate under this factor.

### c. Factor 3: The Terms Relating to Attorneys' Fees Are Reasonable

Class Counsel have requested a fee from the Settlement Fund based on the widely accepted "percentage of the benefit" approach with respect to the value of the $350 million common fund and T-Mobile's $500 million total cash commitment. (Doc. #179). After robust notice directed at the approximately 76.6 million putative class members, the Court received nine (9) objections

21

relating to attorneys' fees. The objections are before the Court and are discussed below. Importantly, the Settlement Agreement is not conditioned upon the Court's approval of the fee award or the requested service awards. (Doc. #158-1). This factor supports approval of the Settlement.

### d. Factor 4: Any Agreement Required To Be Identified Under Rule 23(e)(3)

Class Counsel have confirmed that no agreements exist other than those reflected in the Settlement Agreement. (Doc. #158-3).

### 4. The Settlement Treats Class Members Equitably Relative to Each Other (Rule 23(e)(2)(D))

The Settlement Class Members are treated equitably because they all have similar claims arising from the same data breach, and they all are treated the same under the Settlement. Fed. R. Civ. P. 23(e)(2)(D). All Settlement Class Members are eligible to claim the various benefits provided by the Settlement if they meet its requirements, including compensation for Out-of-Pocket Losses that are fairly traceable to the Data Breach, compensation for Lost Time spent dealing with issues related to the Data Breach, and free Identity Defense Services. Moreover, all Settlement Class Members — even those who do not submit claims — may access Restoration Services, and all Settlement Class Members will benefit from T-Mobile's increased spending on data security, which are consistent remedies appropriate for all Settlement Class Members.

The Settlement provides that the Alternative Cash Payment available to California Settlement Subclass Members is $100, whereas the Alternative Cash Payment available to all other Settlement Class Members is $25. (Doc. 158-2). This difference reflects the availability of statutory damages under the CCPA, a unique state law intended to provide recourse to California residents who are victims of a data breach. Cal. Civ. Code § 1798.150(a)(1)(A). That California Settlement Subclass Members may elect to receive a larger Alternative Cash Payment in lieu of reimbursement for Out-of-Pocket Losses and Lost Time does not render the proposal inequitable,

22

as there is no difference between California Settlement Subclass Members and other Settlement Class Members who are eligible to receive at least $100 of reimbursement for Out-of-Pocket Losses and Lost Time, such as those who claim at least four hours of lost time at $25 per hour.

### H. Objections to the Benefits Conferred on the Settlement Class and Objection to Notice and the Time Period in Which to Opt-Out and Object

The Court received thirteen (13) objections to the Settlement pertaining to the benefits conferred by the Settlement and/or the Notice and time period to opt-out or object. The limited number of objections to the Settlement from among the tens of millions of Settlement Class Members weighs strongly in favor of final approval. The Court has reviewed and considered all objections and now overrules them.

As an initial matter, the Court notes that filings by Richard Mills (Doc. #173), Derek Hanna (Doc. #176), John Lee Jackson (Doc. #195), and Jason Kapinos (Doc. #199) are denominated "objections" on the Court's docket but contain no substantive objections to this settlement. Mr. Kapinos timely excluded himself from the Settlement Class and is therefore not a member of the class with standing to make any objection. Yaisa Carr and James Keebler each emailed an "objection" to the administrator but did not file any objection with the Court that complies with the requirements set forth in the Preliminary Approval Order (Doc. #162) and the Notice; as such, these are not proper objections. Notwithstanding, the Court has considered these emails, which were submitted with the final approval motion. Carr's email states: "I object to attorney fees and expenses, and or amount to be shared by class members." (Doc. #211-2 at 251). Keebler's email states "[n]either side is working in good faith for the victims of the breach." (Doc. #211-2 at 253). Neither email satisfies the specificity requirement of Rule 23(e)(5)(A), and in any event similar objections are addressed below and overruled. Moreover, as addressed above, the Court overrules Objector Achermann's objection regarding standing.

The Court overrules the remaining objections for the reasons set forth below.[3]

### 1. Objections to the Benefits Conferred on the Settlement Class

A few Settlement Class Members express genuine frustration with the fact that T-Mobile compromised their personal information and the scope of the benefits made available under the Settlement. For example, Sim Rosenbaum objects that the $350 million settlement relief is insufficient to hold T-Mobile responsible and deter future data breaches. (Doc. #169). Kyungmi Ayad believes individual class members should be able to claim more than $25,000, more than 15 hours of Lost Time, and that settlement relief should be available for "the lifetime that my information is available[.]" (Doc. #194). Similarly, Yolanda Higginbotham asserts, only on her own behalf and not on behalf of any other class member, that Identity Defense Services should be free for a lifetime. (Doc. #187). Qutonia Strozier objects that the amount of recovery available to an individual through the settlement is insufficient. (Doc. #198). This objection is untimely as postmarked on December 9, 2022 and is thus invalid. Nonetheless, even if the Court were to consider the objection, it would be overruled and denied for the same reasons that the Court overrules and denies the other objections to the amount of settlement relief.

Such objections are unsurprising coming from consumers whose sensitive personal information was compromised in a criminal data breach. But they are not a basis for this Court to reject the settlement. "[I]n determining whether to approve a class action settlement, the issue is not whether everyone affected by the settlement is completely satisfied. Instead, the test is whether the settlement, as a whole, is a fair, adequate, and reasonable resolution of the class claims asserted." In re Capital One Consumer Data Sec. Breach Litig., MDL No. 1:19-md-2915 (AJT / JFA), 2022 WL 18107626, at *8 (E.D. Va. Sept. 13, 2022) (citing Skochin v. Genworth Fin., Inc.,

---

[3] The Court considers objections to the Settlement here, and takes up objections to the requested attorneys' fee separately below.

Civil Action No. 3:19cv49, 2020 WL 6532833, at *18 (E.D. Va. 2020)). "As courts routinely recognize, a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate." Keil v. Lopez, 862 F.3d 685, 696 (8th Cir. 2017); Linney v.Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."). "Objections that the settlement fund is too small for the class size, or that a defendant should be required to pay more to punish and deter future bad behavior, while understandable, do not take into account the risks and realities of litigation, and are not a basis for rejecting the settlement." Capital One, 2022 WL 18107626, at *8.

This Court has determined that the relief provided by the Settlement is "fair, reasonable, and adequate" in accordance with Rule 23(e) of the Federal Rules of Civil Procedure. The Settlement provides substantial and immediate benefits to the class at per capita amounts higher than many comparable settlements, including likely full recovery for documented Out-of-Pocket Losses. Keil, 862 F.3d at 697. Importantly, any class member who believes they suffered greater than the $25,000 individual cap on Out-of-Pocket Losses had the option to exclude themselves from them Settlement Class and pursue those damages and any other relief on an individual basis —and some class members have done so. Marshall v. Nat'l Football League, 787 F.3d 502, 513 (8th Cir. 2015) (affirming class settlement, stating that objectors "were not required to forgo what they believed to be meritorious claims — they could have opted out of the settlement to pursue their own claims, as some class members did."). Other valuable benefits made available under the settlement may not have even been recoverable at trial in any amount, including Alternative Compensation for undocumented losses of money and time, and Identity Defense Services and

Restoration Services.[4] When weighed against the risks attendant to and time required for litigation to a potential class judgment after trial, these immediate benefits strongly support the Court's finding that the settlement relief is fair, reasonable, and adequate. Keil, 862 F.3d at 697.

### 2. Objection to Notice and the Time Period In Which to Opt-Out and Object

One class member, Ashley Ingraham, complains that the time period to object or opt out was too short. However, Ms. Ingraham states that she received notice on October 21, 2022 and prepared a 24 page type-written objection which she emailed to the Court before the objection deadline. (Doc. #192 at 4). Forty-eight days (October 21 to December 8) is more than sufficient time in which to make an informed decision to object to or opt out of the settlement, and thus this objection is overruled. In re BankAmerica Corp. Sec. Litig., 210 F.R.D. 694, 708 (E.D. Mo. 2002) (three to four weeks between the mailing of class notice and the last date to object, with an additional three weeks to prepare for the settlement hearing provided enough time for class members adequately to present their objections) (collecting cases). As detailed in the administrator's declaration, the class notice satisfied due process and was "the best notice that [was] practicable under the circumstances." (Doc. 158-3); Fed. R. Civ. P. 23(c)(2)(B).

The Court also overrules Ms. Ingraham's objection that the Court-approved Notice and the Settlement Agreement do not provide required information. While the basis for the objection is

---

[4] Shanen Givone objects on behalf of herself only and not on behalf of other class members (Doc. #182). Ms. Givone's objections are overruled. She believes the amount of the "$25.00 settlement" is too low. Assuming the objection refers to the available Alternative Compensation, this settlement component is only an alternative — requiring no documentation — to up to $25,000 in Out-of-Pocket Losses and Lost Time. Ms. Givone also criticizes the use of TransUnion to provide credit monitoring data for the Identity Defense Services provided by Pango when TransUnion may have been subject to a previously reported data breach. If Ms. Givone or another class member does not want these services, she need not enroll in them, and she had the opportunity to opt out altogether. Further, Pango has assured the Court of its ability to provide the offered services, which are similar to those approved by courts in other settlements. (Doc. #158-7); In re Equifax Inc. Customer Data Sec. Breach Litig., MDL Docket No. 2800, No. 1:17-md-2800-TWT, 2020 WL 256132, at *16-17, n.16 (N.D. Ga. Mar. 17, 2020) (collecting cases, overruling objections).

not entirely clear, this objection may relate to Ms. Ingraham's professed desire for further information relating to potential adjustment of claims for cash payments on a pro rata basis (Doc. #192 at 5, 17-18). As Ms. Ingraham acknowledges, however, this potential for a pro rata decrease (or increase) of individual settlement payments was explicitly set forth in the Court-approved notice she received, and on the settlement website FAQ. This satisfies due process and Rule 23. In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig., 716 F.3d 1057, 1065 (8th Cir. 2013) ("Valid notice of a settlement agreement may consist of a very general description of settlement terms."); In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d 922, 931 (8th Cir. 2005) ("[D]ue process [is] satisfied where class members received notice of the settlement proposal and were able to argue their objections to the district court."); Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1153 (8th Cir. 1999) ("It is well settled that the notice is not required to provide a complete source of information.").

## III. ATTORNEYS' FEES, COSTS, AND EXPENSES AND SETTLEMENT CLASS REPRESENTATIVE SERVICE AWARDS

Class Counsel request a fee award of 22.5% of the $350,000,000 Settlement Fund they secured for the Settlement Class, or 15.75% of the $500 million total cash T-Mobile has committed under the Settlement, along with litigation expense reimbursement in the amount of $170,845.18 and service award payments to each Settlement Class Representative in the amount of $2,500, all to be paid from the Settlement Fund. (Docs. #179, #179-1). For the reasons set forth herein and in Plaintiffs' briefing, the Court grants the motion for attorneys' fees, costs, expenses, and service awards for Settlement Class Representatives. As set forth below, the Court overrules all objections as to attorneys' fees.

## A. Attorneys' Fees

### 1. Governing Principles

"[I]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. Fed. R. Civ. P. 23(h). "[A] lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980).

"Courts utilize two main approaches to analyzing a request for attorney fees." Johnston v. Comerica Mortg. Corp., 83 F.3d 241, 244 (8th Cir. 1996). One method — the "percentage of the benefit" method — "permits an award of fees that is equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation." Id. at 244–45. Another method — the "lodestar" method — multiplies "the hours expended by an attorney . . . by a reasonable hourly rate of compensation so as to produce a fee amount which can be adjusted, up or down, to reflect the individualized characteristics of a given action." Id. at 244. "It is within the discretion of the district court to choose which method to apply, as well as to determine the resulting amount that constitutes a reasonable award of attorney's fees in a given case." In re Life Time Fitness, Inc., Tel. Consumer Prot. Act (TCPA) Litig., 847 F.3d 619, 622 (8th Cir. 2017). "'[T]he ultimate reasonableness of the award is evaluated by considering relevant factors from the twelve factors listed in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 719–20 (5th Cir. 1974.'" Rawa v. Monsanto Company, 934 F.3d 862, at 870 (8th Cir. 2019) (quoting In re Target Corp. Customer Data Security Breach Litig., 892 F.3d 968, 977 (8th Cir. 2018)). The Johnson factors are these:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client

28

or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Target, 892 F.3d at 977 n.7.

"In the Eighth Circuit, use of a percentage method of awarding attorney fees in a common-fund case is . . . 'well established.'" In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig., 364 F. Supp. 2d 980, 991 (D. Minn. 2005) (quoting Petrovic, 200 F.3d at 1157). Indeed, some courts in this Circuit have concluded that the percentage method "may be preferable." Barfield v. Show-Me Power Elec. Co-op., No. 2:11-cv-4321NKL, 2015 WL 3460346, at *3 (W.D. Mo. June 1, 2015) (quoting West v. PSS World Med., Inc., No. 4:13 CV 574 CDP, 2014 WL 1648741, at *1 (E.D. Mo. Apr. 24, 2014)); Johnston, 83 F.3d at 245, n.8; Court Awarded Attorneys Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 255 (3rd Cir. 1985)). After all, the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation," while "in contrast, the lodestar creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 121 (2d Cir. 2005)

### 2. The Requested Fee Is Reasonable Under the Percentage of the Benefit Approach and the Johnson Factors.

The Court exercises its discretion to apply the percentage method and, upon consideration of the relevant Johnson factors, finds that a fee of 22.5% of the $350 million cash settlement fund, or 15.75% of T-Mobile's $500 million total cash commitment under the Settlement, is reasonable and warranted.

### a. Benefit Conferred on the Class

First, the Settlement represents a significant recovery for the class. "In considering a fee award, the 'most critical factor' is 'the degree of success obtained.'" <u>In re UnitedHealth Group Inc. PSLRA Litig.</u>, 643 F. Supp. 2d 1094, 1104 (D. Minn. 2009) (quoting <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 436 (1983)).

The $350 million Settlement Fund is one the largest data breach settlements in history, and it provides twice as much recovery for the Settlement Class on a per capita basis than the settlement in <u>Equifax</u>. <u>Equifax</u>, 2020 WL 256132, at \*34. The Settlement Fund is three times the size of the fund achieved for a similarly sized class in <u>Anthem</u>, where the court recognized that "[w]hether one looks at absolute or per-capita numbers, a settlement fund of $115 million for approximately 79.15 million class members is significant." <u>In re Anthem, Inc. Data Breach Litig.</u>, Case No. 15-MD-02617-LHK, 2018 WL 3960068, at \*10 (N.D. Cal. Aug. 17, 2018).

The Settlement Fund provides cash reimbursement up to $25,000 for unreimbursed lost time and out-of-pocket payments spent to avoid or recover from fraud or identity theft that is fairly traceable to the T-Mobile Data Breach. It also provides for an Alternative Payment of $25 per Settlement Class Member or $100 if the Settlement Class Member resided in California at the time of the T-Mobile Data Breach, with no requirement of documenting an out-of-pocket loss. Additionally, the Settlement Fund pays for two years of Identity Defense Services, which have a retail value of $96 per year, and two years of Restoration Services, which are available to all Settlement Class Members regardless of whether they made a claim. The Court finds that these are valuable benefits to the Settlement Class. Importantly, some of the settlement benefits —like the Alternative Compensation, Identity Defense Services, and Restoration Services — may not have even been available as a remedy at trial.

Independent of the $350 million Settlement Fund, the Settlement requires T-Mobile to make an incremental spending commitment of at least $150 million for data security and related technology, in the aggregate, for years 2022 and 2023 above its previously budgeted baseline. These are the kinds of "meaningful" business changes that justify a greater fee award because these changes will "provide[] a substantial benefit to all class members." Equifax, 2020 WL 256132, at *34. The Court considers T-Mobile's cash spending commitment in the class benefit, which totals $500 million.

### b. The Risk Involved

Class Counsel faced substantial risks. "'Courts have recognized that the risk of receiving little or no recovery is a major factor in awarding attorney fees.'" Yarrington v. Solvay Chems., Inc., 697 F. Supp. 2d 1057, 1062 (D. Minn. 2010) (quoting Xcel Energy, 364 F. Supp. 2d at 994). "Unless that risk is compensated with a commensurate award, no firm, no matter how large or well-financed, will have the incentive to consider pursuing a case such as this." Tussey v. ABB, Inc., Case No.: 06-CV-04305-NKL, 2019 WL 3859763, at *3 (W.D. Mo. Aug. 16, 2019). "The risks plaintiffs' counsel faced must be assessed as they existed in the morning of the action, not in light of the settlement ultimately achieved at the end of the day." Xcel Energy, 364 F. Supp. 2d at 994.

This Court agrees with other courts that have recognized data breach litigation is risky. See, e.g., Equifax, 2020 WL 256132, at *35; Capital One, 2022 WL 17176495, at *2; Fulton-Green v. Accolade, Inc., 2019 WL 4677954, at *8 (E.D. Penn. Sept. 24, 2019). According to Class Counsel, absent settlement T-Mobile was prepared not only to contest whether it owed a duty to the Class Members, whether Class Members had been damaged, and whether those damages were caused by the T-Mobile Data Breach. Further, T-Mobile was prepared to seek enforcement of arbitration clauses against a sizable portion of the Class. These risks, combined with the fact that

Class Counsel took this case entirely on a contingency basis, supports the requested fee. <u>Caligiuri v. Symantec Corp.</u>, 855 F.3d 860, 866 (8th Cir. 2017) (affirming fee where lower court reasoned, in part, that "[p]laintiffs' counsel, in taking this case on a contingent fee basis, was exposed to significant risk"); <u>Equifax</u>, 2020 WL 256132, at *33 ("This action was prosecuted on a contingent basis and thus a larger fee is justified."); <u>Target</u>, 892 F.3d at 977 n.7 (considering "whether the fee is fixed or contingent").

### c. The Novelty and Difficulty of the Legal and Factual Issues

Data breach litigation, particularly when it involves a breach of consumer data on a nationwide scale by a company the size of T-Mobile, is difficult and presents cutting edge issues. <u>Gordon v. Chipotle Mexican Grill, Inc.</u>, Civil Action No. 17-cv-01415-CMA-SKC, 2019 WL 6972701, at *1 (D. Colo. Dec. 16, 2019) ("Data breach cases . . . are particularly risky, expensive, and complex[.]"); <u>In re Sonic Corp. Customer Data Sec. Breach Litig.</u>, Case No. 1:17-md-2807, MDL No. 2807, 2019 WL 3773737, at *7 (N.D. Ohio Aug. 12, 2019). "The law in data breach litigation remains uncertain and the applicable legal principles have continued to evolve . . . ." <u>Equifax</u>, 2020 WL 256132, at *32.

The "novelty and difficulty of the issues" here favor approving the requested fee, particularly because the novelty and difficulty "created significant risk for Class Counsel." <u>George v. Academy Mortgage Corporation (UT)</u>, 369 F. Supp. 3d 1356, 1378 (N.D. Ga. 2019). Indeed, the risks identified above illustrate the novelty and difficulty of the issues in this case. <u>Equifax</u>, 2020 WL 256132, at *32 ("[T]his case involved many novel and difficult legal questions, such as the threshold issue of whether [the defendant] had a duty to protect plaintiffs' personal data, whether plaintiffs' alleged injuries are legally cognizable and were proximately caused by the [data] breach, . . . [and] the meaning of various state consumer protection statutes . . . .").

**d. Class Counsel's Efficient Resolution of the Litigation**

Courts also consider "the time and labor required." Target, 892 F.3d at 977 n.7. The record reflects that Class Counsel expended more than 9,100 hours prosecuting this litigation. The Court finds that to be a significant investment of time weighing in favor of the requested fee. As was true in Equifax, "the amount of work devoted to this case by class counsel likely was a principal reason that they were able to obtain such a favorable settlement at a relatively early stage." 2020 WL 256132, at *32. The alternative would have meant continued litigation and a larger lodestar (and therefore a smaller lodestar multiplier), but it would also have unnecessarily occupied judicial resources for months, if not years. Xcel Energy, 364 F. Supp. 2d at 996 ("But for the cooperation and efficiency of counsel, the lodestar of plaintiffs' counsel would have been substantially more and would have required this court to devote significant judicial resources to its management of the case.").

The Court agrees that the timeliness with which Class Counsel obtained this extraordinary relief on behalf of the Class is independently valuable and weighs in favor of the requested fee. Courts in this Circuit have recognized that providing expeditious relief — particularly extraordinary relief like the Settlement here — is valuable to the Settlement Class. Yarrington, 697 F. Supp. 2d at 1062 ("[T]he Settlement Class will receive settlement benefits faster than they would receive awards obtained after trial and a likely appeal."); Xcel Energy, 364 F. Supp. 2d at 1001 ("[C]ontinued litigation, which could have extended several years, would have delayed recovery by the class. Instead, the settlement immediately confers benefits.").

Indeed, "time limitations imposed by the client or the circumstances" is a factor weighing in favor of a larger fee award. Target, 892 F.3d at 977 n.7; Equifax, 2020 WL 256132, at *33 ("Priority work done under significant time pressure is entitled to additional compensation and justifies a larger percentage of the recovery."). Efficient resolution in data breach litigation is

33

particularly important. First, the injunctive and identity protection components of the Settlement can have the most impact when delivered as near as possible to the breach. Second, Class Members can be harmed in the future, which likewise can be addressed through early implementation of the Identity Defense Services provided under the Settlement. Further, even Class Members that do not make a claim will have access to the Restoration Services, which will provide immediate access to help any Class Member who suffers fraud or identity theft.

Finally, Class Counsel anticipate spending at least another 3,000 hours after filing their motion for fees litigating appeals, administering the Settlement, managing the claims process, and responding to inquiries from Class Members. As with the substantial amount of time Class Counsel expended to efficiently resolve this litigation, the significant commitment of time in the future supports the requested fee. Equifax, 2020 WL 256132, at *32 (finding that "the work that class counsel . . . estimate they will do" with respect to "managing the claims process and administering the settlement" "weighs in favor of approval of the requested fee" in light of "the magnitude of the settlement and the number of claims").

### e. The Experience, Reputation, and Ability of the Attorneys, and the Skill Requisite to Perform the Legal Service Properly

Both the Class and T-Mobile are represented by highly skilled and reputable attorneys, who are experienced in litigating data breach cases. Tussey, 2019 WL 3859763, at *3. Some of Class Counsel here represented the class in Equifax, where in the Court observed "plaintiffs' legal team includes lawyers from some of the most experienced and skilled class action law firms in the country, who have collectively handled more than 50 data breach cases, including all of the most significant ones." 2020 WL 256132, at *33. The Equifax court observed the necessity of experienced and skilled class counsel "given the scope of the case and the quality of the opposition." Id. Further, Class Counsel are collectively responsible for litigating and resolving groundbreaking privacy and data breach cases, including Equifax, Capital One, Home Depot,

34

Anthem, Yahoo!, and Target. (Doc. #158-3). Class Counsel has been recognized by courts and publications for their knowledge and experience in privacy and data breach cases. This factor weighs in favor of the requested fee.

### f. The Reaction of the Class

Out of a Settlement Class of approximately 76.6 million individuals, the Court received only nine objections to the requested fee. "The extremely small number of objectors is further evidence of the reasonableness of the requested fee." Equifax, 2020 WL 256132, at *35.

### g. The Comparison to Similar Cases

Finally, the requested fee is comparable to or less than awards in other class actions that have resulted in similar settlements. In assessing this factor, this Court looks to similar fee awards in class actions within the Eighth Circuit generally, fee awards in similar litigation in other circuits, and may also consider attorney fee studies. Xcel Energy, 364 F. Supp. 2d at 998.

In the Eighth Circuit, courts have "frequently awarded attorneys' fees ranging up to 36% in class actions." Huyer v. Buckley, 849 F.3d 395, 399 (8th Cir. 2017); Caligiuri, 855 F.3d at 865 (33.33% of $60 million common fund); Custom Hair Designs by Sandy et al., v. Central Payment Co., LLC, 8:17CV310, 2022 WL 3445763, at *5 (D. Neb. Aug. 17, 2022) (33.33% of $84 million common fund); In re Airline Ticket Commission Antitrust Litig., 953 F. Supp. 280, 285-86 (D. Minn. 1997) (33.3% of $86 million common fund); In re Monosodium Glutamate Antitrust Litig., No. CIV. 00MDL1328PAM, 2003 WL 297276, at *3 (D. Minn. Feb. 6, 2003) (30% of $81 million); Xcel Energy, 364 F. Supp. 2d at 998-99 (awarding 25% of $80 million common fund and noting "courts in this circuit and this district have frequently awarded attorney fees between twenty-five and thirty-six percent of a common fund in other class actions").

Other courts have awarded similar percentages in data breach class actions. Anthem, 2018 WL 3960068, at *14-16 (approving a 27% fee award on a $115 million common fund). Class

Counsel are seeking a similar percentage of the Settlement Fund to the one approved in <u>Equifax</u> (and affirmed by the Eleventh Circuit on appeal), despite delivering the Class nearly double the recovery on a per capita basis here. <u>Equifax</u>, 999 F.3d at 1281 ("The District Court awarded $77.5 million in attorney's fees, which it found is 20.36 percent of the $380.5 million settlement fund. . . . 20.36 percent is well within the percentages permitted in other common fund cases, and even in other megafund cases."). Class Counsel also provided evidence that their requested fee here — measured as a percentage of the Settlement Fund — would be below the 23.5% average fee awarded in the five largest data breach class action settlements to date.[5]

These decisions from within the Eighth Circuit and in similar litigation align with the findings of prominent surveys of percentage fee awards. <u>See, e.g.</u>, Theodore Eisenberg, Geoffrey Miller, & Roy Germano, *Attorney Fees in Class Action: 2009–2013*, 92 N.YU. L. Rev. 937, 952 (2017) (finding that the mean fee percentage in consumer class actions was 26% between 2009 and 2013); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (finding that the mean and median fee percentages for settlements between $250 million and $500 million are 17.8% and 19.5%, respectively).

Here, even if the fee is based only on the cash fund, ignoring all other monetary and non-monetary benefits, the requested percentage (22.5%) is substantially less than the percentages commonly awarded in the Eighth Circuit, and it is less than or comparable to the percentages awarded in other data breach cases. The Court also considers the additional $150 million T-Mobile

---

[5] In addition to this case, Class Counsel identified the largest data breach settlements including <u>Equifax</u> (awarding 20.4% of a $380 million cash fund); <u>Capital One</u> (28% of a $190 million cash fund); <u>Yahoo!</u> (19.4% of a $117.5 million cash fund); and <u>Anthem</u> (27% of a $115 million cash fund). Including the requested 22.5% of the cash fund here, the average award for all five cases equals 23.5%.

is required to spend on data security over the next two years, making the request 15.75% of the class benefits, a percentage that compares even more favorably to the similar cases.

### 3. Lodestar Crosscheck

Finally, while Eighth Circuit courts have discretion to "crosscheck" the reasonableness of a percentage fee by referencing counsel's lodestar, a lodestar crosscheck is "not required." Keil, 862 F.3d at 701. Under the facts of this case, a lodestar crosscheck has limited value because it might overemphasize the amount of hours counsel expended on this litigation, penalize counsel for obtaining remarkable relief quickly, and lead to setting fees in a formulaic way in contravention of the flexible, multifactor Johnson analysis. Rawa, 934 F.3d at 870.[6] The Court therefore need not employ a lodestar crosscheck to assess the reasonableness of Class Counsel's requested fee.

Although a lodestar crosscheck is not required, doing so here confirms the requested fee is reasonable. Class Counsel reported spending 8,225 hours through filing their fee application, and that they reasonably anticipate spending at least another 3,000 hours over the next several years.[7] They suggest this additional time is a conservative estimate based on their experience in other similar cases and considering they spent an additional 890 hours during the brief period from November 1, 2022 through January 6, 2023. Thus, the Court finds that Class Counsel's current and anticipated lodestar of $8,173,534 reported with their motion for fees is a conservative calculation for use in a lodestar crosscheck. The Court further finds that the hours and billing rates

---

[6] Professor Fitzpatrick notes that "the majority of courts are wise to reject" the lodestar crosscheck because it "harms class members by creating bad incentives for class counsel. In particular, the lodestar crosscheck reintroduces the very same undesirable consequences of the lodestar method that the percentage method was designed to correct in the first place." Doc. 179-2, Declaration of Brian T. Fitzpatrick, ¶ 28.

[7] Courts often consider class counsel's anticipated future lodestar in assessing requested attorneys' fees. Equifax, 2020 WL 256132, at *32, *39; Reyes v. Bakery & Confectionery Union & Indus. Int'l Pension Fund, 281 F. Supp. 3d 833, 856–57 (N.D. Cal. 2017); In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., 2017 WL 1047834, at *5 (N.D. Cal. Mar 17, 2017). The Court finds it is appropriate to do so here.

reported by Class Counsel are reasonable and necessarily incurred in pursuit of the results obtained for the class.

The requested fee would result in a maximum 9.6 multiplier on Class Counsel's lodestar, which would be reasonable under all the circumstances and considering the Johnson factors. "Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers." Beckman v. KeyBank, N.A., 293 F.R.D. 467, 481 (S.D.N.Y. 2013). A 9.6 multiplier is consistent with this approach, and is well within the range of multipliers approved by other courts. Americas Mining Corp. v. Theriault, 51 A.3d 1213, 1252 (Del. 2012) (66 multiplier); In re Merry-Go-Round Enters. Inc., 244 B.R. 327, 335 (Bankr. D. Md. 2000) (19.6 multiplier); Stop & Shop Supermarket Co. v. SmithKline Beecham Corp., No. Civ.A. 03-4578, 2005 WL 1213926, at *16–18 (E.D. Pa. May 19, 2005) (15.6 multiplier); In re Doral Fin. Corp. Sec. Litig., No. 1:05-cv-04014-RO, at ¶ 9(f) (S.D.N.Y. Jul. 20 17, 2007) (ECF 65) (10.26 multiplier); Farrell v. Bank of Am. Corp., N.A., 827 F. App'x 628, 630, 636 (9th Cir. 2020) (10.15 multiplier). Considering the extraordinary relief Class Counsel expediently obtained in the face of potentially drawn-out litigation with severe risks and an uncertain outcome, the Court's lodestar crosscheck confirms Class Counsel's requested fee is warranted.

## B. Objections to Attorneys' Fees

Nine of the submitted objections relate to the requested attorneys' fees [8] — those of Objectors Brian Wolfe, Jon Shastid, Carolin Lane, Shanen Givone, Raymond McKown, Cassie Hampe, Ashley Ingraham, Robert Calhoun, and Connie Pentz. (Docs. #170, #171, #172, #182,

---

[8] Several of the objections were submitted based on the Notice's statement that Class Counsel may seek attorneys' fees "not to exceed 30%" of the Settlement Fund. However, Class Counsel ultimately sought a lower fee of 22.5%. The Court construes these objections as objecting to the lower fee and overrules them for the reasons stated in this Order.

#184, #189, #192, #196, #197).[9] Upon application of the percentage method, consideration of the relevant Johnson factors, and for the further reasons set forth below, the requested fee is reasonable and each of the fee objections is overruled.

### 1. Objection that the Court Should Adopt a Megafund or Sliding Scale Approach

Primarily, three objectors—Cassie Hampe, Connie Pentz, and Carolin Lane—urge the Court to adopt, in Hampe's words, an approach that "accounts for the economies of scales for megafund settlements." Docs. #189 at 13; Docs. #172, #197. Hampe proffers the Second and Ninth Circuits' "megafund" approaches and the Seventh Circuit's "sliding scale" approach. See Wal-Mart Stores, 396 F.3d at 106; In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 943 (9th Cir. 2011); In re Synthroid Mktg. Litig. ("Synthroid I"), 264 F.3d 712, 721 (7th Cir. 2001). However, the multifactor approach, as opposed to the megafund and sliding scale approaches, are applied in the Eighth Circuit. Target, 892 F.3d at 977 & n.7 (discussing the factors in Johnson, 488 F.2d at 717–19). At least one court in the Eighth Circuit specifically rejected the argument that the "courts traditionally accounted for economies of scale by awarding lower fees as the size of the fund increases or set a multiplier cap." Xcel Energy, 364 F. Supp. 2d at 997.

The multifactor approach is also supported by the law in multiple other jurisdictions. The Eleventh Circuit, which also assesses the reasonableness of attorneys' fees using the factors in Johnson, recently rejected a nearly identical fee objection. Equifax, 999 F.3d at 1280. Like the Eighth Circuit, the Eleventh Circuit's "precedent did not require the District Court to expressly consider the economies of scale in a megafund case in deciding how much to award in attorney's fees." Id. None of the Johnson factors "explicitly address the economies of scale in a megafund case." Id. The court declined to adopt the approach or add it as an additional factor to the Johnson

---

[9] In separate orders, the Court granted Plaintiffs' motions to strike the Hampe and Pentz objections, but nonetheless fully addresses the substance of those objections in this Order.

factors, "questioning the value" of "considering" economies of scale in settlements because it "may lack rigor" and "create 'perverse incentives,' as it may encourage class counsel to pursue 'quick settlements at sub-optimal levels.'" Id. (quoting 5 William B. Rubenstein, *Newberg on Class Actions*, §§ 15:80, 15:81).

The Third Circuit has similarly rejected a proposed requirement that "a district court must apply a declining percentage reduction in every settlement involving a sizable fund" and affirmatively "cautioned against overly formulaic approaches in assessing and determining the amounts and reasonableness of attorneys' fees." In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 303 (3d Cir. 2005). Like the Eleventh Circuit, the Third Circuit "recognized criticism of the declining percentage principle . . . 'by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply.'" Rite Aid, 396 F.3d at 302 n.12 (quoting In re Cendant Corp. Litig., 264 F.3d 201, 284 n.55 (3d Cir. 2001)). Likewise, as Judge Lungstrum observed in In re Syngenta AG MIR 162 Corn Litigation, this approach "fails to provide the proper incentive for counsel and is fundamentally at odds with the percentage-of-the-fund approach favored by the Tenth Circuit." 357 F. Supp. 3d 1094, 1114 (D. Kan. 2018).

Indeed, awarding lower percentages in larger settlements has been criticized, in part because doing so undercuts the virtues of the percentage approach and fails to recognize that such cases are inherently riskier. As one court explained in awarding a fee representing 31.33% of a $1.06 billion fund:

> [D]ecreasing the percentage awarded as the gross class recovery increases . . . is antithetical to the percentage of the recovery method . . . the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained. By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little.

Allapattah Servs., Inc. v. Exxon Corp., 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) (citation omitted). To the contrary, a court can certainly "view[] the size of the fund to be a factor weighing in favor of approval of the fee request." Rite Aid, 396 F.3d at 303; see also Target, 892 F.3d at 977 n.7 (considering "the amount involved and the results obtained" as a factor for courts to weigh in favor of a fee application).

Accordingly, the Court declines to adopt either a megafund or sliding scale approach. These objections are therefore overruled.

## 2. Objection that the Fee Percentage Is Too High

In a related objection, Hampe and Pentz contend the percentage fee requested by Class Counsel is too high, citing one 2010 study of attorneys' fees in class action settlements, which found that the mean and median percentage fee awards for settlements above $175 million are 12% and 10.2%, respectively. (Doc. #189 at 16) (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: 1993–2008*, 7 J. Empirical L. Stud. 248, 265 (2010) ("Eisenberg & Miller 2010")); (Doc. #197 at 3). In this regard, Hampe argues the $150 million T-Mobile must spend on data security and related technology above its 2022 and 2023 levels should be disregarded, reasoning without factual support that T-Mobile would have spent the money anyway to avoid future litigation.[10] Thus, Hampe asserts in her objection that the Court should apply the median 10.2% fee from Eisenberg & Miller 2010, and award Class Counsel a lower fee of $35.7 million based on the $350 million cash portion of the Settlement. (Doc. #189 at 17).

---

[10] Objector Ingraham contends the funds do not benefit the whole class insofar as they do not benefit former customers, but this ignores the fact that T-Mobile maintains the data of former customers.

41

This objection is overruled. In addition to the reasons stated below, the Court finds that the requested fee — whether viewed as 15.75% of the $500 million class benefit under the Settlement or 22.5% of the $350 million Settlement Fund — is reasonable.

As a threshold matter, the Court has already found it appropriate to consider the $150 million as a benefit to the Settlement Class. Courts "routinely consider" precisely this kind of benefit, and especially in the data breach context. See Equifax, 2020 WL 256132, at *38; Anthem, 2018 WL 3960068, at *28. Hampe did not contest this point in her response to Plaintiffs' motion for final approval (Doc. #220) or at the approval hearing, and it is appropriate to apply the percentage method to the entire $500 million class benefit. Thus, even applying Hampe's proposed 10.2%-12% fee taken from Eisenberg & Miller 2010 — which the Court declines to do — a fee of at least $51 to $60 million would be warranted.

Turning to the substance of the objection, other studies, including from Eisenberg and Miller, have found much higher mean and median fee award percentages. See Theodore Eisenberg et. al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 943–44, 947, 953 (2017) ("Looking only at cases with recoveries larger than $100 million, we see that mean and median fee percentages varied from a low of 16.6% in 2009 to a high of 25.5% in 2011[.]"); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (finding the "mean and median fees for settlements between $250 million and $500 million are 17.8% and 19.5%."). Applying those higher percentages of 16.6% and 25.5% to the entire $500 million class benefit would result in a fee of at least $83 million to more than $127 million, which is higher than Class Counsel's request. Doc. 179 at 8 (requesting 15.75% of T-Mobile's total cash commitment of $500 million, or $78.75 million). In and of itself, this demonstrates the high degree of variability and imprecision that would be involved in attempting to adopt Hampe's proposed approach. Moreover, the more fundamental flaw is that

42

neither objector cites Eighth Circuit authority that adopts or applies their proposed approach — in contrast to that approach, the Eighth Circuit considers the Johnson factors. See Target, 892 F.3d at 977 & n.7.

Similarly, the Seventh Circuit does not follow the approach suggested by the objectors and rejected a similar argument in Silverman v. Motorola Sols., Inc., 739 F.3d 956, 958 (7th Cir. 2013). There, the objector "contend[ed] that the judge abused her discretion . . . because fees substantially less than 27.5% have been awarded in other cases." Id. The Seventh Circuit acknowledged that "[d]ata show that 27.5% is well above the norm for cases in which $100 million or more changes hands," but rejected the objection, explaining that "[i]t does not necessarily follow that 27.5% is legally excessive." Id. Rather, other factors predominate: In the Seventh Circuit, the primary concern is for the "structure of the award." Id. at 959 (affirming the fee award). The Seventh Circuit applies an approach that could result in a larger fee in this case if T-Mobile's full $500 million monetary commitment is taken into account. The Seventh Circuit awards fees based on declining percentages for certain bands of recovery—i.e., 30% of the first $10 million, 25% of the next $10 million, 22% of the band from $20 million to $46 million, and 15% of all amounts over $46 million. In re Synthroid Marketing Litig. ("Synthroid II"), 325 F.3d 974, 980 (7th Cir. 2003); see also Synthroid I, 264 F.3d at 721 (commenting favorably on a similar scale). Applying that scale to the $500 million class benefit here would produce a fee of approximately $79 million.

The Ninth Circuit is in accord. Its analysis begins with a "benchmark" of 25%. See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1048 (9th Cir. 2002). While Ninth Circuit courts can depart from the benchmark percentage, doing so is a fact-intensive endeavor that "must be supported by findings that take into account all of the circumstances of the case. . . . '[C]ourts cannot rationally apply any particular percentage — whether 13.6 percent, 25 percent or any other number — in the abstract, without reference to all the circumstances of the case.'" Id. (quoting In

43

re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1298 (9th Cir. 1994)). In fact, the Ninth Circuit has repeatedly "declined to adopt a bright-line rule" requiring "that percentage-based fee awards *must* decline as the size of class recovery increases to account for economies of scale in megafund settlements." In re Optical Disk Drive Prods. Antitrust Litig., 959 F.3d 922, 933 (9th Cir. 2020) (citing Vizcaino, 290 F.3d at 1047).

It is thus unsurprising that Ninth Circuit courts routinely award percentage fee awards in megafund cases that are similar to, or higher than, that requested by Class Counsel here. See, e.g., In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig., 768 F. App'x 651, 654 (9th Cir. 2019) (20% fee on a $208 million fund); Vizcaino, 290 F.3d at 1050 (28% fee on a nearly $100 million common fund); *Anthem*, 2018 WL 3960068, at *27 (27% fee on a $115 million fund).

Ultimately, the effort to peg all large settlements to an average identified in a single 2010 study is effectively an invitation to impose a megafund cap, which this Court has declined to do. See Synthroid I, 264 F.3d at 718 (disapproving district court's imposition of "megafund cap" of 10% in cases involving settlements over $75 million). This objection is accordingly overruled.

### 3. Objection that the Multiplier Is Too High

Some objectors contend that the requested fee results in too large a multiplier of Class Counsel's lodestar. (Docs. #171, #172, #184, #189, #196, #197). The Court disagrees, as explained above.

Additionally, the Court rejects Hampe's and Pentz's contention that Rawa, 934 F.3d at 870 — affirming an award resulting in a 5.3 multiplier — effectively limits the range of allowable multipliers in the Eighth Circuit. The Court disagrees. While the Rawa court noted that the 5.3 multiplier was "high," it also clarified that "it does not exceed the bounds of reasonableness" and it said nothing about a cap or limit. Id. As the Xcel Energy court explained, the multiplier identified in a lodestar crosscheck "need not fall within any pre-defined range," and does not require

44

"mathematical precision nor bean counting but instead is determined by considering the unique circumstances of each case." Xcel Energy, 364 F. Supp. 2d at 999.[11] After all, a discretionary lodestar crosscheck "does not trump the court's primary reliance on the percentage of common fund method." Id. (citing Rite Aid, 396 F.3d at 307; Petrovic, 200 F.3d at 1157). Nor does it trump Eighth Circuit precedent requiring application of the Johnson factors in determining an appropriate fee. Accordingly, this objection is overruled.

### 4. Objection that the Court Should Apply the Lodestar Approach

Pentz urges the Court to apply the lodestar approach instead of the percentage approach. (Doc. #197). The Court declines to do so. As discussed above, the percentage of the benefit approach is the favored and "recommended" method for assessing the reasonableness of a requested attorneys' fee in a common fund, and the lodestar approach has many "deficiencies." Johnston, 83 F.3d at 245, n.8. This objection is overruled.

### 5. Objection that Class Counsel Must Submit a More Detailed Lodestar Submission

Hampe asserts that a more detailed lodestar submission is necessary. Class Counsel provided a detailed explanation of their lodestar and tasks undertaken in the litigation that led to the Settlement before the Court. Since a lodestar crosscheck is not required, see Keil, 862 F.3d at 701, the Court does not require a more detailed lodestar submission, cf. Equifax, 999 F.3d at 1280

---

[11] Ms. Hampe also cited a recently decided case from the Federal Circuit involving a multiplier over 18. (Doc. #225) (citing Health Republic Ins. Co. v. United States, 58 F.4th 2023 WL 1113158, at *5 (Fed. Cir. Jan. 31, 2023)). In Health Republic, the Federal Circuit reversed and required a lodestar crosscheck, because the opt-in class notice in that case *promised* class members that plaintiffs' counsel's fee would be determined in part on a lodestar crosscheck. Id. at *6. The Court declined to impose a blanket rule requiring a lodestar crosscheck absent such a promise (id. at n.2) and distinguished Eighth Circuit precedent that no crosscheck is required under the facts of this case. Id. at *5, citing Keil v. Lopez, 862 F.3d 685, 701 (8th Cir. 2017). And, unlike the Claims Court in Health Republic, the Court here has carefully considered the fee motion under the applicable Johnson factors and conducted a lodestar crosscheck to confirm the reasonableness of the fee.

45

n.26. Further, since the Court references Class Counsel's lodestar only for the discretionary crosscheck of a percentage award, greater detail is unnecessary. See Xcel Energy, 364 F. Supp. 2d at 999; see also Petrovic, 200 F.3d at 1157. This objection is overruled.

### 6. Objection that the Court Must Exclude the Declaration of Brian Fitzpatrick

Hampe challenges Fitzpatrick's Declaration under Daubert v. Merrell Dow Pharmaceuticals, Inc.,509 U.S. 579 (1993) as an "inadmissible legal opinion." (Doc. #189 at 23).

A similar challenge to Professor Fitzpatrick's testimony was recently rejected in part because Fitzpatrick's opinions "are not legal conclusions." Van v. LLR, Inc., No. 3:18-cv-0197-HRH, 2021 WL 2942755, at *3 (D. Alaska July 13, 2021). Rather, they "are the result of [his] research[.]" Id. Other cases have reached this same conclusion when experts have opined on fees. Equifax, 2020 WL 256132, at *44 ("[T]he issues [related to attorneys' fees and final approval of a settlement] on which the experts opine are both relevant and inherently factual in nature, not disputed legal principles, and the declarations are helpful as to these matters.").

Further, Daubert is meant to "protect *juries* from being swayed by dubious scientific testimony." In re Zurn Pex Plumbing Prods. Liab. Litig., 644 F.3d 604, 613 (8th Cir. 2011). Consequently, "Daubert and Rule 702 are only tangentially relevant" in final approval proceedings. In re Target Corp. Customer Data Security Breach Litig., MDL No. 14-2522, 2015 WL 7253765, at *4 (D. Minn. Nov. 17, 2015) (reversed and remanded on other grounds). Other courts hold that "Daubert does not govern at the final approval stage," including where an expert offers an opinion about attorneys' fees. Equifax, 2020 WL 256132, at *43. "At the final approval stage, the weight of authority from the circuits makes clear that district courts have discretion to use 'whatever is necessary . . . in reaching an informed, just and reasoned decision.'" Id. (quoting Mars Steel Corp. v. Cont'l Bank N.A., 880 F.2d 928, 938 (7th Cir. 1989)). "Final approval is not

46

a trial on the merits, and the Court need not be a gatekeeper of evidence for itself." Id.; In re Zurn, 644 F.3d at 613.

To be sure, "legal conclusions [are] for the court to make." Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995). Professor Fitzpatrick provides the Court helpful information to make those conclusions. See Target, 2015 WL 7253765, at *4 ("Even if the affidavit contained impermissible legal conclusions, the Court is capable of separating those conclusions from [the] helpful and insightful factual descriptions of the settlement process in this case."). This objection is therefore overruled.

### 7. Objections Related to the Johnson Factors

Finally, the fee objections all assert to some extent that the requested fee is unreasonable. As the Court has found, the Johnson factors support a finding that the requested fee is reasonable and appropriate. The Court has carefully considered and overrules all of these objections.

The Court therefore grants Class Counsel's motion and approves a reasonable fee award of $78.75 million, to be paid from the Settlement Fund.

### B. Litigation Costs and Expenses

Class Counsel also requests reimbursement from the Settlement Fund of $170,845.18 in litigation expenses incurred prosecuting this case. "Reasonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionately by those class members who benefit by the settlement.'" Yarrington, 697 F. Supp. 2d at 1067 (citation omitted). There is no objection to Class Counsel's request for reimbursement of litigation costs and expenses. The Court agrees that Class Counsel kept costs and expenses at a reasonable level, and therefore approves their request for reimbursement of costs and expenses.

47

**C. Service Awards**

Class Counsel also request that each Settlement Class Representative be awarded a service award of $2,500. There is no objection to Class Counsel's request for service awards.

Courts routinely approve service awards to compensate class representatives for the services they provide and the risks they incur on behalf of the class. See Caligiuri, 855 F.3d at 867 ("[C]ourts in this circuit regularly grant service awards of $10,000 or greater."); Huyer v. Njema, 847 F.3d 923, 941 (8th Cir. 2017) (affirming approval of settlement that included $10,000 service awards to named plaintiffs). The factors for deciding whether the service awards are warranted are: "(1) actions the plaintiffs took to protect the class's interests, (2) the degree to which the class has benefited from those actions, and (3) the amount of time and effort the plaintiffs expended in pursuing litigation." Caligiuri, 855 F.3d at 867.

The Court finds that the Settlement Class Representatives performed important work on the case, including time-consuming gathering of facts and documents, assisting Class Counsel with the allegations in the consolidated amended complaint, and reviewing the Settlement Agreement and Benefits Plan. That work materially advanced the litigation, protected the Class's interests, and ultimately made this historic Settlement possible. Accordingly, the Court approves the requested service awards of $2,500 for each Settlement Class Representative.

## IV. FINAL JUDGMENT

The Court held a Final Approval Hearing on January 20, 2023. After argument from the Parties, the two objectors' counsel who were present, and after considering all objections, the Court concludes as follows: (1) this matter is certified as a class action for settlement purposes pursuant to Fed. R. Civ. P. 23(b)(3) and (e); (2) the Settlement is approved as fair, reasonable, and adequate, and finally approved pursuant to Fed. R. Civ. P. 23(e); (3) the Complaint in this MDL, including all claims asserted in the Complaint, is dismissed with prejudice pursuant to the terms of the

48

Settlement Agreement; and (4) Settlement Class Members, except those who timely and validly excluded themselves, are bound by the releases set forth in the Settlement Agreement. The putative class members who timely and validly excluded themselves from the Settlement Class are listed in Exhibit A hereto. Further, because the Settlement is being reached as a compromise to resolve this litigation, including before a final determination of the merits of any issue in this case, no individual listed on Exhibit A may invoke the doctrines of res judicata, collateral estoppel, or any state law equivalents to those doctrines in connection with any further litigation against Defendants in connection with the Released Claims. The Parties are ordered to carry out the Settlement as provided in the Settlement Agreement.

## A. Releases

As of the Effective Date, all Releasing Parties, on behalf of themselves, their heirs, assigns, beneficiaries, executors, administrators, predecessors, and successors, and any other person purporting to claim on their behalf, shall be deemed to have, and by operation of this Order and Judgment shall have, expressly, generally, absolutely, unconditionally, and forever released and discharged any and all Released Claims against the Released Parties and any of their current, former, and future affiliates, parents, subsidiaries, representatives, officers, agents, directors, employees, contractors, shareholders, vendors, insurers, reinsurers, successors, assigns, and attorneys, except for claims relating to the enforcement of the Settlement or the Agreement.

As of the Effective Date, the Released Parties shall be deemed to have, and by operation of this Order and Judgment shall have, released and discharged Settlement Class Members, Settlement Class Representatives, and Class Counsel from any claims that arise out of or relate in

any way to the institution, prosecution, or settlement of the Action, except for claims relating to the enforcement of the Settlement or the Agreement or claims for breach of this Agreement.[12]

## B. Continuing Jurisdiction

The Court hereby dismisses this Action with prejudice, except the Court retains jurisdiction over this action and the Parties, attorneys and Settlement Class Members for all matters relating to the Settlement, including (without limitation) the administration, interpretation, scope, effectuation or enforcement of the Settlement Agreement and this Order. Without limiting the generality of the foregoing, any dispute concerning the Settlement Agreement, including, but not limited to, any suit, action, arbitration or other proceeding by a Settlement Class Member in which the provisions of the Settlement Agreement are asserted as a defense in whole or in part to any claim or cause of action or otherwise raised as an objection, shall constitute a matter relating to this Order. Nothing in this Order shall preclude any action to enforce the terms of the Settlement Agreement.

## C. Dismissal

This Action, including all claims asserted in the Complaint, is hereby dismissed on the merits, in its entirety, with prejudice and without costs, with the sole exception for individual claims brought by individuals who timely and validly requested exclusion from the Settlement Class as identified in Exhibit A. The Settlement Class Representatives and Settlement Class Members are hereby permanently barred and enjoined (including during the pendency of any

---

[12] On the eve of the fairness hearing, T-Mobile publicly announced the occurrence of a new, different data breach. See T-Mobile SEC Form 8-K, January 19, 2023, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001283699/cd07a3a7-4109-47fe-a6c0-f16a300a3bf7.pdf. T-Mobile's counsel confirmed on the record at the fairness hearing that the release here has no bearing on any claim related to the data breach announced on January 19, 2023, and nothing contained in this Court's order may be used to preclude claims related to the new data breach announced on January 19, 2023.

appeal taken from this Order) from commencing, pursuing, maintaining, enforcing, or prosecuting, either directly or indirectly, any Released Claims in any judicial, administrative, arbitral or other forum. This permanent bar and injunction is necessary to protect and effectuate the Settlement Agreement, this Order, and this Court's authority to effectuate the Settlement Agreement, and is ordered in aid of this Court's jurisdiction and to protect its judgments. The Court finds, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delay, and directs the Clerk to enter final judgment.

       IT IS SO ORDERED.


DATED: <u>June 29, 2023</u>                    <u>/s/ Brian C. Wimes</u>
                                                 JUDGE BRIAN C. WIMES
                                                 UNITED STATES DISTRICT COURT